CBS Law
Christopher J. Bou Saeed (SBN 295774)
Email: chris@thecbslaw.com
633 W 5th Street, 26th Floor
Los Angeles, CA 90071
Tel: (213) 605-5838

CARTER LAW FIRM, APC
COREY CARTER (SBN 269611)
Email: corey@themainstreetattorney.com
27240 Turnberry Lane, Suite 200
Valencia, CA 91355
Tel: (323) 825 – 5529 Fax: (323) 450 - 2222
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YVONNE MENDOZA, RAYMUND MENDOZA, and MARJORIE MARINO, as Administrators of the Estate of Rommel Mendoza, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, public entity, OFFICER DANIEL HARTY, SERGEANT J. HARDACKER, SERGEANT DAN WIDMAN, OFFICER SCOTT, OFFICER JUAN GALVAN, OFFICER SIERRA, OFFICER KELLY, and DOES 1-30, <br><br> Defendants. | No. 2:21-cv-04614 <br><br> COMPLAINT FOR DAMAGES AND JURY TRIAL DEMAND <br> 1. Violation of Civil Rights – Excessive Force – 42 U.S.C. § 1983 <br> 2. Violation of Civil Rights – Unlawful Custom, Policy, Practice, Training, and Supervision – 42 U.S.C. § 1983 <br> 3. Battery <br> 4. Negligence <br> 5. Violation of Bane Act – Cal. Civ. Code § 52.1 |

## **COMPLAINT FOR DAMAGES**

COME NOW, Plaintiffs YVONNE MENDOZA, RAYMUND MENDOZA, and MARJORIE MARINO, in their representative capacity as Administrators of the Estate of Rommel Mendoza, deceased, for their Complaint against CITY OF LOS

ANGELES, OFFICER DANIEL HARTY, SERGEANT J. HARDACKER, SERGEANT DAN WIDMAN, OFFICER SCOTT, OFFICER JUAN GALVAN, OFFICER SIERRA, OFFICER KELLY, and DOES 1-30, inclusive, and allege as follows:

## INTRODUCTION

1.    This civil rights and state tort action seeks to hold accountable those responsible for the shooting and killing of Rommel Mendoza ("Rommel") by Los Angeles Police Department Officer James Harty on May 27, 2020.

2.    Rommel was a Filipino-American from a large, close-knit family.

3.    Rommel's mother, siblings, extended family, and friends mourn his needless death.

4.    Defendant Daniel Harty's shooting of Rommel was unreasonable, unnecessary, and cruel.

5.    Consequently, this civil action seeks compensatory and punitive damages from Defendants for the violation of various rights under the United States Constitution in connection with Defendant Daniel Harty's shooting of Rommel.

## JURISDICTION AND VENUE

6.    This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs assert claims arising under the laws of the United States including 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendment of the United States Constitution.

7.    Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside in this district and all incidents, events, and occurrences giving rise to this action occurred in this district.

## PARTIES

8.     At all relevant times, Plaintiffs YVONNE MENDOZA, RAYMUND MENDOZA, and MARJORIE MARINO, as Administrators of the Estate of Rommel Mendoza, deceased (collectively "Plaintiffs") were Filipino-Americans residing in Los Angeles County.

9.     Decedent Rommel Mendoza was a Filipino-American residing in Los Angeles County who died on May 27, 2020.

10.     Plaintiffs are Rommel's siblings and, as administrators of the Estate of Rommel Mendoza pursuant to Letters of Special Administration issued by the Superior Court of California, his personal representatives.

11.     At all relevant times, Defendant CITY OF LOS ANGELES ("LOS ANGELES") is and was a duly organized public entity, existing under the laws of the State of California.

12.     LOS ANGELES is a chartered subdivision of the State of California with the capacity to be sued.

13.     LOS ANGELES is responsible for the actions, omissions, policies, procedures, training, practices, and customs of its various agents and agencies, including the LOS ANGELES POLICE DEPARTMENT ("LAPD") and its agents and employees.

14.     At all relevant times, Defendant LOS ANGELES was responsible for assuring that the actions, omissions, policies, procedures, training, practices, and customs of the LAPD and its employees and agents complied with the laws of the United States and of the State of California.

15.     At all relevant times, LOS ANGELES was the employer of Defendants OFFICER DANIEL HARTY, SERGEANT J. HARDAKER, SERGEANT DAN WIDMAN, OFFICER SCOTT, OFFICER JUAN GALVAN, OFFICER SIERRA, OFFICER KELLY, and DOES 1-30.

16.     Defendant DANIEL HARTY ("OFFICER HARTY"), serial number

41155, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by fatally shooting Rommel.

   a. Officer Harty, assigned to the Homeless Outreach and Proactive Engagement Team ("HOPE") unit, had received additional, specialized training–beyond that of the average patrol officer–on interacting with individuals suffering from mental illness.

   b. As part of this specialized training, Officer Harty received instruction on responding to persons with edged weapons during divisional training days.

   c. Specifically, Officer Harty recently attended a HOPE unit training which featured a scenario of a man with a sword who waives it around and charges officers.

   d. At this training, Officer Harty was taught how to respond, set up, and fire his service weapon in such a situation.

   e. Officer Harty had also attended other divisional shoot days that featured demonstrations of the dangerousness of edged weapons in addition to incident debriefs involving persons with edged weapons.

17. Defendant SERGEANT J. HARDAKER ("SERGEANT HARDAKER"), serial number 37579, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

18. Defendant SERGEANT DAN WIDMAN ("SERGEANT WIDMAN"), serial number 31146, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and

ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

19.    Defendant OFFICER SCOTT ("OFFICER SCOTT"), serial number 31460, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

20.    Defendant JUAN GALVAN ("OFFICER GALVAN"), serial number 33913, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

21.    Defendant OFFICER SIERRA ("OFFICER SIERRA"), serial number 36102, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

22.    Defendant OFFICER KELLY ("OFFICER KELLY"), serial number 32664, is and was an officer of the LAPD, acting under color of state law in the course and scope of his employment, and with the complete authority and ratification of his principals, Defendant LOS ANGELES, when he violated Rommel's civil rights by directing the fatal shooting of Rommel.

23.    Defendants DOES 1-15 were at all relevant times herein employees and officers for LOS ANGELES and the LAPD.

24.    At the time of the incident, DOES 1-15 were acting under color of state law within the course and scope of their duties and with the complete authority and ratification of their principals, Defendant LOS ANGELES and LAPD.

25. Defendants OFFICER HARTY, OFFICER SCOTT, OFFICER GALVAN, OFFICER SIERRA, OFFICER KELLY and DOES 1-15 are collectively referred to herein as "OFFICER DEFENDANTS".

26. Defendants CITY OF LOS ANGELES were long aware of the propensity of their police officers, including OFFICER DEFENDANTS, to callously and recklessly use excessive force against members of the public, particularly minority groups, and engage in misconduct.

27. The following incidents illustrate the use of excessive deadly force, all of which are pursuant to these unconstitutional customs, policies, and practices of the LAPD:

    a. On April 14, 2019, LAPD Officers Jaime Luna and Bradley Nielson used excessive force against William Crawford, a 47-year-old male, when they shot and killed him. At the time of the shooting, William Crawford posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

    b. On October 29, 2018, LAPD Officers used excessive force when they shot and killed Albert Ramon Dorsey, a 30-year-old male. At the time of the shooting, Albert Ramon Dorsey posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

    c. On August 7, 2018, LAPD Officers James Muniz and Melchor Oronez used excessive force against Santos Nunez-Garcia, a 70-year-old elderly man, when they shot and killed him. At the time of

the shooting, the elderly man posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

d. On February 25, 2018, LAPD Officers shot and killed an unidentified 32-year-old male. At the time of the shooting, the male posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

e. On January 14, 2018, LAPD Officer Edward Artiaga used excessive force against Christian Escobedo, a 22-year-old male, when he shot and killed him. At the time Officer Artiaga fired, Christian Escobedo posed no threat of death or serious bodily injury to the shooting officer, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

f. On December 30, 2017, LAPD Officers Alvaro Carlos, Mathew Matzkin, Steve Norris, and Peter Tulagan used excessive force when they shot and killed Oscar Sandoval, a 39-year-old male. At the time of the shooting, Oscar Sandoval posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

g. On July 27, 2017, LAPD Officer Edward Agdeppa used excessive force when he shot and killed Jerauld Hammond, a 46-year-old

male. At the time Officer Agdeppa fired, Jerauld Hammond posed no threat of death or serious bodily injury to the shooting officer, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

h. On March 25, 2017, LAPD Officers Ivan Garcia, Benjamin Hearst, Nicholas Becerra, Elieser Domingo used excessive force when they shot and killed Juan Avila, a 35-year-old male. At the time of the shooting, Juan Avila posed no threat of death or serious bodily injury to the shooting officers, other officers on scene, or anyone else. The Board of Police Commissioners determined that the pre-shooting tactics were outside department policy.

28.     Defendants SERGEANT HARDAKER, SERGEANT WIDMAN, and DOES 16-30 are supervisory deputies and/or policy makers for LOS ANGELES who were acting under color of state law within the course and scope of their duties and with the complete authority and ratification of their principals, Defendant LOS ANGELES and LAPD.

29.     Defendants OFFICER HARTY, SERGEANT HARDAKER, SERGEANT WIDMAN, OFFICER SCOTT, OFFICER KELLY, OFFICER GALVAN, OFFICER SIERRA, and DOES 1-30 are sued in their individual capacities.

30.     The true names and capacities of DOES 1-30 are unknown to Plaintiffs, who otherwise sue these Defendants by such fictitious names.

31.     Plaintiffs will seek leave to amend this Complaint to show the true names and capacities of these Defendants when they have been ascertained.

32.     Each of the fictitiously named Defendants is responsible in some manner for the conduct or liabilities alleged herein.

33. This is an action for damages and such other relief as may be consistent with state and federal law, to redress violations of the Plaintiffs' rights protected by the United States Constitution by persons acting under color of state law.

34. At all times mentioned herein, each and every separate Defendant was the agent of each and every other Defendant and had the legal duty to oversee and supervise the hiring, training, conduct, and employment of each and every Defendant.

35. All of the acts complained of herein by Plaintiffs against Defendants were done and performed by said Defendants by and through their authorized agents, servants, and/or employees, all of whom at all relevant times herein were acting within the course, purpose, and scope of said agency, service, and/or employment capacity.

36. Defendants and their agents ratified all of the acts complained of herein.

37. On or about November 23, 2020 Plaintiffs timely served a comprehensive claim for damages with LOS ANGELES pursuant to applicable sections of the California Government Code including § 910.4.

38. On February 2, 2021, LOS ANGELES rejected these claims.

**FACTS**

39. Plaintiffs repeats and re-alleges each and every allegation in paragraphs 1 through 38 of this Complaint with the same force and effect as if fully set forth herein.

**THE INITIAL RESPONSE**

40. On May 27, 2020, at approximately 11:35am, two LAPD officers responded to a call of a neighbor dispute at the 6400 block of Elmer Avenue in North Hollywood.

41.     The two LAPD officers met with the husband of the reporting party.

42.     The husband told the two LAPD officers that Rommel had damaged his vehicle with a stick earlier that morning.

43.     The husband also stated that upon his confronting Rommel, Rommel claimed to be a police officer and displayed a badge.

44.     Finally, the husband told the two LAPD officers that he believed Rommel possibly suffered from mental illness and therefore he did not want to press charges.

45.     The two officers spoke with another neighbor.

46.     This neighbor relayed second-hand information that Rommel pointed a firearm at a nearby neighbor weeks earlier.

47.     The two officers were unsure of the validity of the second neighbor's account.

48.     The two officers then contacted a third neighbor to ask whether they've observed Rommel exhibit signs of mental illness, but no one answered the door.

49.     Certain that the current incident did not involve any firearms, the two LAPD officers decided to contact Rommel in his home.

50.     Upon their approach to Rommel's door, the two LAPD officers noted furniture strewn about the side yard with multiple trash barrels, excess property, and various objects on the ground.

51.     When the officers reached Rommel's door and announced their presence, Rommel yelled incoherently and asked if they wanted to fight.

52.     One of the officers responded they did not want to fight, just talk.

53.     Rommel uttered more incoherent statements.

54.     Rommel exited his residence with a cloth on his head, sandals on his feet, and a knife in his right hand.

55.     Rommel repeatedly told the officers to shoot him and ranted

nonsensically.

56.    Rommel held the knife down to the ground and did not lift it above his head.

57.    The officers drew their firearms but did not use them.

58.    The officers believed Rommel exhibited the signs of a mental health disorder.

59.    The officers moved to Elmer Avenue and called for backup.

60.    Rommel followed the officers onto Elmer Avenue.

61.    The officers backed away to create distance from Rommel.

62.    Rommel stopped following the officers.

63.    While on Elmer Avenue, Rommel sobbed, screamed hysterically, referenced God, uttered incoherent statements, and yelled unintelligibly.

64.    One of the officers repeatedly told Rommel to relax.

65.    Rommel returned to his residence.

## THE TACTICAL RESPONSE

66.    Approximately thirty (30) LAPD officers responded to Elmer Avenue, including a police helicopter.

67.    Over police radio, an officer broadcasted that Rommel was armed with a sword and wanted for assault with a deadly weapon on a police officer.

68.    Sergeant Hardaker, a supervisor, arrived and was informed that Rommel had returned to his residence.

69.    Sergeant Hardaker recalled a prior incident allegedly involving Rommel and a rifle.

70.    Sergeant Hardaker requested officers armed with long-range rifles to respond to the scene.

71.    Sergeant Hardaker directed all officers to don helmets and take cover behind police vehicles' ballistic doors.

72. Sergeant Hardaker advised a newly arrived supervisor, Sergeant Widman, that Rommel had assaulted two officers with a deadly weapon and was potentially armed with a rifle.

73. At least one of the officers who arrived on scene, Officer Harty, received information that Rommel was armed with a rifle.

74. Officers in the police helicopter broadcasted that Rommel was in his backyard holding a knife.

75. Over seventeen (17) officers and several police cars grouped together to the south of Rommel's home on Elmer Avenue (the "Vanguard").

76. Sergeants Hardaker and Widman discussed the possibility of crossfire as armed officers were also positioned to the north on Elmer Avenue.

77. Sergeants Hardaker and Widman discussed the possibility of Rommel barricading himself inside the home.

78. Sergeants Hardaker and Widman did not discuss the possibility that Rommel was suffering a mental health crisis.

79. Sergeants Hardaker and Widman agreed to divvy up command responsibilities.

80. Sergeants Hardaker and Widman agreed that Sergeant Hardaker would assume the role of Incident Commander and Sergeant Widman would manage tactics.

81. Sergeant Hardaker was concerned that officers in the Vanguard did not have enough cover should Rommel be armed with an AR-15 rifle.

82. Neither Sergeant Hardaker nor Sergeant Widman requested the LAPD's Mental Evaluation Unit.

83. Neither Sergeant Hardaker nor Sergeant Widman requested the LAPD's System-wide Mental Assessment Response Team.

84. At least three of the officers in the Vanguard were armed with scoped

rifles: Officers Harty, Scott, and Kelly.

85.  Officer Harty positioned himself behind the driver-side door of a police vehicle and disengaged the "safety" mechanism on his rifle.

86.  Officer Scott took up position several feet away from Officer Harty, behind a grey vehicle parked on the curb.

87.  Officer Kelly stood several feet behind Officers Scott and Harty.

88.  Only two officers in the Vanguard were armed with "less-lethal" weaponry.

89.  Officer Luna, armed with a beanbag shotgun, was positioned behind the passenger-side door of the same police vehicle that Officer Harty used for cover.

90.  Officer Suarez-Alvarez, armed with a 40mm less-lethal launcher, was next to Officer Luna.

### ROMMEL'S EXIT FROM THE HOUSE

91.  Approximately ten (10) to fifteen (15) minutes after walking back into his home, Rommel exited onto Elmer Avenue wearing sandals and holding a knife and a cooking pan lid.

92.  Rommel alternatively sobbed, screamed hysterically, referenced God, walked back and forth, and yelled unintelligibly.

93.  Rommel was over one-hundred (100) feet away from the officers in the Vanguard.

94.  Officer Harty, aiming his scoped rifle at Rommel, immediately declared, "I got him! I got him!"

95.  The police helicopter circled above Elmer Avenue at low attitude.

96.  Frequent radio communications broadcasted through every officer's radio equipment.

97.  Officer Sierra, who was standing next to Officer Harty, told Sergeant Hardaker, "Hey, let's get a beanbag up here or a 40."

98. Officer Harty, peering through his rifle scope, declared, "I got a good shot on him," and inquired who would be the designated cover officer.

99. No officer replied to Officer Harty's question.

100. Officer Sierra again told Sergeant Hardaker, "Hey, let's get a 40 up here."

101. Sergeant Hardaker responded that there was an officer, Officer Suarez-Alvarez, armed with a 40 mm less-lethal weapon on the passenger side of the police vehicle next to Officers Sierra and Harty.

102. Officer Sierra told Sergeant Hardaker, "Bring him up here, bring that 40 up here." Sergeant Hardaker complied and had Officer Suarez-Alvarez come to the driver's side of the police vehicle, next to Officers Harty and Scott.

103. Sergeant Hardaker admonished the officers around Officer Suarez-Alvarez, including Officers Scott, Sierra, and Harty, to back up and remain in cover.

104. Officer Scott, aiming his rifle at Rommel on Elmer Avenue, asked the officer behind him, Officer Galvan, to "[f]ind out from the Sergeant what's our threshold, how far are we gonna let him go?"

105. Officer Scott was referring to how far Rommel would be allowed to walk before the LAPD would shoot him.

106. Officer Galvan turned toward Sergeant Hardaker and yelled, "Searg, how far we gonna let him go?"

107. Sergeant Hardaker did not respond to Officer Galvan's question.

108. Officer Scott remained facing forward while aiming his rifle at Rommel.

109. After receiving no response from Sergeant Hardaker, Officer Galvan turned back to Officer Scott and asked, "Do we hit him with a 40?"

110. As Officer Galvan finished his question, Officer Scott spoke over him and said, "Hey, Juan! I'm saying the white SUV is our threshold!"

111.  Officer Galvan immediately turned to the other officers, including Officer Harty, and yelled, "Hey, white SUV is the threshold!"

112.  The officers were referring to a white SUV parked approximately eighty (80) feet in front of them on the east side of Elmer Avenue.

113.  Sergeant Hardaker responded to Officer Galvan's declaration of the white SUV as the threshold by saying, "Ok."

114.  Sergeant Hardaker then walked up to Sergeant Widman and several other officers and said, "We'll keep the white SUV as the threshold."

115.  Officer Harty yelled out, "Let's pick a DCO among the three of us!"

116.  Officer Scott asked Officer Galvan whether the sergeant "copied" his designation of the white SUV as the threshold.

117.  Officer Galvan then confirmed that Sergeant Hardaker had done so.

118.  Officer Scott repeated out loud "White SUV is the threshold!" to ensure every officer was aware of the established threshold for shooting Rommel.

119.  Officer Galvan pointed at the proposed threshold and yelled out to the officers around him, "The white SUV on the right there!"

120.  Officer Sierra responded, "Ok!"

121.  No officers in the Vanguard, including Sergeants Hardaker and Widman, questioned the concept of a "threshold" or sought clarification of its meaning.

122.  Officers Sierra then asked, "Who's DCO?" and Officer Harty immediately repeated the question.

123.  Officer Sierra responded, "Scott, you got it? That Scott? Scott is DCO."

124.  As Officer Sierra finished his statement, Officer Harty spoke over him and said, "I'll take it! I have good background!"

125.  Rommel turned his back to the officers, ran a few steps north on Elmer Avenue, turned back south, and haphazardly walked toward the Vanguard.

126. Two police vehicles over from Officer Harty, Sergeant Widman ordered Officer Doyle to issue commands to Rommel using a police vehicle's public announcement ("PA") system.

127. Officers Sierra and Kelly ordered Officer Suarez-Alvarez to the front of the Vanguard, next to Officer Harty, by saying "40 up. 40 up."

128. Officer Suarez-Alvarez positioned himself right next to Officer Harty.

129. Officer Suarez-Alvarez did not announce his presence nor that of his less-lethal weapon.

130. As Officer Suarez-Alvarez took aim at Rommel, Officer Kelly put a hand on Officer Suarez-Alvarez's shoulder.

131. Rommel was approximately one-hundred feet away from the Vanguard and walking slowly southbound.

132. The effective range of the less-lethal launcher held by Officer Suarez-Alvarez is five (5) to one-hundred and five (105) feet.

133. Officer Kelly asked Officer Suarez-Alvarez, "Can you hit him from here with the 40? Can you hit him from here?"

134. Officer Suarez-Alvarez responded, "I don't think so" and declined to fire his less-lethal weapon.

135. Every officer's radio crackled with frequent dispatch communications as the police helicopter loudly circled overhead at low altitude.

136. Meanwhile, Officer Doyle's commands to Rommel over the PA system grew louder and more intense as multiple officers began shouting their own commands to Rommel.

137. Officer Galvan yelled, "Hey, wanna try to hit him with the 40 first!? Yea?"

138. Centering his rifle scope's crosshairs over Rommel's chest, Officer Harty exclaimed, "I got him! I got him!"

139. Officer Kelly said, "If he gets within range, hit him!"

140. Officer Galvan screamed, "Hit him! Hit him! Do it now! Do it now!"

141. Similarly, Officer Kelly screamed, "Go! Go! Go! Go!"

142. Based on his training and the establishment of the white SUV as a threshold for the use of deadly force, Officer Harty fired his rifle and struck Rommel in the chest from approximately eighty (80) feet away.

143. Almost simultaneously, Officer Suarez-Alvarez fired his less-lethal launcher and missed.

144. No other officer fired their weapon.

145. Rommel immediately fell to the ground and rolled onto his back.

146. He laid unresponsive on the street.

147. Seemingly unaware that Officer Harty shot Rommel with his rifle, officers did not render medical aid to Rommel.

148. Instead, officers placed him in handcuffs.

149. Rommel was pronounced dead at the scene at 12:28pm.

150. The aforesaid acts and omissions of defendants were done knowingly, intentionally, and for the purpose of depriving Plaintiffs and Rommel of their constitutional rights in reckless and callous disregard of the same, and by reason thereof, plaintiffs claim exemplary and punitive damages against each individual defendant (and not against defendant LOS ANGELES) in an amount according to proof.

## FIRST CLAIM FOR RELIEF

### (Violation of Civil Rights – Excessive Force Under Color of Law, 42 U.S.C. § 1983)

### [Plaintiffs in their representative capacity against Defendant HARTY]

151. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 150 of this Complaint with the same force and effect as if fully set forth

herein.

152. On May 27, 2020, Defendant HARTY fatally shot Rommel in the chest from approximately eighty (80) feet away.

153. This caused Rommel great bodily injury, suffering, and death.

154. The lethal force applied to Rommel by Defendant HARTY was in excess of the amount of force a reasonable police officer would have used under similar circumstances.

155. All actions alleged herein were undertaken by Defendant HARTY as a police officer under color of state law.

156. Defendant HARTY's use of deadly force was both excessive and unreasonable under the circumstances.

157. Rommel had the right under the Fourth and Fourteenth Amendments of the United States Constitution to be free from excessive force while being detained and/or arrested by Defendant LOS ANGELES and the LAPD.

158. The acts and omissions of Defendant HARTY violated the rights of Rommel under the Fourth and Fourteenth Amendments of the United States Constitution to be free from excessive force while being detained or arrested.

159. Plaintiffs, as Rommel's personal representatives, have the right and standing to assert Rommel's claim for this violation of his Fourth and Fourteenth Amendment rights.

160. The conduct of Defendant HARTY was willful, wanton, malicious, and done with reckless disregard for the rights and safety of Rommel, and therefore warrants imposition of exemplary and punitive damages.

161. Plaintiffs also seek attorney fees under this claim.

## SECOND CLAIM FOR RELIEF
**(Unlawful Custom, Policy, Practice, Training, and Supervision – 42 U.S.C. § 1983)**

**[Plaintiffs in their representative capacity against Defendant LOS ANGELES]**

162.    Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 161 of this Complaint with the same force and effect as if fully set forth herein, including the allegations that the actions of Defendant HARTY, as a LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officer acting under color of state law, deprived Rommel of his rights under the United States Constitution.

163.    The training policies of Defendant LOS ANGELES and LOS ANGELES POLICE DEPARTMENT with respect to the use of lethal force were not adequate to prevent violations of law by its employees, and defendant LOS ANGELES and LOS ANGELES POLICE DEPARTMENT did not adequately train its police officers to handle the usual and recurring situations with which they must deal. This includes but is not limited to:

a.    Permitting LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers to use lethal force while, at the same time, failing to adequately train LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers when and how to use lethal force.

b.    Failing to adequately supervise and control LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers known, or who reasonably should have been known, to be using unnecessary or excessive force.

c.    Failing to adequately supervise and train LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers known, or who reasonably should have been known, to be employing unconstitutional practices, customs, and/or policies such as using excessive force and establishing "thresholds" for the use of force, including deadly force.

d.    Permitting LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers to interact with those exhibiting signs of mental illness

while, at the same time, failing to adequately train LOS ANGELES and LOS ANGELES POLICE DEPARTMENT officers when and how to interact with those exhibiting signs of mental illness.

164. Plaintiffs are informed and believe, and thereon allege, that Defendant LOS ANGELES and LOS ANGELES POLICE DEPARTMENT maintained, enforced, tolerated, ratified, permitted, acquiesced in, and/or applied policies, training regimes, practices, and customs related to the detention and arrest of persons, including those exhibiting signs of mental illness, with deliberate indifference, and conscious and reckless disregard for the safety, security, and constitutional and statutory rights of Rommel, including the right to be free from unreasonable seizures and excessive force under the Fourth and Fourteenth Amendments.

165. The failure of Defendant LOS ANGELES and LOS ANGELES POLICE DEPARTMENT to prevent violations of law by its employees and provide adequate training, supervision, and policy oversight caused the deprivation of Rommel's rights by Defendant HARTY; that is, the Defendants' failure to adequately train and prevent violations of law by its employees is so closely related to the deprivation of Rommel's rights as to be the moving force that caused the ultimate injury.

166. The policies of Defendants LOS ANGELES and LOS ANGELES POLICE DEPARTMENT to inadequately train and supervise their police officers amounted to a deliberate indifference to the predictable fact that the policies, customs, and practices governing application of deadly force would result in violation of rights accorded by the Fourth and Fourteenth Amendment of the United States Constitution.

167. By reason of the acts and omissions of Defendants, Plaintiffs were required to and did retain an attorney to institute and prosecute this action and to

render legal assistance to Plaintiffs so that they may vindicate Rommel's loss and impairment of rights and by reason thereof, Plaintiffs demand payment by Defendants of damages and a reasonable sum for attorney's fees.

## THIRD CLAIM FOR RELIEF

### Battery

**[Plaintiffs in their representative capacity against Defendants HARTY and LOS ANGELES]**

168. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 167 of this Complaint with the same force and effect as if fully set forth herein.

169. Defendant HARTY, while working as a police officer for LOS ANGELES, and acting within the course and scope of his duties, intentionally, unreasonably, and unnecessarily shot Rommel with a firearm causing great bodily injury and death.

170. This action was an unreasonable use of force against Rommel, performed with a willful and conscious disregard of his rights and safety, to which he did not consent, and thus constituted battery against Rommel.

171. Defendant HARTY'S battery caused Rommel extreme pain, suffering, and loss of life.

172. Plaintiffs are informed and believe and thereon allege that the act of the individual Defendant was willful, malicious, intentional, oppressive, reckless and/or were done in willful and conscious disregard of the rights, welfare, and safety of Rommel, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at trial.

173. As a result of his conduct, Defendant HARTY is liable for Rommel's injuries and death.

174.  Plaintiffs bring this claim as Rommel's personal representatives and seek survival damages under the law.

175.  Defendant LOS ANGELES is vicariously liable for the wrongful, intentional and/or negligent acts of Defendant HARTY pursuant to California Government Code § 815.2, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

## FOURTH CLAIM FOR RELIEF
### Negligence
### [Plaintiffs in their representative capacity against all Defendants]

176.  Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 175 of this Complaint with the same force and effect as if fully set forth herein.

177.  Defendants owed a duty of care toward Rommel and were required to use reasonable diligence to ensure that Rommel was not harmed by Defendants' acts or omissions.

178.  Defendants' actions and omissions constituted a breach of their duty of care to Rommel, including but not limited to:

    a.  The failure to request appropriate personnel and resources, including the Mental Evaluation Unit, System-wide Mental Assessment Response Team, and/or those trained on effectively interacting with persons exhibiting signs of mental illness, upon knowledge and/or observation of Rommel's exhibition of signs of mental illness;

    b.  The failure to train officers how to interact with those exhibiting the signs of mental illness;

c. The failure to deescalate or attempt to deescalate the interaction with Rommel;

d. The failure to communicate and/or attempt to communicate with Rommel upon his retreat back into his home beyond the issuance of commands from a low-flying police helicopter;

e. The unnecessary and escalatory staging of dozens of armed officers around Rommel's home;

f. The transmission of erroneous information that Rommel was armed with a rifle;

g. The failure to train officers how to legally detain persons armed with edged weapons;

h. The failure to communicate clear roles and responsibilities to officers in situations involving persons with edged weapons;

i. The failure to effectively communicate when particular uses of force are authorized;

j. The failure to train officers when and how to use legally force, including the use of deadly force;

k. The failure to plan for detaining Rommel without the use of force, including deadly force;

l. The unreasonable and unjustified use of force, including deadly force, against Rommel;

m. The failure to properly evaluate employee qualifications and performance during hiring, retention, and assignment of its employees, including the individual defendants; and

n. The failure to properly train, supervise, and discipline employees, including the individual Defendants.

179. Defendants' conduct caused Rommel, without limitation, extreme pain

and suffering, loss of life, and enjoyment of life.

180. As a result of their conduct, Defendants are liable for Rommel's injuries, either because they were integral participants in the negligence, or because they failed to intervene to prevent these violations.

181. Plaintiffs bring this claim as Rommel's personal representatives and seek survival damages under the law and exemplary damages against individual defendants.

182. Defendant LOS ANGELES is vicariously liable for the wrongful, intentional and/or negligent acts of Defendant HARTY pursuant to California Government Code § 815.2, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

## FIFTH CLAIM FOR RELIEF

### Violation of Bane Act (Cal. Civ. Code § 52.1)

### [Plaintiffs in their representative capacity against all Defendants]

183. Plaintiffs repeat and re-allege each and every allegation in paragraphs 1 through 182 of this Complaint with the same force and effect as if fully set forth herein.

184. As alleged herein, Defendants interfered by threats, intimidation, or coercion with Rommel's rights under state and federal laws and the state and federal constitution, including, without limitation, the right to be free from excessive force, unreasonable search and seizure, false arrest, the right to due process, and the right to bodily integrity, including their rights under Civil Code § 43, Penal Code §§ 149, 240, and 242, and their rights under the Fourth and Fourteenth Amendments to the United States Constitution and their rights under Article 1, Sections 1, 7, and/or 13 of the California Constitution.

185. Defendants' conduct caused Rommel extreme pain and suffering, and loss of life.

186. As a result of their conduct, Defendants are liable for Rommel's injuries, either because they were integral participants in the misconduct or because they failed to intervene to prevent these violations.

187. As a direct and legal result of Defendants' acts and omissions, including the establishment of a threshold for the use of force, including the use of deadly force, Rommel suffered damages, including, without limitation, loss of earnings and earning capacity, loss of enjoyment of life, pain and suffering, physical injuries and sickness, emotional distress, medical expenses, funeral and burial expenses, attorney's fees, costs of suit, other pecuniary losses not yet ascertained.

188. Plaintiffs are informed and believe and thereon allege that the acts of the individual Defendants were willful, malicious, intentional, oppressive, reckless and/or were done in willful and conscious disregard of the rights, welfare, and safety of Plaintiffs, thereby justifying the awarding of punitive and exemplary damages in an amount to be determined at trial against individual defendants.

189. Plaintiffs bring this claim as Rommel's personal representatives and seek survival damages under the law.

190. Defendant LOS ANGELES is vicariously liable for the wrongful, intentional and/or negligent acts of Defendant HARTY pursuant to California Government Code § 815.2, which provides that a public entity is liable for the injuries caused by its employees within the scope of the employment if the employee's act would subject him or her to liability.

## **Request for Relief**

WHEREBY Plaintiffs request entry of judgment in their favor against all Defendants as follows:

1.  For compensatory damages, including survival damages under federal and state law, in the amount to be proven at trial in excess of $15,000,000;

2.  For punitive damages according to proof from each defendant;

3.  For interest;

4.  For reasonable attorney's fees and litigation expenses.

5.  For Plaintiffs' costs of suit; and

6.  For any additional relief deemed proper by the court.

## JURY TRIAL DEMAND

Plaintiffs hereby respectfully demands a trial by jury in this action pursuant to Rule 38 of the Federal Rules of Civil Procedure.

CBS LAW

DATE: June 4, 2021                    By: /s/ Christopher J. Bou Saeed
                                      **Christopher J. Bou Saeed**
                                      **Attorney for Plaintiffs**