# Deposition Transcript

Case Number: 2:21-cv-04614-KS
Date: June 21, 2022

In the matter of:

# Mendoza, et al. v City of Los Angeles, et al.

## SERGEANT JASON HARDAKER

**CERTIFIED COPY**

Reported by:
Rebecca A. Graziano
CSR No. 14407



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**Exhibit 14 - P. 96**

1               UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA

2

  YVONNE MENDOZA; RAYMUND MENDOZA;  )
3 and MARJORIE MARINO, as           )
  Administrators of the Estate of  )
4 ROMMEL MENDOZA,                   )
                                    )
5          Plaintiffs,              )
                                    )
6 vs.                               )Case No.
                                    )2:21-cv-04614-KS
7 CITY OF LOS ANGELES, a public     )
  entity; OFFICER DANIEL HARTY;     )
8 SERGEANT J. HARDAKER; SERGEANT    )
  DAN WIDMAN; OFFICER SCOTT;        )
9 OFFICER JUAN GALVAN; OFFICER      )
  SIERRA; OFFICER KELLY; and DOES   )
10 1-30,                            )
                                    )
11         Defendants.              )

12

13        ********************************
          REMOTE VIDEOTAPED DEPOSITION OF
              SERGEANT JASON HARDAKER
14                June 21, 2022
          ********************************

15

16        SERGEANT JASON HARDAKER, produced as a

17   witness at the instance of the Plaintiffs, was

18   duly sworn and deposed in the above-styled and

19   numbered cause on June 21, 2022, from 12:06 p.m.

20   to 4:24 p.m. CST, stenographically reported,

21   pursuant to the Federal Rules of Civil Procedure

22   and the provisions stated on the record.

23

  Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24                Texas CSR 9306
                  California CSR 14407
25                Illinois CSR 084.004659

**Exhibit 14 - P. 97**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1                    A P P E A R A N C E S

 2     (all attendees appearing via remote videoconference)

 3
       REPRESENTING THE PLAINTIFF:
 4
        Mr. Christopher J. Bou Saeed
 5      CBS LAW
        633 West 5th Street, 26th Floor
 6      Los Angeles, California  90071
        (213) 605-5838
 7      chris@thecbslaw.com

 8
       REPRESENTING THE DEFENDANT, CITY OF LOS ANGELES:
 9
        Ms. Colleen R. Smith
10      CITY ATTORNEY'S OFFICE
        200 North Main Street, Sixth Floor, City Hall East
11      Los Angeles, California  90012
        (213) 978-7027
12      colleen.smith@lacity.org

13
       REPRESENTING THE DEFENDANT, OFFICER DANIEL HARTY:
14
        Ms. Deann Rivard
15      MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
        801 South Figueroa Street, 15th Floor
16      Los Angeles, California  90017
        (213) 624-6900
17      dyr@manningllp.com

18
       REPRESENTING THE DEFENDANT, SERGEANT J. HARDAKER:
19
        Mr. Kevin E. Gilbert
20      ORBACH HUFF SUAREZ & HENDERSON, LLP
        6210 Stoneridge Mall Road, Suite 210
21      Pleasanton, California  94588
        (510) 999-7908
22      kgilbert@ohhlegal.com

23
       THE VIDEOGRAPHER/VIDEOCONFERENCE TECHNICIAN:
24
        Mr. Eli Wheeler
25
```

**Exhibit 14 - P. 98**

SERGEANT JASON HARDAKER                                          JOB NO. 274522
JUNE 21, 2022

```
 1                          INDEX
                                                    PAGE
 2

 3     EXAMINATION BY MR. BOU SAEED....................   5

 4

 5

 6                         EXHIBITS

 7   NUMBER          DESCRIPTION                      PAGE

 8   Exhibit 1       Volume 1 policies...................  31

 9   Exhibit 2       Body-worn camera footage............. 116

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SERGEANT JASON HARDAKER                              JOB NO. 274522
JUNE 21, 2022

```
  1              PROCEEDINGS

  2         (On the record at 12:06 p.m. CST)

  3              THE VIDEOGRAPHER:  Good morning.

  4    We are now on the record at 10:06 a.m.

12:06  5    Pacific time on June 21st, 2022, to begin

  6    the deposition of Sergeant J. Hardaker in

  7    the matter of Mendoza versus City of

  8    Los Angeles, et al.  This case is venued

  9    in the United States District Court,

12:06 10    Central District of California.  The case

 11    number is 2:21-cv-04614-KS.

 12              The deposition is taking place via

 13    the Steno Connect platform.  The legal

 14    videographer is Eli Wheeler here on behalf

12:06 15    of Steno, and the court reporter is Becky

 16    Graziano, also here on behalf of Steno.

 17              Would Counsel please identify

 18    yourselves and state whom you represent.

 19              MR. BOU SAEED:  Good morning.

12:06 20    Chris J. Bou Saeed for the plaintiffs.

 21              MR. GILBERT:  Good morning.  Kevin

 22    Gilbert for the deponent and defendant,

 23    Sergeant Hardaker.

 24              MS. SMITH:  Good morning.  Colleen

12:06 25    Smith for the defendant City of
```

**Exhibit 14 - P. 100**

```
 1          Los Angeles.

 2                  MS. RIVARD:  Good morning.  Deann

 3          Rivard for defendant Daniel Harty.

 4                  THE VIDEOGRAPHER:  Thank you,

12:07  5          Counsel.

 6                  Would the reporter please swear in

 7          the witness.

 8                      (Witness duly sworn.)

 9                  SERGEANT JASON HARDAKER,

12:07 10     being first duly sworn, testified as follows:

11                          EXAMINATION

12     BY MR. BOU SAEED:

13      Q     Good morning, Sergeant Hardaker.

14      A     Good morning, sir.

12:07 15      Q     Would you please state your name?

16      A     Sergeant Jason Hardaker.

17      Q     Sergeant Hardaker, have you ever had a

18     deposition taken of yourself before?

19      A     No.

12:07 20      Q     Have you ever testified in court before?

21      A     Yes.

22      Q     Approximately how many times have you

23     testified in court?

24      A     Greater than 20.

12:07 25      Q     Do you understand that you have a duty to
```

SERGEANT JASON HARDAKER                                   JOB NO. 274522
JUNE 21, 2022

| | | |
|---|---|---|
| | 1 | Q      Sure. |
| | 2 | What kind of firearm were you armed |
| | 3 | with on May 27th, 2020? |
| | 4 | A      A Smith & Wesson M&P pistol. |
| 12:16 | 5 | Q      On May 27th, 2020, did you require any |
| | 6 | corrective vision apparatus, for example, glasses |
| | 7 | or contact lenses? |
| | 8 | A      No. |
| | 9 | Q      I want to go into your background and |
| 12:17 | 10 | training, Sergeant Hardaker. |
| | 11 | What year did you enter into the |
| | 12 | police academy? |
| | 13 | A      2005. |
| | 14 | Q      Approximately how old were you in 2005? |
| 12:17 | 15 | A      23. |
| | 16 | Q      Did you hold any other employment from the |
| | 17 | age of 18 to 23? |
| | 18 | A      Yes. |
| | 19 | Q      Could you please tell me what employment |
| 12:17 | 20 | you held when -- during the period of ages 18 to |
| | 21 | 23? |
| | 22 | A      I was a computer technician, I was a |
| | 23 | tutor, and I was a parking enforcement officer. |
| | 24 | Q      How long were you a computer tech? |
| 12:18 | 25 | A      I was a computer tech for about five |

**Exhibit 14 - P. 102**

|       |    |     |                                                        |
|-------|----|-----|--------------------------------------------------------|
|       | 1  | Q   | When did you graduate college?                         |
|       | 2  | A   | 2004.                                                  |
|       | 3  | Q   | Where did you go to school?                            |
|       | 4  | A   | University --                                          |
| 12:19 | 5  | Q   | Let me be clear.                                       |
|       | 6  |     | Where did you go to school where you                   |
|       | 7  |     | received a college degree?                             |
|       | 8  | A   | University of California at Irvine.                    |
|       | 9  | Q   | Fellow Anteater.  Nice to meet you.                    |
| 12:19 | 10 |     | What was your major?                                   |
|       | 11 | A   | Criminology, law and society.                          |
|       | 12 | Q   | How long was the LAPD academy that you                 |
|       | 13 |     | attended in 2005?                                      |
|       | 14 | A   | When I attended, it was seven months.                  |
| 12:20 | 15 | Q   | As part of your academy training, did you              |
|       | 16 |     | have to study California peace officer standards       |
|       | 17 |     | and training learning domain?                          |
|       | 18 | A   | Yes.                                                   |
|       | 19 | Q   | And the domains consisted of chapters on               |
| 12:20 | 20 |     | different subjects; correct?                           |
|       | 21 | A   | I don't know if I'd categorize it as                   |
|       | 22 |     | "chapters on different subjects."  We did learn        |
|       | 23 |     | various subjects.                                      |
|       | 24 | Q   | And those subjects were related to law                 |
| 12:20 | 25 |     | enforcement responsibilities as a peace officer;       |

SERGEANT JASON HARDAKER                                        JOB NO. 274522
JUNE 21, 2022

```
         1   correct?
         2   A       Yes.
         3   Q       Did you also learn about law enforcement
         4   tactics while in the academy?
12:20    5   A       Yes.
         6   Q       Was the use of force one of those tactics?
         7   A       Yes.
         8   Q       Was the use of lethal force another
         9   tactic?
12:20   10   A       Yes.
        11   Q       And less-than-lethal force?
        12   A       Yes.
        13   Q       Did you learn about the concept of
        14   reasonable suspicion to detain a subject?
12:21   15   A       Yes.
        16   Q       And probable cause to arrest?
        17   A       Yes.
        18   Q       Did you learn about law enforcement
        19   interaction with persons with mental disabilities?
12:21   20   A       Yes.
        21   Q       And did you learn about law enforcement
        22   interaction with persons with edged weapons?
        23   A       Yes.
        24   Q       Upon graduation from the LAPD academy in
12:21   25   2005, what was your first assignment?
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1    please?
 2      Q      Was part of the subject matter that you
 3    received in your training for becoming a field
 4    supervisor the use of force?
 5      A      Yes.
 6      Q      And the reasonable use of force?
 7      A      Yes.
 8      Q      And the proportional use of force?
 9      A      We learned about what proportional use of
10    force was with regards to case law.
11      Q      And you also learned about officer safety?
12      A      Yes.
13      Q      And you received training as part of that
14    course that would help you reinforce department
15    rules and expectations to subordinate officers?
16      A      I don't recall if I received specific
17    training with regards to that exact subject that
18    you asked.
19      Q      Did you receive training regarding
20    proactive leadership?
21      A      I do not recall if they talked about
22    proactive leadership in field supervisor school.
23      Q      Are you -- have you ever been trained by
24    the LAPD on active leadership?
25      A      On proactive leadership?
```

12:57  5
12:57  10
12:58  15
12:58  20
12:58  25

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1              appropriate and different situations where
 2              lethal force would be appropriate.
 3    BY MR. BOU SAEED:
 4     Q      In your training as a peace officer, after
 5    the academy, did you also receive additional
 6    training regarding people with DS -- disabilities?
 7                    MS. SMITH:  I'm just going to
 8              object that that's vague.  Are you
 9              referring to physical disabilities?
10                    MS. RIVARD:  Object -- joined.
11                    MR. BOU SAEED:  I'll rephrase.
12    BY MR. BOU SAEED:
13     Q      After your academy training as a LAPD
14    peace officer, did you receive additional training
15    regarding interactions with people with mental
16    disabilities?
17     A      Yes.
18     Q      Did you also receive additional training
19    regarding deescalation techniques?
20     A      Yes.
21     Q      And did you learn that the purpose of
22    deescalation techniques was to decrease the
23    intensity of a situation?
24     A      I think by stating that I learned it
25    would -- would infer that I had not known it
```

**Exhibit 14 - P. 106**

SERGEANT JASON HARDAKER                                     JOB NO. 274522
JUNE 21, 2022

1    A      Disengagement techniques was not a

2  technique while I was an officer.

3    Q      As a sergeant, have you received training

4  regarding disengagement techniques?

01:03  5    A      Yes.

6    Q      Had you received that training prior to

7  May 27th, 2020?

8    A      Yes.

9    Q      You had mentioned that the LAPD has core

01:03 10  values; correct?

11    A      Yes.

12    Q      And the LAPD has a particular policy

13  regarding the use of force that reflects those

14  core values; correct?

01:04 15    A      Well, I hadn't mentioned that.  But, yes,

16  I do believe that the LAPD's use of force policy

17  is in line with the core values.

18    Q      And that one of the guiding principles of

19  the LAPD policy regarding use of force shall be

01:04 20  reverence for human life; correct?

21    A      Yes.

22    Q      And another guiding principle would be to

23  attempt to control the incident, when feasible,

24  using, for example, time?

01:04 25    A      I don't know if that's necessarily a

**Exhibit 14 - P. 107**

```
 1   guiding principle of our use of force policy,

 2   using time.

 3    Q      Would you say it's part of the LAPD policy

 4   regarding the use of force, as you understand it?

 5            MR. GILBERT:  Vague.

 6            Go ahead.

 7            THE WITNESS:  Could you ask the

 8       full question, please?

 9   BY MR. BOU SAEED:

10    Q      Sure.

11            Is part of your understanding of the

12   LAPD policy regarding the use of force that an

13   officer should attempt to control an incident when

14   feasible using deescalation techniques?

15    A      That is one of the parts of the use of

16   force policy.

17    Q      And as part of that deescalation

18   technique, an officer should try to utilize time

19   to control a situation, if possible; correct?

20    A      When feasible, yes.

21    Q      And also when feasible, an officer should

22   attempt to utilize distance?

23    A      When feasible, yes.

24    Q      And when feasible, an officer should also

25   utilize communication?
```

01:04 (line 5)
01:04 (line 10)
01:05 (line 15)
01:05 (line 20)
01:05 (line 25)

**Exhibit 14 - P. 108**

```
        1    A       Yes.

        2    Q       And incorporate efforts to deescalate or

        3    deintensify the situation; correct?

        4    A       When feasible.

01:05   5    Q       Is that a "yes"?

        6    A       Yes.

        7    Q       Any use of force by an LAPD officer must

        8    be objectively reasonable; correct?

        9    A       Yes.

01:06  10    Q       And the most important factor in

       11    determining reasonableness is whether a subject

       12    poses an immediate threat to the officer or to the

       13    public; correct?

       14    A       Could you ask that question again, please?

01:06  15    Q       Sure.

       16            The most important factor for a

       17    Los Angeles Police Department officer's

       18    objectively reasonable use of force is whether the

       19    subject poses an immediate threat to the officer

01:06  20    or to the public; correct?

       21    A       I don't know if that's categorized as the

       22    most important factor in use of force in general.

       23    Q       In -- in your determination of whether a

       24    use of force is reasonable, would whether an

01:07  25    individual poses an immediate threat to the
```

1   officer or public be the most important factor?

2          MS. SMITH:  I'm just going to

3       object that that's vague and overbroad as

4       stated.  Are you referring to the use of

01:07   5       any force?

6          MS. RIVARD:  Joined.

7          MR. BOU SAEED:  Yes.

8          MR. GILBERT:  Sergeant, do you

9       understand the question?

01:07  10          THE WITNESS:  I -- I don't

11       understand the question.

12   BY MR. BOU SAEED:

13    Q     Okay.  Your understanding -- I want to

14   just stick with your understanding.

01:08  15          Officers are allowed to use deadly

16   force; correct?

17    A     In certain circumstances, yes.

18    Q     And part of those circumstances are the

19   use of deadly force has to be reasonable; correct?

01:08  20    A     Yes.

21    Q     And the most important factor in

22   determining the reasonableness of a use of deadly

23   force is whether the subject poses an immediate

24   threat of death or great bodily injury to the

01:08  25   officer -- to an officer or a member of the

**Exhibit 14 - P. 110**

SERGEANT JASON HARDAKER
JUNE 21, 2022                                                    JOB NO. 274522

```
 1   public; correct?
 2              MR. GILBERT:  Vague.  Are you
 3         asking his understanding of the policy or
 4         the law or something else?
 5              MR. BOU SAEED:  His understanding
 6         of the law.
 7              MR. GILBERT:  Go ahead, sir.
 8              THE WITNESS:  If you're referring
 9         to lethal force --
10   BY MR. BOU SAEED:
11    Q      Yes, correct.
12    A      -- then, yes, a danger to others is a
13   factor.
14    Q      Would the immediate danger of death or
15   great bodily injury to others be the most
16   important factor to you in the use of lethal
17   force?
18              MR. GILBERT:  Vague as to "most
19         important."
20              Go ahead.
21              MS. RIVARD:  Objection; relevance.
22              THE WITNESS:  Our policy words it
23         "eminent."  Eminent threat, not immediate.
24         And I would put "eminent [sic]."
25
```

01:08 at line 5
01:08 at line 10
01:09 at line 15
01:09 at line 20

```
 1              THE WITNESS:  I'm not sure how I'm
 2         supposed to know what another person's
 3         thinking, sir.
 4    BY MR. BOU SAEED:
 5     Q     Let me be clear.  I'm not asking you
 6    whether Mr. Mendoza could comprehend the commands.
 7    I'm asking you, on that day, did any doubt arise
 8    in your mind that Mr. Mendoza was unable to
 9    comprehend the commands?
10     A     No.
11     Q     As part of your official training with the
12    Los Angeles Police Department, you've been trained
13    regarding the recognition of behaviors associated
14    with mental illness; correct?
15     A     Yes.
16     Q     And that training doesn't allow you to
17    diagnose mental illness; correct?
18     A     Correct.
19     Q     But the training does allow you to
20    recognize general indicators of mental illness;
21    correct?
22     A     Yes.
23     Q     One of those general indicators that
24    you've been trained on is fearfulness; correct?
25     A     I -- I don't recall if fearfulness is one
```

01:41  5
01:42 10
01:42 15
01:43 20
01:43 25

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1            heard that was not part of LAPD training,
 2            was that somebody with a knife at 21 feet
 3            could be dangerous.
 4    BY MR. BOU SAEED:
02:03  5     Q       In your training that you've received by
 6    the LAPD regarding persons with weapons other than
 7    firearms, was an element that distance is not the
 8    only factor for determining the appropriate
 9    response?
02:03 10    A       I would say distance is one of several
11    factors that an officer has to evaluate.
12    Q       In that same training that you've received
13    over the course of your career, was the word
14    "threshold" ever used?
02:04 15    A       Not that --
16              MR. GILBERT:  Go ahead.
17              THE WITNESS:  Not that specific
18        word, but many elements of that word are
19        ingrained and integrated in many aspects
02:04 20        of LAPD training.
21    BY MR. BOU SAEED:
22    Q       Can you explain?
23    A       For example, in building searches, the
24    term "threshold" is actually used, and it's used
02:04 25    to delineate a zone inside and outside of a room
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

1    or a building.  So the word "threshold" is a

2    common word known to everybody, and it's an

3    effective way of communicating a zone, an area.

4    Q        And just so I'm clear, that word was never

02:05  5    used in the training that you've received from the

6    LAPD regarding persons with weapons other than

7    firearms?

8    A        I cannot recall that word officially being

9    in any printed pamphlet, but I cannot say if it

02:05  10   was or was not stated in any of the trainings I've

11   received in my 17 years with the Los Angeles

12   Police Department.

13   Q        In prior situations as a police officer,

14   have you ever used the word "threshold" to

02:05  15   communicate with other police officers regarding

16   how to respond to an incident?

17   A        I do not recall if I specifically used the

18   word "threshold," but the general idea of

19   "threshold" being a zone or an area where we have

02:06  20   to reassess has been used throughout my career.

21   Q        So just to be clear, you've never been

22   trained by the Los Angeles Police Department

23   regarding the utilization of a threshold?

24              MS. SMITH:  I'm just going to

02:06  25        object --

**Exhibit 14 - P. 114**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1              MR. GILBERT:  Misstates testimony.

 2              MS. SMITH:  It's also vague.  Are

 3          you asking him about the use of the term

 4          generally, as in the definition in

02:06  5      Merriam-Webster's dictionary, or in a

 6          specialized manner?

 7   BY MR. BOU SAEED:

 8    Q      You may answer the question.

 9    A      I do not recall if the specific word was

02:07 10   ever used, but the general idea of "threshold" is

11   integrated in many aspects of training I received

12   with the Los Angeles Police Department.

13    Q      And in regards to the training that you've

14   received in responding to persons with edged

02:07 15   weapons, the word "threshold" has not been used;

16   correct?

17              MR. GILBERT:  Asked and answered.

18              Go ahead.

19              THE WITNESS:  Not that I recall.

02:07 20   BY MR. BOU SAEED:

21    Q      In training that you've received regarding

22   persons with edged weapons, has the concept of a

23   physical line ever been taught to you in regards

24   to responding or using force?

02:08 25              MR. GILBERT:  Vague.
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1              Go ahead.
 2                 THE WITNESS:  I believe the word
 3          "physical line" has not been used.
 4          However, time plus distance -- distance in
 5          itself -- I think that the word
 6          "threshold" is referring to distance and
 7          spatial relations, which is all in line
 8          with training I received with the
 9          Los Angeles Police Department and the
10          policies you're citing.
11  BY MR. BOU SAEED:
12   Q      Have you ever received training that when
13  a person armed with an edged weapon goes into a
14  particular zone, a use of force is then reasonable
15  solely because they've entered that zone?
16                 MS. RIVARD:  Objection; vague as to
17          "zone."
18                 MR. GILBERT:  Vague; incomplete
19          hypothetical.
20                 Go ahead.
21                 MS. SMITH:  Joined.
22                 THE WITNESS:  We have received
23          training that if a sub- -- suspect is
24          exhibiting particular behaviors, such as
25          being violent and having a weapon, and
```

02:08 appears at lines 5 and 10
02:09 appears at lines 15, 20, and 25

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
         1            they're closing the distance, that there's
         2            a certain point where action needs to be
         3            taken.
         4    BY MR. BOU SAEED:
02:09    5     Q      And regarding that action that needs to be
         6    taken, did your training ever specify what action
         7    needs to be taken?
         8     A      It depends on the behavior of the suspect
         9    at the time.
02:10   10     Q      So your training was -- let me -- let me
        11    rephrase again.
        12                On May 27th, 2020, you heard Officer
        13    Scott say the word "threshold;" correct?
        14     A      Yes.
02:10   15     Q      And what did that word mean to you on
        16    May 27th, 2020?
        17     A      To me, that delineated an area where we
        18    were no longer going to allow him to freely act as
        19    he was acting --
02:11   20                THE WITNESS:  I have something
        21        going on on the screen right there.
        22                MR. GILBERT:  All right.  Hold on.
        23        Go ahead.  Keep answering.
        24                THE WITNESS:  Okay.
02:11   25                That that was an area where we were
```

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

1      going to have to reassess, and -- because

2      before we were letting the subject walk

3      around in circles and act erratic in an

4      area that was safe for us.  But at the

02:11  5   point where the threshold was called, that

6      would be the point that less-lethal would

7      need to be used if the subject was

8      continuing to act like he was acting.

9      Because past the point of the threshold,

02:11  10  there were many points where he could have

11     concealed himself and produced a weapon or

12     caused a danger to officers.

13         MR. GILBERT:  Counsel, we need

14     about 30 seconds.  My plugs have an issue,

02:11  15  so just pause on your next question real

16     quick.

17         MR. BOU SAEED:  Yes.

18        (Discussion off the record.)

19         MR. GILBERT:  All right.  Sorry.

02:13  20  Technical issues.  We're good now.

21  BY MR. BOU SAEED:

22  Q      Sergeant Hardaker, during that delay, I

23  saw you looking off to the side.  Were you reading

24  something?

02:13  25  A      No.  I was watching them retrieve the

```
  1    power adapter for this laptop.
  2      Q      When Officer Scott used the word
  3    "threshold," you had a full understanding of what
  4    it meant; correct?
02:13  5             MR. GILBERT:  Vague; speculation.
  6             Go ahead.
  7             MS. SMITH:  Joined.
  8             THE WITNESS:  Yes.
  9    BY MR. BOU SAEED:
02:14 10     Q      Officer Scott never used the word
 11    "less-lethal" in relation to the threshold;
 12    correct?
 13     A      No, he did not use that specific word that
 14    I heard.
02:14 15     Q      And you did not communicate that the
 16    threshold meant the utilization of less-lethal
 17    force; correct?
 18     A      I did not verbally communicate that;
 19    however, it's in line with our department policy
02:14 20    that that threshold be used for less-lethal.  And
 21    all the officers on the line had received similar
 22    training to myself, because they are part of the
 23    Los Angeles Police Department.
 24     Q      Therefore, you did not think it was
02:14 25    necessary to explicitly specify it meant
```

**Exhibit 14 - P. 119**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
  1    Q        Prior to May 27th, 2020, had you ever used
  2    the word "threshold" to designate a zone in
  3    responding to a suspect armed with a firearm -- or
  4    I'm sorry -- with a weapon not a firearm?
02:22  5    A        I don't recall.
  6    Q        Prior to May 27th, 2020, had you ever
  7    heard another police officer use the term
  8    "threshold" at a scene involving a person armed
  9    with a weapon other than a firearm?
02:23 10    A        I don't recall.
 11    Q        I want to take you to May 27th, 2020,
 12    Sergeant Hardaker.
 13            You were at the police station when
 14    you received the call for help; correct?
02:24 15    A        I personally did not receive the call for
 16    help, but I heard the help call on the radio when
 17    I was at the police station.
 18    Q        And when you overheard that radio call,
 19    you were unaware of the reason why the officers
02:25 20    were on the scene; correct?
 21    A        Correct.
 22    Q        And you immediately departed to the scene
 23    from the station; correct?
 24    A        Correct.
02:25 25    Q        And you were monitoring radio
```

SERGEANT JASON HARDAKER                                        JOB NO. 274522
JUNE 21, 2022

```
 1   training, it did refer to distances and areas.
 2    Q     Is there anything that would refresh your
 3   recollection as to whether the training used those
 4   types of words?
 5        MR. GILBERT:  Speculation.
 6             Go ahead.
 7             THE WITNESS:  I would have to go
 8        over 17 years of both written and verbal
 9        training to tell you if those specific
10        words were used.
11   BY MR. BOU SAEED:
12    Q     When you say "written training," what do
13   you mean?
14    A     Training can be given orally by somebody
15   else, a supervisor or peer.  It can be given
16   formally through a classroom.  There can be an
17   online video.  There can be training directives
18   printed out.  Training can come in a myriad of
19   different ways, and it does with LAPD.
20    Q     And -- and some of that, like you
21   mentioned, is in writing?
22    A     Yes.
23    Q     And do you get to keep those writings, or
24   you turn them back in after the end of the
25   training?
```

04:00 (line 5)
04:00 (line 10)
04:01 (line 15)
04:01 (line 20)
04:01 (line 25)

**Exhibit 14 - P. 121**

```
     1   word "zone" as a synonym for -- for area and

     2   distance and didn't necessarily indicate that

     3   there's different zones designated for specific

     4   things.

04:03 5    Q    So how does -- in your training, how would

     6   area and distance relate to the use of a use of

     7   force?

     8    A    Could you be more specific?

     9    Q    No.

04:03 10        How does area and distance relate to

    11   the training you've received regarding the use of

    12   force?

    13        MR. GILBERT:  Overbroad; vague;

    14      compound.

04:03 15        Go ahead.

    16        MS. RIVARD:  Joined.

    17        THE WITNESS:  I think you'd have to

    18      be more specific, because that's --

    19      there's too many variables with that

04:04 20      question, sir.

    21   BY MR. BOU SAEED:

    22    Q    Have you been trained that a particular

    23   use of force option should only be utilized when a

    24   suspect is in a particular area?

04:04 25    A    I think it would depend on the use of
```

**Exhibit 14 - P. 122**

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

1    force option you're referring to, sir.

2                    MR. BOU SAEED:  Court Reporter,

3            could you read back to me the question I

4            just asked?

04:05  5            (Record read as requested.)

6    BY MR. BOU SAEED:

7     Q     So, Sergeant Hardaker, I'm trying to

8    understand your training in regards to use of

9    force options.

04:05  10                   How are you taught to use a

11   40-millimeter less-lethal launcher in relation to

12   a suspect armed with a weapon other than a

13   firearm?

14                   MR. GILBERT:  Vague.

04:05  15                   Go ahead.

16                   THE WITNESS:  It really depends on

17           the situation, sir.  For instance, we're

18           not supposed to utilize a 40-millimeter on

19           somebody armed with something other than a

04:05  20           firearm if they're standing on a balcony

21           because they might fall off the building.

22                   Is that what you're referring to,

23           sir?

24   BY MR. BOU SAEED:

04:05  25    Q     Sure.

**Exhibit 14 - P. 123**

SERGEANT JASON HARDAKER                          JOB NO. 274522
JUNE 21, 2022

```
 1            "edged weapon," whether it's a sword or a
 2            pocket knife, and the circumstances
 3            leading up to it.
 4                    Go ahead, sir.
04:07  5                    MS. RIVARD:  Joined.
 6                    THE WITNESS:  It all depends on
 7            what the suspect -- the suspect's actions
 8            and all of the other circumstances present
 9            at the time.
04:07 10  BY MR. BOU SAEED:
11   Q       When you walked over to the east side of
12   that police car and said, "We'll keep the white
13   SUV as a threshold," did any officer ask you what
14   you meant?
04:07 15   A       No.
16   Q       So every officer indicated that they
17   understood what you were saying?
18                    MR. GILBERT:  Vague as to
19            "indicated."
04:07 20                    Go ahead.
21                    MS. SMITH:  Joined.
22                    THE WITNESS:  The word "threshold"
23            is just a word that I used to convey a
24            general concept that is known with other
04:07 25            LAPD officers that have received the same
```

**Exhibit 14 - P. 124**

SERGEANT JASON HARDAKER                                          JOB NO. 274522
JUNE 21, 2022

```
      1        training and ongoing training as me.
      2    BY MR. BOU SAEED:
      3      Q      And what did that concept mean?
      4      A      It meant that while we were going to let
04:08 5    the suspect walk around where he was at up the
      6    street, if he got to the point where that white
      7    SUV was, we were going to have to utilize
      8    less-lethal in an attempt to deescalate the
      9    situation if the subject was continuing to act
04:08 10   like he -- he was at the present time.
      11     Q      And so that, you're saying, is not
      12   something you were ever trained on?
      13                MR. GILBERT:  Misstates testimony.
      14                Go ahead.
04:08 15                THE WITNESS:  I never said that.
      16   BY MR. BOU SAEED:
      17     Q      So you had received training on the
      18   concept of a threshold and the use of less-lethal
      19   force?
04:08 20                MR. GILBERT:  Misstates testimony.
      21                MS. SMITH:  Joined.
      22                MR. GILBERT:  Go ahead.
      23                THE WITNESS:  I have --
      24                MS. RIVARD:  Joined.
04:08 25                THE WITNESS:  I have received
```

**Exhibit 14 - P. 125**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
      1            trained on less-lethal force.  I've
      2            received training on the effective ranges
      3            of less-lethal force.  And -- is that what
      4            you're asking?
04:09 5    BY MR. BOU SAEED:
      6     Q      Yes.  Why did you believe it was clear
      7    that it meant less-lethal force and not lethal
      8    force?
      9     A      Because lethal force can only be used by
04:09 10   each individual officer based on the circumstances
     11    they know at the time and cannot be directed to
     12    use lethal force.
     13     Q      Did it make sense to you that that concept
     14    of a threshold, as you used it, would also be a
04:09 15   point in which an officer would use lethal force?
     16     A      I was --
     17            MS. SMITH:  I'll object as vague.
     18            MR. GILBERT:  Go ahead.
     19            THE WITNESS:  I was not using that
04:09 20           term in that context, and the context was
     21            how the suspect was acting at the time
     22            that I -- that I talked about the SUV.
     23    BY MR. BOU SAEED:
     24     Q      So it would not have made sense to you if
04:09 25   lethal force was then used based on what you said
```

**Exhibit 14 - P. 126**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
         1    don't know how that's written in policy exactly.
         2      Q      Is that something that you ever thought
         3    about didn't make sense?
         4      A      I can't say that I spent any time thinking
04:12    5    about that exact question, sir.
         6      Q      At the time on May 27th, 2020, when you
         7    conveyed -- or I'm sorry.
         8                   At the time on May 27th, 2020, when
         9    you said "okay" to the white SUV being the
04:13   10    threshold, you believed it unambiguously meant
        11    less-lethal force; correct?
        12      A      Yes.
        13      Q      Now do you still feel like it would mean
        14    unambiguously less-lethal force?
04:14   15                   MR. GILBERT:  Vague.
        16                   Go ahead.
        17                   THE WITNESS:  Yes.
        18    BY MR. BOU SAEED:
        19      Q      So it is your understanding that every
04:14   20    officer understood you to mean less-lethal force
        21    in relation to the threshold?
        22                   MS. RIVARD:  Objection; calls for
        23        speculation.
        24                   MR. GILBERT:  Speculation;
04:14   25        foundation; incomplete question.
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
  1              Go ahead.
  2              MS. SMITH:  Joined.
  3              THE WITNESS:  What was the
  4      question?
04:14 5  BY MR. BOU SAEED:
  6      Q      Today, sitting here, you believe that the
  7  issuance of a threshold that did not specify
  8  less-lethal is unambiguous?
  9              MR. GILBERT:  Vague.
04:14 10             MS. RIVARD:  Joined.
 11              THE WITNESS:  Yes, because someone
 12          cannot be directed to utilize lethal
 13          force.  It has to be that officer's
 14          individual decision based on the totality
04:15 15         of circumstances.
 16  BY MR. BOU SAEED:
 17   Q      And you thought the white SUV, at that
 18  distance, would be an appropriate distance for the
 19  40-millimeter less-lethal launcher?
04:15 20             MR. GILBERT:  Asked and answered
 21          several times.
 22              Go ahead.
 23              THE WITNESS:  Yes.
 24              MR. BOU SAEED:  One moment, please.
 25
```

**Exhibit 14 - P. 128**

1        This concludes the deposition of

2    Sergeant J. Hardaker in the matter of

3    Mendoza versus City of Los Angeles, et al.

4    We are now off the record.  The time is

04:24   5    2:24 p.m. Pacific time.

6        (Off the record at 4:24 p.m. CST)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

1        I, SERGEANT JASON HARDAKER, have read the

2   foregoing deposition and hereby affix my signature

3   that same is true and correct, except as noted

4   above.

5                          _____

6                          SERGEANT JASON HARDAKER

7   THE STATE OF _____ )

8   COUNTY OF _____ )

9        BEFORE ME, _____, on

10  this day personally appeared SERGEANT JASON

11  HARDAKER, known to me (or proved to me under oath

12  of _____ or through

13  _____) (description of

14  identity card or other document) to be the person

15  whose name is subscribed to the foregoing

16  instrument and acknowledged to me that they

17  executed the same for the purposes and

18  consideration therein expressed.

19       Given under my hand and seal of office this

20  ___ day of _____, 2022.

21

22

23                          _____

24                          NOTARY PUBLIC IN AND FOR
                            THE STATE OF _____
25                          MY COMMISSION EXPIRES:
                            _____

**Exhibit 14 - P. 130**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1                    UNITED STATES DISTRICT COURT
 2                    CENTRAL DISTRICT OF CALIFORNIA

 3   YVONNE MENDOZA; RAYMUND MENDOZA;  )
     and MARJORIE MARINO, as           )
 4   Administrators of the Estate of   )
     ROMMEL MENDOZA,                   )
 5                                     )
             Plaintiffs,               )
 6                                     )
     vs.                               )Case No.
 7                                     )2:21-cv-04614-KS
     CITY OF LOS ANGELES, a public     )
 8   entity; OFFICER DANIEL HARTY;     )
     SERGEANT J. HARDAKER; SERGEANT    )
 9   DAN WIDMAN; OFFICER SCOTT;        )
     OFFICER JUAN GALVAN; OFFICER      )
10   SIERRA; OFFICER KELLY; and DOES   )
     1-30,                             )
11                                     )
             Defendants.               )
12

13                    REPORTER'S CERTIFICATION
                 REMOTE VIDEOTAPED DEPOSITION OF
14                   SERGEANT JASON HARDAKER
                         June 21, 2022
15

16        I, Rebecca A. Graziano, Certified Shorthand

17   Reporter in and for the States of Texas,

18   California, and Illinois, hereby certify to the

19   following:

20        That the witness, SERGEANT JASON HARDAKER,

21   was duly sworn and that the transcript of the oral

22   deposition is a true record of the testimony given

23   by the witness;

24        I further certify that pursuant to FRCP Rule

25   30(f)(1) that the signature of the deponent:
```

1        _____ was requested by the deponent or a

2    party before the completion of the deposition and

3    returned within 30 days from date of receipt of

4    the transcript.  If returned, the attached Changes

5    and Signature Page contains any changes and the

6    reasons therefor.

7        _____ was not requested by the deponent or a

8    party before the completion of the deposition.

9        I further certify that I am neither attorney

10   nor counsel for, related to, nor employed by any

11   of the parties to the action in which this

12   testimony was taken.

13       Further, I am not a relative or employee of

14   any attorney of record in this cause, nor do I

15   have a financial interest in the action.

16

17                    Certified on July 6, 2022

18

19

20       _____
                    Rebecca A. Graziano, CSR, RMR, CRR
21                  Texas CSR 9306
                    Expiration:  07/31/22
22                  California CSR 14407
                    Expiration:  09/30/22
23                  Illinois CSR 084.004659
                    Expiration:  05/31/23
24

25

**Exhibit 14 - P. 132**