# Deposition Transcript

Case Number: 2:21-cv-04614-KS
Date: July 20, 2022

In the matter of:

# MENDOZA, et al. v CITY OF LOS ANGELES, et al.

## Officer Paul Scott

**CERTIFIED COPY**

**Reported by:**
Monica Vogelbacher
CSR No. 6404



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**Exhibit 15 - P. 133**

1          UNITED STATES DISTRICT COURT

2          CENTRAL DISTRICT OF CALIFORNIA

3

4   YVONNE MENDOZA, RAYMUND          )  No. 2:21-cv-04614-KS
    MENDOZA, and MARJORIE MARINO, as )
5   Administrators of the Estate of  )
    Rommel Mendoza,                  )
6                                    )
                Plaintiffs,          )
7                                    )
                vs.                  )
8                                    )
    CITY OF LOS ANGELES, public      )
9   entity, OFFICER DANIEL HARTY,    )
    SERGEANT J. HARDACKER, SERGEANT  )
10  DAN WIDMAN, OFFICER SCOTT, OFFICER)
    JUAN GALVAN, OFFICER SIERRA,     )
11  OFFICER KELLY, and DOES 1-30,    )
                                     )
12              Defendants.          )
    _____)

13

14    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER AND BOUND

15        SEPARATELY:  PAGES 32, 47, 49, 55, 57

16

17        REMOTE AND VIDEOTAPED DEPOSITION OF

18              OFFICER PAUL SCOTT

19            Wednesday, July 20, 2022

20

21

22

23   Reported by:

24   MONICA T. VOGELBACHER, CSR No. 6406

25   Job No.:  280085

Exhibit 15 - P. 134

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4    YVONNE MENDOZA, RAYMUND          )  No. 2:21-cv-04614-KS
     MENDOZA, and MARJORIE MARINO, as )
5    Administrators of the Estate of  )
     Rommel Mendoza,                   )
6                                      )
                Plaintiffs,            )
7                                      )
               vs.                     )
8                                      )
     CITY OF LOS ANGELES, public       )
9    entity, OFFICER DANIEL HARTY,     )
     SERGEANT J. HARDACKER, SERGEANT   )
10   DAN WIDMAN, OFFICER SCOTT, OFFICER)
     JUAN GALVAN, OFFICER SIERRA,      )
11   OFFICER KELLY, and DOES 1-30,     )
                                       )
12              Defendants.            )
     _____)

13

14

15

16

17           Deposition of OFFICER PAUL SCOTT, taken

18   remotely, beginning at 1:05 p.m. and ending at 2:33 p.m.,

19   on Wednesday, July 20, 2022, before MONICA T.

20   VOGELBACHER, Certified Shorthand Reporter No. 6406.

21

22

23

24

25

```
 1    APPEARANCES:

 2

 3    For Plaintiffs:

 4            CBS LAW
               BY:  CHRISTOPHER J. BOU SAEED
 5            Attorney at Law
               633 West 5th Street, 26th Floor
 6            Los Angeles, California  90071
               (213) 605-5838
 7            chris@thecbslaw.com

 8    For City of Los Angeles:

 9            CITY ATTORNEY'S OFFICE
               BY:  COLLEEN R. SMITH
10            Attorney at Law
               200 North Main Street, Sixth Floor
11            City Hall East
               Los Angeles, California  90012
12            (213) 978-7027
               colleen.smith@lacity.org
13
      For Defendant Officer Daniel Harty:
14
               MANNING & KASS
15            ELLROD, RAMIREZ, TRESTER LLP
               BY:  CRAIG SMITH
16            Attorney at Law
               801 South Figueroa Street, 15th Floor
17            Los Angeles, California  90017
               (213) 553-2405
18            gcs@manningllp.com

19
      Also Present:
20
               RENEE MAYFIELD, video operator
21
               AUSTIN LIETZ, tech
22

23

24

25
```

```
 1              Wednesday, July 20, 2022
 2                 1:05 p.m. - 2:33 p.m.
 3
 4         THE VIDEO RECORDER:  We are on record.
 5         My name is Renee Mayfield.  I'm a notary public
 6    contracted by Steno.  I am not financially interested in
 7    this action nor am I a relative or employee of any of the
 8    attorneys or any of the parties.
 9         Today is July 20th, 2022.  The time is 1:05 p.m.
10    Pacific.  This video deposition is taken remotely via
11    Steno Connect.
12         The name of the case is Yvonne Mendoza, et al.,
13    versus City of Los Angeles, filed in the United States
14    District Court, Central District of California, number
15    2:21-cv-04614-KS.
16         This is Volume 1 in the video recorded
17    deposition of Officer Paul Scott.  The attorney taking
18    this deposition is Christopher Saeed.
19         Would the attorneys introduce themselves and
20    state who you represent.
21         MR. SAEED:  Good afternoon, Officer Scott and
22    everyone.  Christopher Bou Saeed for the plaintiffs.
23         MS. SMITH:  Good afternoon.  Colleen Smith for
24    the City of Los Angeles.  And I'm also representing the
25    deponent for purposes of this deposition.  That would be
```

01:05 5
01:05 10
01:05 15
01:06 20
01:06 25

**Exhibit 15 - P. 137**

```
 1   Officer Paul Scott.
 2            MR. SMITH:  And good afternoon.  Craig Smith on
 3   behalf of Officer Daniel Harty.
 4            THE VIDEO RECORDER:  Would the court reporter
01:06  5   please swear in the witness.
 6            (Witness sworn.)
 7            THE WITNESS:  I do.
 8
 9                    OFFICER PAUL SCOTT,
10   having been first duly sworn, was examined and testified
11   as follows:
12
13                    EXAMINATION
14   BY MR. SAEED:
01:06 15        Q   Good afternoon, Officer Scott.
16        A   Good afternoon.
17        Q   Have you ever had your deposition taken before?
18        A   Yes.
19        Q   Have you ever testified in court before?
01:06 20        A   Yes.
21        Q   Okay.  Do you understand that a deposition,
22   though it's in this informal setting, has the same force
23   and effect as testimony given in court?
24        A   Yes.
01:07 25        Q   And do you understand that you've taken an oath
```

1    understand, please just let me know you don't understand

2    the question, and I'll rephrase.

3        A    I will.

4        Q    Okay.

01:08 5        When were you first hired by the Los Angeles

6    Police Department?

7        A    January of 1995.

8        Q    And you are no longer employed with the Los

9    Angeles Police Department?

01:08 10       A    I'm not.

11       Q    When did you leave employment with the Los

12   Angeles Police Department?

13       A    August 1st of last year.

14       Q    That's of 2021?

01:08 15       A    Yes.

16       Q    And are you currently employed as a law

17   enforcement officer?

18       A    I'm a reserve with the Los Angeles Police

19   Department.

01:08 20       Q    Do you have any other employment currently?

21       A    Yes.

22       Q    What are you employed as?

23       MS. SMITH:   Sorry, can you repeat that question.

24   I didn't quite catch all of it.

01:09 25       MR. SAEED:   Sure.

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
 1    BY MR. SAEED:
 2         Q    I asked what are you employed as, Officer Scott?
 3         A    Private security.
 4         Q    What's the name of the private security company?
01:09  5         MS. SMITH:  I'm just going to object to that
 6    that invades his rights to privacy, and it's not relevant
 7    for purposes of this case, this deposition.  So I would
 8    instruct him not answer as to the name of the company
 9    that he works for.
01:09 10    BY MR. SAEED:
11         Q    When you retired from the Los Angeles Police
12    Department, what was your title at the time?
13         A    I was a -- what's considered a police officer 3,
14    a field training officer.
01:10 15         Q    How long were you a police officer 3 for with
16    the LAPD?
17         A    Approximately six years.
18         Q    And you mentioned you were also a field training
19    officer?
01:10 20         A    Correct.
21         Q    What were your responsibilities as a field
22    training officer?
23         A    My responsibilities were, once we get a -- what
24    we call probationer sent to the division, I was assigned
01:10 25    with the probationer, and my role was to guide them,
```

1    the best candidate at the time.

2    BY MR. SAEED:

3        Q    And at some point during your career with the

4    Los Angeles Police Department, did you become qualified

01:12  5    to carry a rifle?

6        A    Yes.

7        Q    When did you become qualified to carry a rifle?

8        A    I would, without my record in front of me,

9    estimate it was approximately 10 to 12 years ago.

01:12  10       Q    So around 2010?

11       A    Roughly.

12       Q    How did you achieve qualifications and carry a

13    rifle with the Los Angeles Police Department?

14       A    We attend a 40-hour class sponsored and taught

01:12  15    by the Los Angeles Police Department.

16       Q    Beyond the 40-hour class, were there any

17    recertification requirements to maintain your status as a

18    rifle qualified officer?

19       A    Yes.

01:12  20       Q    What were those -- I'm sorry, what were those

21    training requirements?

22       A    Well, they've changed over the years, and

23    obviously COVID played a part in that as well.  But they

24    would be anywhere from quarterly to annually, anywhere

01:13  25    from four-year blocks of -- I'm sorry, four-hour blocks

**Exhibit 15 - P. 141**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

1    of instruction to six- and eight-hour blocks of

2    instruction.

3          Q    And you mentioned COVID interfered with that?

4          A    Yes.  When we had the outbreak, they limited the

01:13  5    amount of people, and some of the classes even got

6    cancelled.

7          Q    And before you retired, had they resumed those

8    classes, as far as you are aware?

9          A    Yes.

01:13  10         Q    Do you know when?

11         A    I do not.

12         Q    On May 27th, 2020, were the rifle qualification

13    classes on hiatus due to the pandemic?

14              MS. SMITH:  Calls for speculation.

01:14  15              You can answer if you know.

16              THE WITNESS:  I don't know.

17    BY MR. SAEED:

18         Q    On May 27, 2020, you deployed your rifle at the

19    incident at 6400 Elmer Avenue, correct?

01:14  20         A    Yes.

21         Q    Was this your first time ever deploying the

22    rifle at an incident?

23         A    No.

24         Q    Approximately how many times prior to May 27,

01:14  25    2020 did you deploy your rifle as a Los Angeles Police

**Exhibit 15 - P. 142**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
         1          Q    Why not?

         2          A    Well, it's a personal preference.  Many officers

         3    do, some don't.  My personal preference is that I'm more

         4    comfortable with a -- with open sights or those iron

01:16    5    sights or a red dot.

         6          Q    Did your rifle come with a red dot that was

         7    deployed on May 27, 2020?

         8          A    Yes.

         9          Q    What's the distinction between a red dot and a

01:16   10    scope?

        11          A    A scope is a magnification of what it's looking

        12    at, and that can vary anywhere from two times

        13    magnification to nine times magnification, whereas a red

        14    dot is just a mirror, and it acts -- in the absence of

01:17   15    iron sights, it acts as the sight, so there's no

        16    magnification.

        17          Q    And the red dot represents where the presumed

        18    target is or where the bullet would reach the target?

        19          A    Correct.

01:17   20          Q    Give me one moment, please.  I dropped

        21    something.

        22          A    Uh-huh.

        23          Q    Thanks.

        24               So on May 27, 2020, you responded to a help call

01:17   25    at 6400 Elmer Avenue?
```

```
 1          A    Yes.
 2          Q    And that was in your capacity as a P3 field
 3    training officer?
 4          A    Yes.
01:17  5    Q    And you had a probationer with you?
 6          A    Yes.
 7          Q    And you arrived on scene.
 8               Did you see the suspect when you immediately
 9    arrived on scene?
01:18 10    A    No.
11          Q    What did you do when you arrived on scene?
12               MS. SMITH:  I'm just going to object that that's
13    vague.
14               But if you understand, you can answer his
01:18 15    question.
16    BY MR. SAEED:
17          Q    How about I'll re-ask.
18               What did you initially do when you arrived on
19    scene?
01:18 20    A    Are you -- so that I answer correctly, or at
21    least to the best that I can, are you asking from the
22    time I parked my vehicle, and that's going to be several
23    blocks away, or are you asking from the time I actually
24    got to where the incident was?
01:18 25    Q    I'll retract the question and just ask you more
```

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
 1    did you see -- did you initially see Mr. Mendoza exit his

 2    residence?

 3         A    Immediately upon setting up?

 4         Q    Yes.

01:23  5   A    No.  No.

 6         Q    How did you know where Mr. Mendoza was

 7    immediately upon setting up?

 8         A    Through the communication from the airship, from

 9    the helicopter.

01:23 10   Q    So through radio dispatch?

 11        A    Yes.

 12        Q    At some point thereafter, did you see

 13   Mr. Mendoza exit the street, exit onto the street?

 14        A    Yes.

01:23 15   Q    And you were under the impression, at that

 16   moment, that he may have been armed with a rifle.

 17        A    Correct.

 18        Q    And did you then see that he was not armed with

 19   a rifle?

01:24 20   A    Yes.

 21        Q    And did you see, instead, he was armed with an

 22   edged weapon?

 23        A    Yes.

 24        Q    When you first saw Mr. Mendoza, you had not

01:24 25   heard any orders from supervisory officers, correct?
```

**Exhibit 15 - P. 145**

1    regarding the suspect's actions, correct?

2         A    Correct.

3         Q    And you formulated a plan at that time with

4    Officer Galvan, correct?

01:27 5         A    Correct.

6         Q    And you had asked Officer Galvan to ask a

7    supervisor, How far are we going to let Mr. Mendoza go,

8    correct?

9         A    Yes.

01:27 10         Q    And you received no response from Mr. Galvan,

11   correct?

12        A    Correct.

13        Q    And that was after you heard Officer Galvan yell

14   out, Hey, Sarge, how far are we going to let this guy go?

01:27 15        A    Yes.

16        Q    So it was at that moment in time you decided to

17   fill -- I'm sorry.

18             It was at that moment in time -- I'll retract

19   that.

01:28 20             It was at that moment in time that you then set

21   the white SUV on the east side of Elmer Street as the,

22   quote, threshold, correct?

23        A    Correct.

24        Q    Had you ever, in a prior incident, set a

01:28 25   threshold before?

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
      1        A    What type of incident?

      2        Q    An incident involving a suspect with an edged

      3   weapon.

      4        A    Not to my recollection.

01:28 5        Q    In any other type of incident with a suspect

      6   armed with a weapon, had you ever set a threshold before?

      7             MS. SMITH:  I'm just going to object that that

      8   that's -- it's vague as worded.

      9             You can answer.

01:28 10            THE WITNESS:  Mentally, as an officer, you

     11   always have in your mind what the danger zone is going to

     12   be depending on the threat.  You're constantly assessing

     13   and reassessing what that threat is.  So that means that

     14   your threshold will change and develop.  It's very fluid.

01:29 15  BY MR. SAEED:

     16        Q    So prior to May 27, 2020, you had never verbally

     17   set a threshold to other officers before, correct?

     18        A    Using that specific terminology or just in

     19   general?

01:29 20        Q    Using that specific terminology.

     21        A    No.

     22        Q    Had anyone, in your experience on scene of an

     23   incident, ever used that terminology before, a threshold?

     24        A    One more time.  I'm sorry, repeat it.

01:29 25        Q    Have you in your experience as a Los Angeles
```

**Exhibit 15 - P. 147**

1   Police Department officer ever heard another officer on

2   scene use the word "threshold" before?

3           A    Yes.

4           Q    Approximately how many times?

01:29  5    A    I couldn't say.  I don't know.

6           Q    Over a hundred times?

7           A    No.

8           Q    Over five times?

9           A    Yes.

01:29  10   Q    Over 20 times?

11          A    Somewhere between 20 and five I think is fair.

12          Q    And those times you had heard the word

13   "threshold" used, it meant to you how far a suspect can

14   come before a use of force is utilized?

01:30  15   A    No.

16          Q    What did it mean?

17          A    It's just a point of reference.

18          Q    In regards to what?

19          A    Anywhere from where a suspect could be hiding,

01:30  20   we're clearing a building, like a door threshold, or that

21   danger zone, that cushion, if you will, between whatever

22   we're dealing with and ourselves.

23          Q    And when you say a danger zone between whatever

24   we're dealing with and ourselves, what do you mean

01:30  25   "danger zone"?

**Exhibit 15 - P. 148**

1         A    Well, for instance, if you are serving a search

2    warrant and you're making entry into a building, there's

3    going to be a threshold at a door, and from that point in

4    is going to be your danger zone.  So crossing that

01:31  5    threshold would represent a danger zone.

6         Q    In May 27, 2020, when you set the white SUV as a

7    threshold, in your mind, that was the marker of the

8    danger zone, correct?

9         A    No, that was a marker as far as the situation is

01:31 10    concerned and how we're going to relate it to

11    less-lethal.

12         Q    So, in other words, when the suspect reached

13    that threshold, that's when you thought less-lethal was

14    appropriate?

01:31 15         A    That's when we needed to start considering using

16    less-lethal.

17         Q    Not lethal force?

18         A    Not lethal force.

19         Q    What factors did you use in setting the

01:32 20    threshold as the white SUV?

21         A    The distance, the type of weapon that the

22    suspect had, the distance between the suspect, at that

23    point, and officers.  And there's various factors when

24    that window from transitioning to -- from less-lethal to

01:32 25    lethal force is needed.

OFFICER PAUL SCOTT                  Confidential                    JOB NO. 280085
JULY 20, 2022

1    appropriate threshold?

2          A    No.

3          Q    When receiving training as a rifle operator, did

4    you ever receive training on how to set a threshold for a

01:34  5    use of force?

6          A    No.

7          Q    During your training as a rifle operator, did

8    you ever train with officers armed with 40-millimeter

9    less-lethal launchers?

01:34  10          A    One more time.

11          Q    During your training as a rifle operator with

12    the Los Angeles Police Department, did you ever conduct

13    training exercises with officers armed with 40-millimeter

14    less-lethal launchers?

01:34  15          A    No.

16          Q    You mentioned that when you set the threshold,

17    you understood it to mean a threshold for the use of

18    less-lethal force, correct?

19          A    Correct.

01:35  20          MS. SMITH:   Objection, misstates his testimony.

21    BY MR. SAEED:

22          Q    In your head, did you believe that the other

23    officers also understood it to mean less-lethal force?

24          A    Yes.

01:35  25          Q    Why did you believe that?

**Exhibit 15 - P. 150**

```
 1        A    Based on the conversation that I had with

 2    Officer Galvan, who was over my right shoulder, and the

 3    conversations that I heard behind me in regards to the

 4    40-millimeter.

 5        Q    You were aware that there was officers on scene

 6    with a 40-millimeter less-lethal launcher, correct?

 7        A    Yes.

 8        Q    Did you have a threshold or distance in mind

 9    where the use of lethal force would be necessary based on

10    Mr. Mendoza's actions?

11        A    No.

12        Q    Was it your intent that should Mr. Mendoza reach

13    that white SUV, that less-lethal force would be used?

14        A    I'm sorry, one more time.

15        Q    Was it your intent that when Mr. Mendoza reached

16    that white SUV, that less-lethal force would be used?

17        A    My intent was that once Mr. Mendoza reached the

18    white SUV, that that was the time when we needed to start

19    considering using less-lethal.

20        Q    And was your idea that if less-lethal was used,

21    then officers would have sufficient time and space to

22    determine whether another use of force was necessary?

23        A    Correct.

24        Q    Even a higher level of force, like lethal force.

25        A    Well, you're constantly reassessing the use of
```

01:36 at line 5
01:36 at line 10
01:37 at line 15
01:37 at line 20
01:37 at line 25

**Exhibit 15 - P. 151**

```
          1            You can answer based on your understanding.
          2            THE WITNESS:  Officer Galvan had the advantage
          3    of seeing a situation around me where -- and things that
          4    I could not, such as officers to my right, to my left,
01:41     5    conversations going on behind me.  And in that capacity,
          6    he could act as a spotter.
          7    BY MR. SAEED:
          8        Q   What is a spotter?
          9        A   Well, it depends on what the role is and what
01:41    10    the definition, because different departments and
         11    different agencies use them differently.
         12        Q   What is the role of a spotter in the Los Angeles
         13    Police Department while you were an officer there?
         14        A   We don't train with spotters per se.  We don't
01:42    15    have that.  Each operator is their own set of eyes when
         16    it comes to lethal force.
         17        Q   In your rifle training with the Los Angeles
         18    Police Department, were you trained to utilize an officer
         19    as a comm- -- another officer as a communication tool?
01:42    20        A   I'm sorry, one more time?
         21        Q   Sure.  Give me one moment.
         22            In your training as a rifle operator with the
         23    Los Angeles Police Department, were you ever trained to
         24    utilize another officer, like you had utilized Officer
01:42    25    Galvan on May 27, 2020?
```

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
     1        A    During the entire incident?

     2        Q    Correct.

     3        A    I don't recall.

     4        Q    In your interview with the force investigation

01:54 5   division, you told them that you had maintained your

     6    finger on the side of the receiver, correct?

     7        A    Correct.

     8        Q    And you did not tell them that you had placed

     9    your finger on the trigger, correct?

01:54 10       A    Correct.

     11       Q    One moment, please.

     12       A    Uh-huh.

     13       Q    On May 27, 2020, when you set the threshold as

     14   the white SUV for less-lethal force, did you have in your

01:56 15  mind any threshold for lethal force?

     16       A    No.

     17       Q    After Mr. Mendoza was shot, you led the team to

     18   place him under arrest, correct?

     19       A    Correct.

01:57 20       Q    And while you were walking up to Mr. Mendoza as

     21   part of the arrest team, you did not know, at that moment

     22   in time, that he had been shot with lethal force,

     23   correct?

     24       A    Correct.

01:57 25       Q    And you did not learn he was shot with lethal
```

**Exhibit 15 - P. 153**

```
 1              THE WITNESS:  Imminent threat is based on the
 2    officer that engages the suspect, what their
 3    interpretation is, not my interpretation.  So -- go
 4    ahead.
02:04 5    BY MR. SAEED:
 6         Q   No, please go ahead, finish.
 7         A   No, I'm finished.
 8         Q   So based on your interpretation of what
 9    constituted an imminent threat of death or great bodily
02:04 10   injury, you did not believe that the white SUV reached
 11   that threshold, correct?
 12        A   The only reason why the white SUV came into play
 13   is because our tactical plan called for less-lethal, and
 14   less-lethal was the option at that -- at the white SUV.
02:04 15   It's the only reason why it was in play.  Not as a
 16   threshold for imminent threat or, you know, that
 17   somebody's going to die or get killed, it's based on our
 18   less-lethal option.
 19        Q   As a police officer, can you think of any
02:05 20   benefit from an officer firing lethal force at the same
 21   time another officer fires less-lethal force?
 22             MS. SMITH:  I'm just going to object that that's
 23   vague, it's overbroad, it's argumentative, it's an
 24   incomplete hypothetical.
02:05 25             I'm also going to object that that's calling for
```

```
     1    BY MR. SAEED:

     2         Q   You received training from the Los Angeles

     3    Police Department in addition to just the rifle operator

     4    training, correct?

02:11 5              MS. SMITH:  I'm going to object as vague and

     6    overbroad.  Are you talking about any and all training,

     7    Counsel?

     8              MR. SAEED:  Yes.

     9              MS. SMITH:  You can answer the question.

02:11 10             THE WITNESS:  Yes.

    11    BY MR. SAEED:

    12         Q   In any of those trainings, did you ever perform

    13    a training exercise where various officers utilized

    14    various different kinds of weapon systems?

02:12 15        A   Yes.

    16         Q   In those trainings that you said yes to, was

    17    there ever a situation where the suspect was armed with a

    18    edged weapon?

    19         A   Yes.

02:12 20        Q   And did those trainings involve utilizing

    21    less-lethal force before the utilization of lethal force?

    22         A   When you're able to.

    23         Q   Is that a "yes"?

    24         A   Yes, when you're able to.

02:12 25        Q   One moment, please.
```

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
 1        A    I don't recall if it came from the helicopter or
 2   it came from the patrol car.
 3        Q    Could you hear what any officer was saying,
 4   besides Officer Galvan, during your time before
 5   Mr. Mendoza was shot?
 6        A    Yes.
 7        Q    Before Mr. Mendoza was shot, as you were at the
 8   parked car on the west side of Elmer Street, could you
 9   hear Sergeant Hardacker speaking?
10             MS. SMITH:  I'm just going to object that that
11   assumes facts and lacks foundation.
12             But you can answer.
13             THE WITNESS:  I hear someone identified as a
14   sergeant.  I can't -- at that time, I couldn't tell you
15   exactly who it was.
16   BY MR. SAEED:
17        Q    Are you familiar with the Los Angeles Police
18   Department's policy on the use of force issued on
19   February 4th, 2020?
20        A    Use of deadly force or force in general?
21        Q    Use of deadly force in particular.
22        A    Yes.
23        Q    And in that policy, does it state that in
24   determining whether deadly force is necessary, officers
25   shall evaluate each situation in light of the particular
```

02:25  5
02:26 10
02:26 15
02:27 20
02:27 25

**Exhibit 15 - P. 156**

1    circumstances of each case and shall use other available

2    resources and techniques if reasonably safe and feasible?

3        A    Yes.

4        Q    And it is partially based on your understanding

02:28 5    of the Los Angeles Police Department's policy on the use

6    of deadly force that you set the less-lethal threshold as

7    the white SUV?

8        A    Yes.

9        Q    In those times that you had mentioned you had

02:30 10   heard other officers utilize the term "threshold" as you

11   used it on May 27, 2020, did those officers specify that

12   it meant for less-lethal force?

13           MS. SMITH:  Well, I'm just going to object that

14   that assumes facts, it lacks foundation, and it calls for

02:30 15   speculation as to when or why the word "threshold" was

16   ever used.

17           You can answer if you understand the question.

18           THE WITNESS:  Can you repeat the question one

19   more time.

02:30 20           MR. SAEED:  Madame Reporter, can you repeat

21   that.

22           (The record was read as follows:

23           "Question:  In those times that you

24           had mentioned you had heard other

02:30 25           officers utilize the term 'threshold'

**Exhibit 15 - P. 157**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
  1            as you used it on May 27, 2020, did
  2            those officers specify that it meant
  3            for less-lethal force?")
  4            THE WITNESS:  No.
02:31 5  BY MR. SAEED:
  6       Q   But you understood those references to
  7  "threshold" during those incidents as meaning less-lethal
  8  force?
  9            MS. SMITH:  I object that that's overbroad, it
02:31 10 lacks foundation, it calls for speculation.
  11           You can answer.
  12           THE WITNESS:  I think it would have to be on a
  13 case-by-case basis as to what the meaning was.
  14 BY MR. SAEED:
02:32 15      Q   Based on the circumstances as present on scene?
  16      A   The day of?
  17      Q   Those prior instances --
  18      A   Oh.
  19      Q   -- when you heard the term "threshold" being
02:32 20 used, that's what I'm asking about.
  21      A   Again, it's a generic term.  It can be applied
  22 multiple ways.  So it would have to be on a case-by-case,
  23 you know, in reference to it being used in the past.
  24      Q   When you say "generic term," you mean that the
02:32 25 word can be understood in various different ways.
```

OFFICER PAUL SCOTT                       Confidential                    JOB NO. 280085
JULY 20, 2022

```
  1        A    Correct.
  2        Q    And you've never received training regarding how
  3   to use that term in different ways, correct?
  4             MS. SMITH:  Are you asking training from the
02:32  5   LAPD or training in his life?
  6             MR. SAEED:  Training from the LAPD.
  7             MS. SMITH:  Okay.
  8             THE WITNESS:  No.
  9   BY MR. SAEED:
02:32 10        Q    Thank you, Officer Scott.  I appreciate it.
 11             MR. SAEED:  I have no further questions,
 12   Counsel.
 13             THE WITNESS:  Thank you.
 14             MR. SMITH:  I don't have any questions.
02:33 15             MS. SMITH:  No questions.
 16             MR. SAEED:  I think, then, we could go off
 17   record.
 18             MS. SMITH:  Okay.
 19             THE VIDEO RECORDER:  We are off the record.  The
02:33 20   time is 2:33 p.m.
 21             (The deposition was concluded at 2:33 p.m.)
 22   //
 23   //
 24
 25
```

**Exhibit 15 - P. 159**

```
 1

 2

 3

 4

 5

 6

 7            I, OFFICER PAUL SCOTT, do hereby declare under

 8     penalty of perjury, under the laws of the United States,

 9     that I have read the foregoing transcript; that I have

10     made such corrections as noted herein, in ink, initialed

11     by me, or attached hereto; that my testimony as contained

12     herein, as corrected, is true and correct.

13            EXECUTED this _____ day of _____,

14     20_____, at _____, _____.
                          (City)                    (State)

15

16

17            _____
                          OFFICER PAUL SCOTT

18

19

20

21

22

23

24

25
```

**Exhibit 15 - P. 160**

OFFICER PAUL SCOTT                          Confidential                          JOB NO. 280085
JULY 20, 2022

```
 1   STATE OF CALIFORNIA        )
                                : ss
 2   COUNTY OF LOS ANGELES      )

 3

 4          I, the undersigned, a Certified Shorthand

 5   Reporter of the State of California, do hereby certify:

 6          That the foregoing proceedings were taken before

 7   me at the time and place herein set forth; that any

 8   witnesses in the foregoing proceedings, prior to

 9   testifying, were placed under oath; that a verbatim

10   record of the proceedings was made by me using machine

11   shorthand which was thereafter transcribed under my

12   direction; further, that the foregoing is a true record

13   of the testimony given.

14          Before completion of the deposition, review of

15   the transcript [X] was [ ] was not requested.  If

16   requested, any changes made by the deponent (and provided

17   to the reporter) during the period allowed are appended

18   hereto.

19          I further certify that I am not interested in

20   the outcome of the action.

21          WITNESS my hand this date

22   July 22nd, 2022.

23

24              Monica T. Vogelbacher

25          MONICA T. VOGELBACHER, CSR No. 6406
```

**Exhibit 15 - P. 161**