# Deposition Transcript

Case Number: 2:21-cv-04614-KS
Date: July 26, 2022

In the matter of:

# MENDOZA, et al. v CITY OF LOS ANGELES, et al.

# Officer Christopher Kelly

**CERTIFIED COPY**

Reported by:

Jasmine Richau
CSR No. 14217

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**Exhibit 16 - P. 162**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4      YVONNE MENDOZA, RAYMUND MENDOZA
        and MARJORIE MARINO, as
 5      Administrators of the Estate of
        Rommel Mendoza,
 6
                     Plaintiff,   Case No.
 7                                2:21-cv-04614-KS

 8                  vs.

 9      CITY OF LOS ANGELES public
        Entity, OFFICER DANIEL HARTY,
10      SERGEANT J. HARDAKER, SERGEANT
        DAN WIDMAN, OFFICER SCOTT,
11      OFFICER JUAN GALVAN, OFFICER
        SIERRA, OFFICER KELLY, and
12      DOES 1-30,

13
                     Defendants.
14
        _____
15

16

17            VIDEOCONFERENCE DEPOSITION OF

18              OFFICER CHRISTOPHER KELLY

19                   JULY 26, 2022

20    CONFIDENTIAL PORTIONS BOUND SEPARATELY PURSUANT TO

21                  PROTECTIVE ORDER

22    Reported By:
      Jasmine Richau
23    CSR No. 14217

24    Job No. 302882

25
```

**Exhibit 16 - P. 163**

OFFICER CHRISTOPHER KELLY          Non-Confidential                      JOB NO. 302882
JULY 26, 2022

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4      YVONNE MENDOZA, RAYMUND MENDOZA
        and MARJORIE MARINO, as
 5      Administrators of the Estate of
        Rommel Mendoza,
 6
                          Plaintiff,     Case No.
 7                                        2:21-cv-04614-KS
                        vs.
 8
        CITY OF LOS ANGELES public
 9      Entity, OFFICER DANIEL HARTY,
        SERGEANT J. HARDAKER, SERGEANT
10      DAN WIDMAN, OFFICER SCOTT,
        OFFICER JUAN GALVAN, OFFICER
11      SIERRA, OFFICER KELLY, and
        DOES 1-30,
12
                          Defendants.
13

14  ---------------------------------------------------------

15

16

17            Deposition of OFFICER CHRISTOPHER KELLY,

18  taken on behalf of the Plaintiff via Steno Connect,

19  beginning at 12:13 p.m., and ending at  1:47 p.m., on

20  July 26, 2022, before JASMINE RICHAU, Certified

21  Shorthand Reporter No. 14217.

22

23

24

25
```

OFFICER CHRISTOPHER KELLY          Non-Confidential                JOB NO. 302882
JULY 26, 2022

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFFS:

 3            CBS Law

 4            BY: CHRISTOPHER J. BOU SAEED, ESQ.

 5            633 West 5th Street,

 6            26th Floor

 7            Los Angeles, California

 8            90071  (213) 605-5838

 9            chris@thecbslaw.com

10
    FOR THE CITY OF LOS ANGELES:
11
              City Attorney's Office
12
              BY: COLLEEN R. SMITH, ESQ.
13
              200 North Main Street
14
              Sixth Floor
15
              Los Angeles, California
16
              90071  (213) 978-7027
17
              colleen.smith@lacity.org
18

19

20

21

22

23

24

25
```

 1 | APPEARANCES:

 2 | FOR THE DEFENDANT OFFICER HARTY:

 3 |          Manning & Kass, Ellrod, Ramirez, Trester LLP

 4 |          BY:  EUGENE RAMIREZ, ESQ.

 5 |          801 South Figueroa Street,

 6 |          15th Floor

 7 |          Los Angeles, California

 8 |          90017 (213) 553-2405

 9 |          epr@manningllp.com

10 |

11 | ALSO PRESENT:

12 | Matthew Boyd, Videographer

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

**Exhibit 16 - P. 166**

```
 1                          I-N-D-E-X

 2   WITNESS:   OFFICER KELLY

 3   EXAMINATION                                      PAGE

 4   BY MR. SAAED                                       6

 5

 6                      E-X-H-I-B-I-T-S

 7   PLAINTIFF

 8   Exhibit 19   Statement of Police Officer III       47
 9                Christopher Kelly; page 10, lines
                  1-8 (confidential)
10

11      THE FOLLOWING PORTIONS ARE CONFIDENTIAL PURSUANT TO

12                    PROTECTIVE ORDER

13              PAGE                    LINES

14               45                     19-23
                 46                      1-7
15               47                     11-19
                 52                     17-24
16               53                      1-14

17

18

19

20

21

22

23

24

25
```

```
 1              Tuesday, July 26, 2022

 2                   12:13 p.m.

 3                    -o0o-

 4         THE VIDEOGRAPHER:  Good morning.  We are

 5 now on the record at 12:13 p.m. Pacific Time on

 6 July 26th, 2022, to begin the deposition of Officer

 7 Kelly in the matter of Mendoza et al, versus City of

 8 Los Angeles, et al.  This case is venued in United

 9 States District Court, Central District of California.

10 The case number is 21:cv-04614-KS.  This deposition is

11 taking place via Steno's Steno Connect platform.  The

12 legal videographer is David Boyd here on behalf of

13 Steno.  And the court reporter is Jasmine Richau, also

14 here on behalf of Steno.  Would counsel please identify

15 yourselves and state whom you represent.

16         MR. SAAED:  Good afternoon.  Chris Bou Saaed

17 for the plaintiffs.

18         MS. SMITH:  Good afternoon.  Colleen Smith for

19 defendant, City of Los Angeles.  I'm also representing

20 the deponent, Officer Christopher Kelly.

21         MR. RAMIREZ:  Good afternoon.  I am

22 Eugene Ramirez of Manning and Kass, et al.  I will be

23 representing Officer Dan Harty.

24         THE VIDEOGRAPHER:  Thank you, Counsel.  Would

25 the reporter please swear in the witness.
```

The timestamps in the left margin: 12:13 (line 4), 12:14 (line 8), 12:14 (line 12), 12:14 (line 16), 12:15 (line 20), 12:15 (line 24).

1          THE REPORTER:  Officer Kelly, please raise your

2 right hand.  Do you solemnly swear that the testimony

3 you are about to give in this deposition shall be the

12:15  4 truth, the whole truth, and nothing but the truth?

5          THE WITNESS:  Yes, I do.

6                    -o0o-

7                  EXAMINATION

12:15  8 BY MR. SAAED:

9     Q    Good afternoon.  Would you please state your

10 name for the record.

11     A    Christopher Kelly.

12:15 12     Q    Officer Kelly, have you ever had your

13 deposition taken before?

14     A    No.

15     Q    Have you ever testified in court before?

12:15 16     A    Yes.

17     Q    Approximately how many times have you testified

18 in court before?

19     A    Upwards of 30, probably.

12:16 20     Q    Do you understand, Officer Kelly, that you have

21 a duty to tell the truth today?

22     A    Yes.

23     Q    And do you understand that your testimony is

12:16 24 being taken down subject to the penalty of perjury?

25     A    Yes.

1          A     I did have eye surgery, and I don't know when.

2    I believe at that time I was still wearing glasses.

3          Q     Did you attend the Los Angeles Police

12:30  4    Department academy?

5          A     Yes.

6          Q     Approximately, when did you attend the LAPD

7    academy?

12:30  8    A     1996.

9          Q     Approximately, how long did you attend the LAPD

10   academy for in 1996?

11         A     Seven months.

12:30  12   Q     As part of your training in the LAPD academy,

13   did you learn about peace officer standards and training

14   learning domains?

15         A     I don't believe we had those in those days, or

12:30  16   we didn't call it that.

17         Q     Now you are familiar with learning domains,

18   post?

19         A     Yes.

12:30  20   Q     And that's because you've received additional

21   training after the academy that involved post learning

22   domains?

23         A     I am a training officer for the department.

12:31  24   Q     What is your current title, Officer Kelly?

25         A     Police officer three, training officer.

1        Q      What does training officer mean?

2        A      It means I train the younger probationary

3   officers that are just coming out of the academy.

12:31   4        Q      Train them on LAPD policies and procedures?

5        A      Among other things, yes.

6        Q      What other things?

7        A      Tactics, ethics, morals, dealing with the

12:32   8   department, dealing with citizens.

9        Q      Where are you currently stationed?

10       A      North Hollywood division.

11       Q      How long have you been stationed in North

12:32  12   Hollywood division?

13       A      Twenty-two years.

14       Q      Is that common for an officer to stay at the

15   same station for such a long period of time?

12:32  16       A      No.

17       Q      Why are you so lucky?

18       A      I like the place I am at, so I got comfortable

19   and stayed.

12:32  20       Q      So during your time at the LAPD academy, were

21   you taught on the LAPD policy use of force?

22       A      Yes.

23       Q      Including the LAPD policy on less than lethal

12:32  24   force?

25       A      Yes.

**Exhibit 16 - P. 171**

OFFICER CHRISTOPHER KELLY    Non-Confidential    JOB NO. 302882
JULY 26, 2022

1    Q    And the LAPD policy on lethal force?

2    A    Yes.

3    Q    The concept of reasonable suspicion to detain?

12:33  4    A    Yes.

5    Q    Probable cause to arrest?

6    A    Yes.

7    Q    Interactions with persons with mental

12:33  8  disabilities?

9    A    I do not recall.

10    Q    Subsequent to your training at the academy,

11  during your career as an LAPD officer, have you received

12:33  12  training on interacting with person with mental

13  disabilities?

14    A    Yes.

15    Q    Similarly, subsequent to your LAPD academy

12:33  16  training, have you received LAPD training on interacting

17  with persons armed with edged weapons?

18    A    Yes.

19    Q    Is part of your duty as a P3 training officer

12:34  20  to remain current on LAPD training bulletins?

21    A    Yes.

22    Q    And LAPD policies and procedures?

23    A    Yes.

12:34  24    Q    And you mentioned you provide direction and

25  training to younger probationary or inexperienced

**Exhibit 16 - P. 172**

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

```
       1  probationary officers?

       2       A     Yes, sir.

       3       Q     Subsequent to your training in the academy,

12:34  4  have you received LAPD training on the use of force?

       5             MS. SMITH:  I'll just object that that's vague

       6  and overbroad.  You can answer.

       7             THE WITNESS:  Yes.

12:35  8  BY MR. SAAED:

       9       Q     And training on the use of less lethal force?

      10       A     Yes.

      11       Q     Have you received training on the less lethal

12:35 12  force options available to a LAPD police officer?

      13       A     Yes.

      14       Q     Have you received training on the beanbag

      15  shotgun?

12:35 16       A     Yes.

      17       Q     And the 40-millimeter less lethal launcher?

      18       A     Yes.

      19       Q     For sake of clarity, may I call the

12:35 20  40-millimeter Less Lethal launcher the 40?

      21       A     Certainly.

      22       Q     And have you also received training on the use

      23  of a Taser?

12:35 24       A     Yes.

      25       Q     In the last seven years, have you received any
```

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

```
 1  LAPD training on interacting with people with mental

 2  disabilities?

 3      A     Yes.

12:35  4   Q     Have you received training within the last

 5  seven years from the LAPD on de-escalation techniques?

 6      A     Yes.

 7      Q     And when I say de-escalation, is it your

12:36  8  understanding that these are techniques used to decrease

 9  the intensity of a situation?

10      A     Yes.

11      Q     Have you also been trained within the last

12:36 12  seven years on disengagement techniques?

13      A     Yes.

14      Q     And have you received training on establishing

15  command and control as a senior officer on scene?

12:36 16      A     Yes.

17      Q     With your level of experience, Officer Kelly,

18  is it common that you find yourself as the senior

19  officer on scene?

12:36 20      A     Yes.

21      Q     And when you are the senior officer on scene,

22  does that mean that you establish a plan for dealing

23  with a particular situation, generally speaking?

12:36 24          MS. SMITH:  I am going to object.  It's vague

25  and overbroad.  And incomplete hypothetical, but you can
```

OFFICER CHRISTOPHER KELLY    Non-Confidential    JOB NO. 302882
JULY 26, 2022

1         MS. SMITH:  It's vague.  It's ambiguous.

2  Overbroad and incomplete hypothetical.  You can answer,

3  if you understand.

12:42  4        THE WITNESS:  It's each officer's discretion

5  whether he needs to use use of force or not, both lethal

6  and non-lethal.

7    Q   What's the purpose of a DCO if any officer can

12:42  8  use lethal force?

9    A   Many officers have different jobs.  We have

10  different weapon systems.  If we have a weapon system

11  out that's -- and one officer doesn't need one, he may

12:42 12  go to non-lethal and the DCO is responsible for

13  protecting that officer.

14    Q   Would a DCO ever be armed and deploy a less

15  lethal force option?

12:42 16    A   He may have a less lethal with him, but he

17  would not be utilizing it.

18    Q   So when an officer, based on your training and

19  experience, is the designated cover officer, that means

12:43 20  during that period of time they are utilizing a lethal

21  force option, potentially?

22    A   Yes.

23    Q   Based on your training and experience, what

12:43 24  does threshold mean?

25    A   I am just going to object.  It's vague and

**Exhibit 16 - P. 175**

1  ambiguous.  Overbroad.  You can answer.

2          THE WITNESS:  An area designating the

3  difference between two places.

12:43  4  BY MR. SAAED:

5      Q    While in the academy, did you receive training

6  by the LAPD regarding using a threshold?

7          MS. SMITH:  Objection.  Vague and ambiguous.

12:43  8  Overbroad.  You can answer.

9          THE WITNESS:  The only training I got from the

10  academy about thresholds was while going through a door.

11  BY MR. SAAED:

12:43  12      Q    In the training that you received from the

13  LAPD, after your graduation from the academy, did you

14  ever receive training regarding the utilization of the

15  term threshold?

12:44  16          MS. SMITH:  Objection.  Vague and ambiguous and

17  overbroad.  You can answer, if you understand.

18          THE WITNESS:  The same.  It always has to do

19  with going through a door separating the two rooms.

12:44  20  BY MR. SAAED:

21      Q    So other than a threshold designating a door

22  separating two rooms, you have never received any

23  training from the LAPD that utilized the term threshold?

12:44  24      A    Not that I recall.

25      Q    Regarding the training that you received

**Exhibit 16 - P. 176**

OFFICER CHRISTOPHER KELLY          Non-Confidential          JOB NO. 302882
JULY 26, 2022

1  utilizing threshold as a separation of two rooms by a

2  door, did the training ever attach a use of force to a

3  breach of the threshold?

12:45  4      A    Not that I recall.

5      Q    Prior to May 27th, 2020, have you ever

6  responded to a scene where an officer used the word

7  threshold?

12:45  8      A    Yes, like we spoke about earlier, at a door.

9      Q    Other than for situations that were inside of a

10  structure that involved a door and the separation of

11  rooms, have you ever responded to a scene as a LAPD

12:46  12  officer where an officer used the term threshold?

13      A    I don't believe so.

14          MS. SMITH:  Counsel, I'll just interpose an

15  objection to clarify for the record.  Did your question

12:46  16  include this incident or prior incidents?

17          MR. SAAED:  Prior incidents.

18          MS. SMITH:  Okay.  Thank you.

19  BY MR. SAAED:

12:46  20      Q    On May 27, 2020, did you hear Officer Scott

21  utilize the word threshold?

22      A    Yes, I did.

23      Q    What did it mean to you when you first heard

12:46  24  it?

25      A    Honestly, I didn't even think about it, because

**Exhibit 16 - P. 177**

OFFICER CHRISTOPHER KELLY  Non-Confidential  JOB NO. 302882
JULY 26, 2022

1 I had no idea what he was talking about.

2  Q Why didn't you ask for clarification?

3  A Because we were in the middle of a tactical

12:47 4 situation.

5  Q When you heard Officer Scott use the word

6 threshold, you were on the west side of Elmer Avenue; is

7 that correct?

12:47 8  A Yes, sir.

9  Q Were you the senior officer on the west side of

10 Elmer Avenue at that moment in time?

11  MS. SMITH:  I am just going to object.  It's

12:48 12 vague.  It's overbroad.  You can answer if you

13 understand the question.

14  THE WITNESS:  No, I was not.

15 BY MR. SAAED:

12:48 16  Q Who was the senior officer at that moment in

17 time?

18  A Paul Scott.

19  Q Prior to May 27th, 2020 had you worked with

12:48 20 Officer Scott before?

21  A Yes.

22  Q Approximately, how long had you worked with

23 Officer Scott prior to May 27th, 2020?

12:48 24  A Can you clarify that question.

25  Q Sure.  Do you recall approximately when was the

**Exhibit 16 - P. 178**

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

1  believe that we've only had one-day trainings.

2      Q      In your initial certification training to be an

3  LAPD qualified rifle operator, no instructor used the

12:52  4  word threshold; correct?

5      A      Not that I recall.

6      Q      And in your recertification trainings to be an

7  LAPD rifle qualified operator, no instructor ever used

12:52  8  word threshold; correct?

9      A      Not that I recall.

10      Q      In your initial certification training to

11  become a qualified rifle operator with the LAPD, did any

12:52  12  instructor ever provide instruction on the phrase of

13  designated cover officer?

14      A      Yes.

15      Q      What instruction did you receive regarding

12:52  16  designated cover officer in your initial certification

17  training?

18      A      Just what I discussed earlier, what the roles

19  are of the DCO.

12:53  20      Q      Since you first learned about the role or

21  responsibilities of a DCO, has that role or

22  responsibility changed up until the point of

23  May 27th, 2020?

12:53  24      A      I don't believe so.

25      Q      In your training to be a qualified rifle

**Exhibit 16 - P. 179**

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

1  operator, whether it be the initial training or the

2  recertification trainings, did you ever conduct training

3  exercise with officers armed with a 40?

12:53   4       MS. SMITH:  I am just going to object that it's

5  vague and ambiguous.  You can answer the question if you

6  understand.

7           THE WITNESS:  No, I have not.

12:53   8  BY MR. SAAED:

9       Q    Outside of rifle training specifically, have

10  you ever performed training exercises with the LAPD

11  where you were equipped with a rifle and another officer

12:54  12  was equipped with a 40?

13          MS. SMITH:  Same objections.

14          THE WITNESS:  No.

15  BY MR. SAAED:

12:54  16      Q    Have you ever received training by the LAPD to

17  use lethal force simultaneously to another officer using

18  less lethal force?

19      A    That's not a trainable situation.

12:54  20      Q    So is the answer no?

21      A    It's not something that can be trained.

22      Q    Why not?

23      A    Because it's at the discretion of an individual

12:55  24  officer whether he uses lethal force or not.

25      Q    Is it your understanding that it's at the

**Exhibit 16 - P. 180**

1  discretion of the individual officer whether to use less

2  lethal force or not?

3      A    Yes.

12:55  4      Q    You mentioned that you had received training as

5  a P3 training officer on interacting with persons armed

6  with weapons other than firearms; correct?

7      A    Yes.

12:55  8      Q    And is it your understanding that the LAPD

9  training provided to you in that regard instructs that

10  officers should attempt to resolve a situation with the

11  least force possible?

12:56  12      A    Yes, of course.

13      Q    Even when confronting a person with an edged

14  weapon?

15      A    Yes.

12:56  16      Q    And is it also your understanding based on your

17  training and experience that just because lethal force

18  may be authorized, it does not have to be used if the

19  situation could be resolved safely with other force

12:56  20  options?

21      A    Yes.

22      Q    Is it your understanding that a guiding

23  principle to the LAPD use of force policy is the

12:56  24  preservation and reverence for human life?

25      A    Yes.

OFFICER CHRISTOPHER KELLY          Non-Confidential          JOB NO. 302882
JULY 26, 2022

```
 1      Q    And did you assist in bringing that officer
 2 armed with a 40 up to the front where you were?
 3      A    Yes.
13:11 4      Q    And was that because you thought less lethal
 5 could be utilized here?
 6      A    Yes.
 7      Q    And in fact, you thought at that point your
13:11 8 rifle wasn't going to do you any good; is that correct?
 9      A    Yes.  There were already other rifles there.  I
10 didn't need mine.
11      Q    That officer who had the 40 next to you was
13:11 12 Officer Suarez-Alvarez; is that correct?
13      A    Yes.
14      Q    And did you tell Officer Suarez-Alvarez at that
15 moment in time if he, meaning Mr. Mendoza, comes within
13:11 16 range then go ahead and hit him?
17      A    A little bit out of context.  Yeah.  There were
18 other parts of the conversation, yes.
19      Q    Did you believe that when Mr. Mendoza was 30 to
13:12 20 40 yards away that he was within range of the 40?
21      A    The 40 has a range of 110 feet, which is
22 probably about the distance he was at.  But it would
23 take a very good shooter to be able to hit him at that
13:12 24 far.
25      Q    As Mr. Mendoza walked -- let me ask you this:
```

1    A    I think he did that one time.

2    Q    And then after that one time, he started

3  walking towards you; is that correct?

13:15  4    A    Started walking towards the line of officers.

5    Q    As he continued walking towards that line of

6  officers, was he also approaching the white SUV?

7    A    I didn't know where the white SUV was.  I never

13:15  8  paid attention to the white SUV.

9    Q    When did you tell Officer Suarez-Alvarez, if he

10  comes within range, then go ahead and hit him?  Do you

11  recall the particular point in time?

13:15  12    A    When he began to walk towards us.

13    Q    And as he continued walking, did you then tell

14  Officer Suarez-Alvarez something to the effect of, go,

15  go, go, hit him?

13:15  16    A    Yes.

17    Q    And did you also have your hands on Officer

18  Suarez-Alvarez's left shoulder?

19    A    Yes.  I didn't know at the time, but after

13:16  20  watching body video, yes, I did.

21    Q    Do you recall why you put your hand on his

22  shoulder?

23    A    No.  I believe just bringing him up from the

13:16  24  back.  Maybe I never removed it.  I don't know.

25    Q    And isn't it true at one point Officer

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

```
 1

 2

 3

13:33    4

 5

 6

 7

13:33    8

 9

10

11

13:33   12

13

14

15              MR. SAAED:  And we can go off confidential now.

13:34   16  BY MR. SAAED:

17      Q      Based on your training as a qualified rifle

18  operator, when is a LAPD rifle operator supposed to take

19  their rifle off safety?

13:34   20      A      When you are on target and ready to shoot.

21      Q      Does ready to shoot mean a person presents a

22  imminent threat or great bodily injury?

23      A      Yes.

13:34   24      Q      You saw the edged weapon held by Mr. Mendoza

25  while he was on Elmer Avenue; correct?
```

OFFICER CHRISTOPHER KELLY         Non-Confidential                    JOB NO. 302882
JULY 26, 2022

```
      1     A     Yes.

      2     Q     You were not pointing the rifle at

      3  Mr. Mendoza?

13:39 4     A     No.

      5     Q     You were standing still?

      6     A     Yes.

      7     Q     You were telling Officer Suarez-Alvarez to fire

13:39 8  his 40-millimeter less lethal launcher?

      9     A     Yes.

     10     Q     While on scene, if you personally, Officer

     11  Kelly, were in fear of imminent battery, death or great

13:40 12 bodily injury would you have used lethal force?

     13     A     If I felt fear for great bodily injury, yes, I

     14  would.

     15     Q     At the moment Mr. Mendoza was shot, were you in

13:40 16 fear of imminent death or great bodily injury to

     17  yourself?

     18     A     I was not focused on being a shooter at the

     19  time.  I had other people to rely on that for me.

13:40 20    Q     So you were not in fear of imminent death or

     21  great bodily injury to yourself at that moment in time?

     22     A     I was not.  I had other people to protect me.

     23     Q     Based on your training and experience in

13:41 24 interacting with persons armed with edged weapons, is it

     25  your understanding that distance is not the only factor
```

OFFICER CHRISTOPHER KELLY          Non-Confidential                    JOB NO. 302882
JULY 26, 2022

```
      1  that must be considered?

      2      A    Yes.

      3      Q    In the last seven years, have you received any

13:41 4  training from the Los Angeles Police Department on

      5  recognizing behaviors associated with mental illness?

      6      A    Yes.

      7      Q    And is that training not to help you diagnose a

13:42 8  disorder, but rather just recognize general indicators

      9  of mental illness?

     10      A    Yes.

     11      Q    That way you can take appropriate actions based

13:42 12  on your assessment?

     13      A    Hopefully.

     14      Q    Are some of those -- let me ask you.  Strike

     15  that.  Is one of those general indicators fearfulness?

13:42 16          MS. SMITH:  I'm going to object.  It's vague

     17  and overbroad.  If understand, you can answer.

     18          THE WITNESS:  I don't understand.

     19  BY MR. SAAED:

13:42 20      Q    Sure.  You had talked about that you received

     21  training regarding recognizing general indicators

     22  associated with mental illness; correct?

     23      A    Correct.

13:42 24      Q    Is one of those general indicators being

     25  nonresponsive to commands?
```

```
 1

 2

 3

 4

 5

 6

 7

 8      I, OFFICER KELLY, do hereby declare under the

 9  penalty of perjury that I have read the foregoing

10  transcript; that I have made any corrections as appear

11  noted, in ink, initialed by me, or attached hereto; that

12  my testimony is true and correct.

13      EXECUTED this _____ day of _____,

14  2022, at _____, _____.

15

16                    _____

17                    Officer Christopher Kelly

18

19

20

21

22

23

24

25
```

1          I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3   That the foregoing proceedings were taken before me at

4   the time and place herein set forth; that any witness in

5   the foregoing proceedings, prior to testifying were duly

6   sworn, that a verbatim record of the proceedings was

7   made by me using machine shorthand, which was thereafter

8   transcribed under my direction; that the foregoing

9   transcript is a true record of the testimony given.

10          Further, that if the foregoing pertains to the

11  original transcript of a deposition in a Federal Case

12  before completion of the proceedings, review of the

13  transcript was not requested.

14          I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17          IN WITNESS WHEREOF, I have on this date

18  subscribed my name.

19  Date:

20  July 31, 2022

21

22  _____

23          Jasmine Richau
            CSR No. 14217

24

25

**Exhibit 16 - P. 188**