# Deposition Transcript

Case Number: 2:21-cv-04614-KS

Date: July 26, 2022

In the matter of:

# MENDOZA, et al. v CITY OF LOS ANGELES, et al.

## Officer Suarez-Alvarez

**CERTIFIED COPY**

Reported by:

Jasmine Richau
CSR No. 14217

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

**Exhibit 17 - P. 189**

1                  UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3

4        YVONNE MENDOZA, RAYMUND MENDOZA
         and MARJORIE MARINO, as
5        Administrators of the Estate of
         Rommel Mendoza,
6
                          Plaintiff,   Case No.
7                                      2:21-cv-04614-KS

8                    vs.

9        CITY OF LOS ANGELES public
         Entity, OFFICER DANIEL HARTY,
10       SERGEANT J. HARDAKER, SERGEANT
         DAN WIDMAN, OFFICER SCOTT,
11       OFFICER JUAN GALVAN, OFFICER
         SIERRA, OFFICER KELLY, and
12       DOES 1-30,

13

                          Defendants.
14       _____

15

16

17               VIDEOCONFERENCE DEPOSITION OF

18                  OFFICER SUAREZ-ALVAREZ

19                      JULY 26, 2022

20      CONFIDENTIAL PORTIONS BOUND SEPARATELY PURSUANT TO
                          PROTECTIVE ORDER

21

22      Reported By:
        Jasmine Richau
23      CSR No. 14217

24      Job No. 302888

25

**Exhibit 17 - P. 190**

```
 1              UNITED STATES DISTRICT COURT

 2              CENTRAL DISTRICT OF CALIFORNIA

 3

 4       YVONNE MENDOZA, RAYMUND MENDOZA
         and MARJORIE MARINO, as
 5       Administrators of the Estate of
         Rommel Mendoza,
 6
                            Plaintiff,    Case No.
 7                                    2:21-cv-04614-KS
                         vs.
 8
         CITY OF LOS ANGELES public
 9       Entity, OFFICER DANIEL HARTY,
         SERGEANT J. HARDAKER, SERGEANT
10       DAN WIDMAN, OFFICER SCOTT,
         OFFICER JUAN GALVAN, OFFICER
11       SIERRA, OFFICER KELLY, and
         DOES 1-30,
12
                            Defendants.
13

14  --------------------------------------------------------

15

16

17

18          Deposition of OFFICER SUAREZ-ALVAREZ, taken on

19  behalf of the Plaintiff via Steno Connect, beginning at

20  10:03 a.m., and ending at 11:45 a.m., on

21  July 26, 2022, before JASMINE RICHAU, Certified

22  Shorthand Reporter No. 14217.

23

24

25
```

OFFICER SUAREZ-ALVAREZ          Confidential              JOB NO. 302888
JULY 26, 2022

```
 1  APPEARANCES:

 2  FOR THE PLAINTIFFS:

 3           CBS Law

 4           BY: CHRISTOPHER J. BOU SAEED, ESQ.

 5           633 West 5th Street,

 6           26th Floor

 7           Los Angeles, California

 8           90071  (213) 605-5838

 9           chris@thecbslaw.com

10
    FOR THE CITY OF LOS ANGELES:
11
             City Attorney's Office
12
             BY: COLLEEN R. SMITH, ESQ.
13
             200 North Main Street
14
             Sixth Floor
15
             Los Angeles, California
16
             90012  (213) 978-7027
17
             colleen.smith@lacity.org
18

19

20

21

22

23

24

25
```

**Exhibit 17 - P. 192**

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

```
 1  APPEARANCES:

 2  FOR THE DEFENDANT OFFICER HARTY:

 3          Manning & Kass, Ellrod, Ramirez, Trester LLP

 4          BY:  EUGENE RAMIREZ, ESQ.

 5          801 South Figueroa Street,

 6          15th Floor

 7          Los Angeles, California

 8          90017 (213) 553-2405

 9          epr@manningllp.com

10

11  ALSO PRESENT:

12  David Boyd, Videographer

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICER SUAREZ-ALVAREZ                    Confidential                          JOB NO. 302888
JULY 26, 2022

```
 1                               I-N-D-E-X

 2  WITNESS:   OFFICER SUAREZ-ALVAREZ

 3  EXAMINATION                                                   PAGE

 4  BY MR. SAAED                                                     7

 5  BY MS. SMITH                                                    59

 6

 7                             E-X-H-I-B-I-T-S

 8  PLAINTIFF

 9  Exhibit 18   Statement of Police Officer II,                  54
                 Jonathan Suarez; page 33
10               (confidential)

11       THE FOLLOWING PORTIONS ARE CONFIDENTIAL PURSUANT TO
                       PROTECTIVE ORDER
12
                  PAGE                    LINES
13
                  24                      15-22
14                25                      12-21
                  26                      11-14
15                26                      22-25
                  27                      1-4
16                53                      1-8
                  53                      12-21
17                53                      24-25
                  54                      1
18                56                      1-12
                  59                      14-23
19

20

21

22

23

24

25
```

**Exhibit 17 - P. 194**

```
 1                  Tuesday, July 26, 2022

 2                       10:07 a.m.

 3                         -o0o-

10:06  4         THE VIDEOGRAPHER:  Good afternoon.  We are on

 5  the record at 10:07 a.m. Pacific Time on July 26, 2022,

 6  to begin the deposition of Officer Suarez-Alvarez in the

 7  matter of Mendoza, et al. versus City of Los Angeles, et

 8  al.  This case is venued in the United States District

 9  Court, Central District of California.  The case number

10  is 2:21-cv-04614-KS.  This deposition is taking place

11  via Steno, Steno Connect platform.  The legal

12  videographer is David Boyd, here on behalf of Steno.

13  The court reporter is Jasmine Richau, also here on

14  behalf of Steno.  Would counsel please identify

15  yourselves and state whom you represent.

10:07 16         MR. SAAED:  Good morning, everyone.

17  Christopher Saaed for the plaintiffs.

10:07 18         MS. SMITH:  Good morning, everyone.

10:07 19  Colleen Smith on behalf of defendant, City of Los

20  Angeles.  And also representing the deponent, Officer

21  Jonathan Suarez-Alvarez.

10:08 22         MR. RAMIREZ:  Good morning.  Eugene Ramirez of

23  Manning & Cass, et al.  Representing Officer Daniel

24  Harty.

10:08 25         THE VIDEOGRAPHER:  Thank you, Counsel.  Would
```

| | | |
|---|---|---|
| | 1 | the reporter please swear in the witness. |
| 10:08 | 2 | THE REPORTER:  Mr. Alvarez, please raise your |
| | 3 | right hand.  Do you solemnly state that the testimony |
| | 4 | you are about to give in this deposition shall be the |
| | 5 | truth, the whole truth, and nothing but the truth? |
| 10:08 | 6 | THE WITNESS:  Yes, I do. |
| 10:08 | 7 | -o0o- |
| 10:08 | 8 | EXAMINATION |
| 10:08 | 9 | BY MR. SAAED: |
| 10:08 | 10 | Q    Good morning, Officer Suarez-Alvarez.  Would |
| | 11 | you please state your name. |
| 10:08 | 12 | A    Yes.  Good morning.  My name is Jonathan |
| | 13 | Suarez-Alvarez. |
| 10:08 | 14 | Q    Officer, have you ever had your deposition |
| | 15 | taken before? |
| 10:08 | 16 | A    No.  No, I haven't. |
| 10:08 | 17 | Q    Have you ever testified in court before? |
| 10:08 | 18 | A    I have not. |
| 10:08 | 19 | Q    Do you understand you have a duty to tell the |
| | 20 | truth today? |
| 10:09 | 21 | A    Yes. |
| 10:09 | 22 | Q    And do you understand that your testimony is |
| | 23 | being taken down subject to the penalty of perjury? |
| 10:09 | 24 | A    Yes. |
| 10:09 | 25 | Q    If I ask a question you don't understand, |

1 activate and have it start recording, in the front there

2 is a button that you press twice.  And as soon as you

3 do, it turns on.

10:14  4     Q    When you arrived on scene, were you armed with

5 a firearm?

10:14  6     A    Yes.  We always have a firearm on our hips.

10:14  7     Q    Before you had arrived on scene, did you check

8 out a 40-milllimeter Less-Lethal Launcher?

10:14  9     A    Yes, I did.

10:14 10     Q    And is that something you do at the beginning

11 of every shift, or just on certain shifts?

10:15 12     A    We, at the beginning of every shift, we do take

13 either a 40-millimeter launcher, or a beanbag shotgun.

14 One or the other.  It's not the same.  We don't always

15 check out one, it could be either/or.  Whatever we are

16 assigned.

10:15 17     Q    So that day you were assigned a 40-milllimeter

18 Less-Lethal Launcher?

10:15 19     A    I was.

10:15 20     Q    On May 27th, 2020, did you require the use of

21 any corrective eyewear apparatus?  Like, for example,

22 glasses or contact lenses?

10:15 23     A    No.

10:15 24     Q    When were you first hired by the Los Angeles

25 Police Department?

**Exhibit 17 - P. 197**

OFFICER SUAREZ-ALVAREZ       Confidential       JOB NO. 302888
JULY 26, 2022

```
10:16   1      A    I was hired on May 15th of 2017.

10:16   2      Q    And did you attend the Los Angeles Police

        3 Department Police Academy?

10:16   4      A    Yes, I did.

10:16   5      Q    And was that before May 15, 2017 or after

10:16   6 May 15th, 2017?

10:16   7      A    No, it began on May 15th, 2017.

10:16   8      Q    How long did you attend the LAPD academy?

10:16   9      A    It was an academy of six months.

10:16  10      Q    And as part of your six months in academy, did

       11 you have to study peace officer standards and training

       12 guidelines?

10:16  13      A    Yes.  We did study guidelines and procedures.

10:16  14      Q    And did you receive training in the academy on

       15 the use of force?

10:16  16      A    Yes.

10:17  17      Q    In the academy, specifically, did you receive

       18 training on using less than lethal force?

10:17  19      A    Yes.

10:17  20      Q    Did you receive training in the academy on the

       21 use of lethal force?

10:17  22      A    Yes.

10:17  23      Q    Did you receive training on the concepts of

       24 reasonable suspicion to detain?

10:17  25      A    Yes.
```

**Exhibit 17 - P. 198**

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

10:17 | 1      Q      How about probable cause to arrest?  Did you

2    receive training on that?

10:17 | 3      A      Yes, I did.

10:17 | 4      Q      Did you also receive training on interacting

5    with persons with mental disabilities while in the

6    academy?

10:17 | 7      A      Yes.

10:17 | 8      Q      And did you also receive training in the

9    academy on interacting with persons armed with edged

10   weapons?

10:17 | 11     A      Yes.

10:18 | 12     Q      Did you graduate from the LAPD academy in

13   November of 2017?

10:18 | 14     A      Yes.  I can't remember exactly the date, but I

15   believe it was the last days of October of 2017.

10:18 | 16     Q      And upon graduation from the academy, what was

17   your first assignment as a Los Angeles Police Department

18   police officer?

10:18 | 19     A      After I graduated, I was assigned a regular

20   patrol at Devonshire division.

10:18 | 21     Q      What were your responsibilities as regular

22   patrol at Devonshire division?

10:18 | 23     A      I was on probation for approximately a year.

24   So we were assigned to work with a training officer,

25   with a field training officer, in order to learn and be

**Exhibit 17 - P. 199**

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

10:20    1        (The reporter asked for clarification of the

         2        record.)

10:20    3             THE WITNESS:  As a P2, we're assigned an A car,

         4    which is just a police vehicle that has a designated

         5    area in North Hollywood that we cover and respond to any

         6    radio calls in that area.

10:21    7    BY MR. SAAED:

10:21    8        Q    While you were a probation officer at the

         9    Devonshire station, you said you were assigned to a

        10    field training officer?

10:21   11        A    Yes.

10:21   12        Q    And did that field training officer go over

        13    with you policies and procedures as it relates to the

        14    use of force?

10:21   15        A    Yes.

10:21   16        Q    Did the training officer also go over with you,

        17    go over with you -- let me retract that.  Did the

        18    training officer during your time as a probation officer

        19    at Devonshire station also go over policies and

        20    procedures regarding interactions with persons with

        21    mental disabilities?

10:21   22        A    Yes.

10:21   23        Q    Did they also go over training on interactions

        24    with persons with edged weapons?

10:21   25        A    Yes.

**Exhibit 17 - P. 200**

10:22 1     Q    Outside of the field supervision training that

2 you received while a probation officer before

10:22 3 May 27th, 2020, did you receive any other post-academy

4 training?

10:22 5     A    Training regarding what, sir?

10:22 6     Q    The use of force.

10:22 7     A    Yes.  From time to time, we're sent to

8 different trainings that are located at a different

9 facility.

10:22 10     Q    That training, after your time as probation

11 officer, did it involve training on use of the

12 40-milllimeter Less-Lethal Launcher?

10:23 13     A    No.

10:23 14     Q    Prior to May 27, 2020, when was with the last

15 time that you had received training from the Los Angeles

16 Police Department on use of the 40-milllimeter

17 Less-Lethal Launcher?

10:23 18         MS. SMITH:  I'm going to object that it's

19 vague.  It's overbroad.  You can answer.

10:23 20     A    I did receive training on the 40-millimeter

21 launcher while I was in academy.

10:23 22 BY MR. SAAED:

10:23 23     Q    So after the training that you received on the

24 40-milllimeter Less-Lethal Launcher at the academy, you

25 did not receive any other training regarding the use of

1 the 40-milllimeter Less-Lethal Launcher; is that

2 correct?

10:24  3        MS. SMITH:  I'm just going to object that

4 that's vague.  It's overbroad.  Are you referring to

5 formal training?

10:24  6        MR. SAAED:  I am referring to training received

7 by the Los Angeles Police Department.

10:24  8        MS. SMITH:  You can answer if you understand.

10:24  9        THE WITNESS:  We -- because while we are in

10 academy, we received official training on the whole

10:24 11 40-millimeter.  After that, there was training where

12 they let us know that we could use it, but we no longer

13 were required to use it or any training like that.

14 Because we were expected to already know how to operate

15 it.

10:24 16 BY MR. SAAED:

10:24 17    Q    So is that a no that you did not receive any

18 formal additional training after the academy on the

19 40-milllimeter Less-Lethal Launcher?

10:24 20    A    No.

10:24 21    Q    So that is correct?

10:25 22    A    Correct.

10:25 23    Q    Prior to May 27th, 2020, had you ever fired the

24 40-milllimeter Less-Lethal Launcher while on a scene?

10:25 25    A    No.

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

10:25   1        Q     Prior to May 27th, 2020, when was the last time

        2    you fired a 40-milllimeter Less-Lethal Launcher, whether

        3    in training or in another situation as a Los Angeles

        4    Police Department officer?

10:25   5        A     That was -- I can't say the exact date, but

        6    that was during my training in academy.

10:26   7        Q     In your Los Angeles Police Department training,

        8    you are instructed to only use tactics that you received

        9    official LAPD training on; is that correct?

10:26  10             MS. SMITH:  I am going to object.  It's vague

       11    and overbroad.  If you understand, you can answer.

10:27  12             THE WITNESS:  Can you repeat the question,

       13    please.

10:27  14    BY MR. SAAED:

10:27  15        Q     Sure.  In your training by the Los Angeles

       16    Police Department, are you trained to only use those

       17    tactics that the LAPD has trained you on?

10:27  18        A     Yes.

10:27  19        Q     Based on your training and experience, is

       20    effective communication important to a police officer?

10:27  21        A     Yes, it is.

10:27  22        Q     What does effective communication mean to you

       23    as a police officer?

10:27  24             MS. SMITH:  I'm just going to object as vague

       25    and overbroad.  You can answer.

**Exhibit 17 - P. 203**

10:27  1          THE WITNESS:  I believe it's important to be

2  able to communicate.  And just with different

3  situations, it could help you in different situations as

4  for de-escalating a situation or being able to speak to

5  multiple parties at a radio call.

10:28  6  BY MR. SAAED:

10:28  7    Q    Is part of effective communication making sure

8  everyone is on the same page regarding what is being

9  communicated?

10:28 10          MS. SMITH:  I am going to object that it's

11  vague.  It's overbroad.  It lacks foundation.  Calls for

12  speculation.  If you understand, you can answer.

10:28 13          THE WITNESS:  That just -- do not understand

14  who you mean by everyone.  Everyone as in us officers,

15  my partners?  Or everyone as, like, the people involved

16  in the radio call?

10:28 17  BY MR. SAAED:

10:28 18    Q    Good question.  Is effective communication

19  amongst officers important to ensure that every officer

20  is on the same page?

10:29 21    A    Yes.

10:29 22    Q    Based on your training and experience, what

23  does the term Code Robert mean?

10:29 24    A    Code Robert refers to the unit at scene

25  requesting an officer that's been trained and is

**Exhibit 17 - P. 204**

1 equipped with a rifle.

10:29  2    Q    Based on your training and experience, what

3 does low and ready mean?

10:29  4          MS. SMITH:  I am just going to object that it's

5 vague and it assumes facts.  If you understand, you can

6 answer.

10:29  7          THE WITNESS:  Low ready, just what it means is

8 you have your weapon, whatever it may be.  It doesn't

9 refer to either lethal or less lethal.  It just means

10 that you have it pointed still low towards the ground,

11 and you have your eyes up assessing the situation.

10:30 12 BY MR. SAAED:

10:30 13    Q    Based on your training and experience, what

14 does airship mean?

10:30 15    A    Our department airship is the helicopter we use

16 at scene.

10:30 17    Q    Based on your training and experience, what

18 does designated cover officer mean?

10:30 19    A    Designated cover officer is the officer

20 assigned or in charge to use lethal force if necessary.

10:30 21    Q    Is there any term similar to designated cover

22 officer that refers to an officer assigned or in charge

23 to use less than lethal force?

10:31 24    A    There is no term that I could think of, but

25 there is always one officer or several officers,

**Exhibit 17 - P. 205**

```
     1  actually, that will be assigned less lethal.  And you

     2  are just told by the person in charge or the incident

     3  commander at scene who will be in charge of less lethal.

10:31  4      Q    On May 27, 2020, when you arrived at the 6400

     5  block of Elmer Avenue, did anyone tell you that you,

     6  Officer Suarez-Alvarez, would be in charge of less

     7  lethal?

10:31  8      A    Yes.  I was told by the sergeant at the scene

     9  that I was assigned less lethal.

10:32 10      Q    Did you hear that sergeant assign anyone as the

    11  designated cover officer?

10:32 12      A    No, I didn't.

10:32 13      Q    Did you hear any officer identify either

    14  themselves or another officer as the designated cover

    15  officer?

10:32 16      A    No, I did not.  My responsibility was less

    17  lethal, so I did not go around and ask who was the

    18  designated cover officer.

10:32 19      Q    Based on your training and experience, what

    20  does threshold mean?

10:32 21          MS. SMITH:  I'm just going to object that

    22  that's vague.  It's overbroad.  It lacks foundation.  If

    23  you understand the question, you can answer.

10:33 24          THE WITNESS:  The word threshold is not a

    25  specific word that we use in LAPD.  As for training,
```

```
      1  it's just a common word that we use like any other word
      2  in our regular vocabulary.
10:33 3  BY MR. SAAED:
10:33 4      Q    Have you ever received any Los Angeles Police
      5  Department training that used the word threshold?
10:33 6          MS. SMITH:  I am just going to object.  Assumes
      7  facts.  It lacks foundation.  Calls for speculation.
      8  It's vague.  And it's overbroad, but if you understand,
      9  you can answer.
10:33 10         THE WITNESS:  Like I said prior, it's not a
     11  specific word.  It does not mean anything different than
     12  it does to you as for training, but we have used it in
     13  the term of -- for example, building searches, where we
     14  were entering and clearing out a building.  We have used
     15  the word of just threshold as for when explaining a room
     16  situation, a door but nothing different.
10:34 17 BY MR. SAAED:
10:34 18     Q    One moment please, Officer Suarez-Alvarez.
10:34 19     A    Yes.
10:34 20     Q    Now, on May 27th, 2020, the term threshold was
     21  used by other officers that you heard; correct?
10:34 22     A    Correct.
10:34 23     Q    And your understanding of what threshold meant
     24  on scene that day was that it was a line that if
     25  Mr. Mendoza crossed, lethal force would be used;
```

**Exhibit 17 - P. 207**

1  correct?

10:35  2       MS. SMITH:  Well, I am just going to object

3  that that misstates testimony.  It lacks foundation.  It

4  calls for speculation.  If you understand his question,

5  you can answer.

10:35  6       THE WITNESS:  I believe what I explained is

7  that not him passing this line, like, you worded was a

8  time to use lethal force.  It was the time where he was

9  getting closer to the officers at scene, and based on

10  Mr. Mendoza's actions, and the way he was, it was the

11  level that deadly force was rising.  And it could for

12  whatever officer has to analyze and decide whether he or

13  she should use lethal force.

10:35  14  BY MR. SAAED:

10:36  15

16

10:36  17

10:36  18

19

20

21

22

10:36  23       MS. SMITH:  Okay.  I am going to -- because you

24  are asking questions directly related to statements he

25  gave to force investigation division, which were

1 produced pursuant to the protective order.  That

2 question and any other questions and answers concerning

3 what he said specifically in that statement need to be

4 under seal.  So, Ms. Court Reporter, we'll have to put

5 this portion under seal.  So if you remember the

6 question or do you need it read back?

10:37  7        THE WITNESS:  No.  Can you read it back to me,

8 please.

10:37  9        MR. SAAED:  Madame reporter, can you read it

10 back to Mr. Suarez-Alvarez.

10:37  11        (The reporter read back the question.)

10:37  12

13

14

15

16

17

18

19

20

21

10:38  22 BY MR. SAAED:

10:38  23    Q    So you believe that the threshold meant to use

24 lethal force if it was passed?

10:38  25        MS. SMITH:  I'm just going to object that

         1  misstates testimony.  You can answer.

10:38    2          THE WITNESS:  Again, like I explained, it was

         3  not a point where just because Mr. Mendoza crossed he

         4  would be -- officers would use lethal.  It was all based

         5  on his actions.  If they escalated where he was more

         6  violent and the use or the situation where we use lethal

         7  would have rised.  And it was all dependent on his

         8  actions.  If he merely just passed or walked to that

         9  spot, that does not mean we were going to use lethal.

        10  It still has to be analyzed just by any officer.

10:39   11

        12

        13

        14

10:39   15          MS. SMITH:  Object.  That misstates testimony.

        16  Misstates the evidence.  And it's also incomplete in

        17  that it disregards further statements made during that

        18  same interview.  If you understand his question, you can

        19  answer.

10:39   20          THE WITNESS:  Can you repeat the question.

10:39   21  BY MR. SAAED:

10:39   22

        23

        24

        25

**Exhibit 17 - P. 210**

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

| | | |
|---|---|---|
| 10:40 | 1 | |
| 10:40 | 2 | |
| | 3 | |
| 10:40 | 4 | |
| 10:40 | 5 | Q    On May 27th, 2020, when the term threshold was |
| | 6 | told to you, did you ask any follow-up questions |
| | 7 | regarding its meaning? |
| 10:41 | 8 | A    Not that I can remember. |
| 10:41 | 9 | Q    Prior to May 27th, 2020, had you ever heard the |
| | 10 | term threshold used by officers on a scene before? |
| 10:41 | 11 | MS. SMITH:  I'm going to object that that's |
| | 12 | vague.  It's overbroad.  You can answer. |
| 10:41 | 13 | THE WITNESS:  Yes, I have heard it before. |
| 10:41 | 14 | BY MR. SAAED: |
| 10:41 | 15 | Q    At approximately how many incidents have you |
| | 16 | heard the term threshold used by officers before on |
| | 17 | scene? |
| 10:41 | 18 | A    I can't remember exactly the amount of times, |
| | 19 | but I would say anywhere from three to five times. |
| 10:42 | 20 | Q    And in those three to five times, did threshold |
| | 21 | mean to you the same thing that it meant to you on |
| 10:42 | 22 | May 27th, 2020? |
| 10:42 | 23 | MS. SMITH:  I'm just going to object.  It's |
| | 24 | vague.  It's ambiguous.  It's overbroad.  You can |
| | 25 | answer. |

OFFICER SUAREZ-ALVAREZ         Confidential         JOB NO. 302888
JULY 26, 2022

10:42  1         THE WITNESS:   No.   On previous times when I

      2  have heard, it's been used more inside of a building.

      3  Like I said earlier, to explain just the entering of a

      4  doorway or a location.   So it had not been used the same

      5  way.

10:42  6  BY MR. SAAED:

10:42  7     Q    In those three to five times you had heard it

      8  said previously, had it ever been used outside of a

      9  structure?

10:42 10     A    No.

10:42 11     Q    And had in those three to five times it was

   12  used inside of a structure, did it mean that if a

   13  suspect crossed it, lethal force would be used?

10:43 14         MS. SMITH:   I'm going to object.   That's vague,

   15  ambiguous, overbroad.   It's an incomplete hypothetical,

   16  but you can answer.

10:43 17         THE WITNESS:   I have not experienced any time

   18  where when we were inside a building search for whoever

   19  it is, we eventually found anyone in there.   So it's

   20  never had to be used where a person has actually crossed

   21  out or exited a structure or a threshold.

10:43 22         MR. SAAED:   Madame reporter, would you repeat

   23  my question.

10:43 24         (The reporter read back the question.)

10:44 25         THE WITNESS:   No, but the reason I say no is in

**Exhibit 17 - P. 212**

OFFICER SUAREZ-ALVAREZ                Confidential                    JOB NO. 302888
JULY 26, 2022

1  a situation where we are entering buildings, we are the

2  ones crossing thresholds, clearing room through room.

3  There has never been a situation where a suspect is

4  coming towards us.  We are the ones in there searching

5  for anyone.

10:44  6  BY MR. SAAED:

10:44  7      Q      Did you ever receive any field training after

8  the academy on the use of the word threshold as it was

9  used on May 27th, 2020?

10:44 10          MS. SMITH:  I'm just going to object.  It's

11  vague and ambiguous.  Overbroad.  Been asked and

12  answered.  You can answer, if you understand.

10:45 13          THE WITNESS:  No.

10:45 14  BY MR. SAAED:

10:45 15      Q      You mentioned that you received training in the

16  academy firing a 40-milllimeter Less-Lethal Launcher; is

17  that correct?

10:45 18      A      Yes, that's correct.

10:45 19      Q      While in the academy, did you ever participate

20  in any exercises where an officer would utilize the

21  40-milllimeter Less-Lethal Launcher, and at least one

22  other officer would utilize a patrol-issued rifle?

10:45 23      A      Can you repeat the question.

10:45 24      Q      Madame reporter, can you repeat the question?

10:45 25          (The reporter read back the question.)

OFFICER SUAREZ-ALVAREZ                    Confidential                    JOB NO. 302888
JULY 26, 2022

1 correct?

11:08  2      A      Yes.

11:08  3      Q      It goes up to 110 feet; correct?

11:08  4      A      It does.

11:08  5      Q      Why didn't you fire the less lethal launcher

6 before Mr. Mendoza reached the threshold when he was

7 within 110 feet of you?

11:08  8      A      As soon as I saw him walking rapidly, that's

9 when I was no longer on the low ready.  I was now

10 looking through the 40-millimeter scope or the way that

11 we view it, it's a red dot system, and it's not that I

12 was waiting for him for a specific time.  I was only

13 waiting for me to get a clear view of the target and

14 clear the designated area where we strike the targets

15 with the 40-millimeter, which is the abdominal area.  As

16 soon as I saw that it was on target, that's when I used

17 the 40-millimeter.

11:09 18      Q      While you were standing on the west side of

19 Elmer Avenue with your 40-milllimeter Less-Lethal

20 Launcher, deployed a senior officer, Officer Kelly, was

21 next to you on your left-hand side; correct?

11:09 22      A      Yes.

11:09 23      Q      And before you fired your less lethal launcher,

24 Officer Kelly told you once he gets within range to fire

25 the launcher; correct?

OFFICER SUAREZ-ALVAREZ        Confidential        JOB NO. 302888
JULY 26, 2022

11:10   1     A    Yes.

11:10   2     Q    And he asked you at one point while Mr. Mendoza

      3 was approaching, is he within range yet; correct?

11:10   4     A    Yes.

11:10   5     Q    And you said, no; correct?

11:10   6     A    Yes.

11:10   7     Q    And you wanted to fire your 40-milllimeter

      8 Less-Lethal Launcher before Mr. Mendoza reached the

      9 threshold; correct?

11:10 10     A    Yes.

11:10 11     Q    And that was because you understood the

     12 threshold to mean once Mr. Mendoza reached it, lethal

     13 force would be used; correct?

11:10 14       MS. SMITH:  I am going to object that misstates

     15 facts.  It misstates testimony, but you can answer the

     16 question.

11:11 17       THE WITNESS:  Yes.  I wanted to use my less

     18 lethal prior to him entering an area where less lethal

     19 can be used, yes.

11:11 20 BY MR. SAAED:

11:11 21     Q    For clarity, in your time as a Los Angeles

     22 Police Department officer, you had never heard another

     23 officer use the term threshold relating to the use of

     24 lethal force while on scene; correct?

11:11 25     A    Correct.

**Exhibit 17 - P. 215**

11:11  1      Q      Neither had you ever used that term threshold

2  for the use of lethal force in training as a LAPD

3  officer; correct?

11:12  4      A      Correct.

11:12  5      Q      When you heard the term used on May 27th, 2020,

6  in relation to the use of lethal force, did you have any

7  questions regarding whether that was an appropriate

8  tactic?

11:12  9           MS. SMITH:  I am going to object that it

10  misstates testimony.  It misstates the evidence.  It's

11  also an incomplete hypothetical.  You can answer it, if

12  you understand it.

11:12 13           THE WITNESS:  Actually, I don't understand what

14  tactic exactly you mean.

11:13 15  BY MR. SAAED:

11:13 16      Q      The tactic of using a threshold to mean the use

17  of lethal force.

11:13 18      A      Did I believe that it was an appropriate

19  contact tactics, is that your question?

11:13 20      Q      Correct.

11:13 21           MS. SMITH:  Well, I am just going to also

22  interpose an objection to the extent that you are asking

23  for his lay opinion.  He is not here in expert capacity.

24  So you can answer the question.

11:13 25           THE WITNESS:  I've never had it been used

1 already -- the airship was already communicating with

2 him or attempting to communicate with him.  And I just

3 had let the helicopter operator do the talking.

11:20  4      Q     During that same period of time, why did you

5 not announce yourself to the other officers as being

6 present with a 40-milllimeter Less-Lethal Launcher?

11:21  7      A     You mean on the west side, the officers that

8 were there?

11:21  9      Q     Correct.

11:21 10      A     It was the sergeant that was in charge of that

11 team that pulled me and assigned me to that aware.  So I

12 just believed that they already knew that that's the

13 reason I was called, because they needed a less lethal

14 officer there.  From what I remember, they also asked

15 while I arrived to the west side, they asked, does

16 anybody have lethal?  And I did voice, yes, I do.  I'm

17 here.  I have -- sorry -- less lethal.  I said yes, I'm

18 here.  I have less lethal.

11:21 19      Q     And that was when you were on the east side of

20 Elmer Avenue?

11:22 21      A     No, that was on the west side.

11:22 22      Q     Before you fired the 40-milllimeter Less-Lethal

23 Launcher while standing on the west side of Elmer

24 Avenue, did Officer Kelly put his hand on your left

25 shoulder?

OFFICER SUAREZ-ALVAREZ                Confidential                    JOB NO. 302888
JULY 26, 2022

| | | |
|---|---|---|
| 11:22 | 1 | A    Yes. |
| 11:22 | 2 | Q    And any time that his hand was on your |
| | 3 | shoulder, did he squeeze your shoulder using his hands? |
| 11:22 | 4 | A    No.   I don't believe he squeezed my shoulder. |
| 11:22 | 5 | Q    Before you fired your 40-milllimeter |
| | 6 | Less-Lethal Launcher he told you to "Hit him, hit him, |
| | 7 | hit him, hit him"? |
| 11:22 | 8 | A    Yes.   I do remember him saying, hit him. |
| 11:23 | 9 | Q    Did he also say to you, before you fired the |
| | 10 | 40-milllimeter Less-Lethal Launcher, "go, go, go"? |
| 11:23 | 11 | A    Yes. |
| 11:23 | 12 | Q    And what did you take, hit him, hit him, hit |
| | 13 | him to mean? |
| 11:23 | 14 | A    I believe that he just advising me that |
| | 15 | Mr. Mendoza is already walking our way and whenever I |
| | 16 | have a clear shot or a good decent range, I should |
| | 17 | deploy at that time. |
| 11:23 | 18 | Q    And when he said, go, go, go, what did that |
| | 19 | mean to you? |
| 11:23 | 20 | A    Just like I said, as soon as I have a clear |
| | 21 | target, for Mr. Mendoza's abdominal area, I should fire |
| | 22 | my 40-millimeter. |
| 11:23 | 23 | Q    While you were on the west side of Elmer Avenue |
| | 24 | before you fired the 40-milllimeter Less-Lethal |
| | 25 | Launcher, there was lots of ambient noise around you; |

OFFICER SUAREZ-ALVAREZ                 Confidential                    JOB NO. 302888
JULY 26, 2022

```
        1              MS. SMITH:  That's fine.
11:30   2              THE VIDEOGRAPHER:  We are now off the record.
11:37   3    The time is 11:30 a.m. Pacific Time.
11:40   4              THE VIDEOGRAPHER:  We are now back on the
        5    record.  The time is 11:40 a.m. Pacific Time.
11:40   6    BY MR. SAAED:
11:40   7         Q    Officer Suarez-Alvarez, are you familiar with
        8    the Los Angeles Police Department's use of force policy?
11:40   9         A    Yes.
11:40  10         Q    And is it correct that a guiding principle
       11    under that policy says that when using force reverence
       12    for human life should be a guiding principle?
11:40  13         A    Yes.
11:40  14         Q    And is that guiding principle of reverence for
       15    human life also reflected in training bulletins you've
       16    received?  Like, for example, one issued on weapons
       17    other than firearms?
11:41  18         A    Yes.
11:41  19         Q    And is it safe to say that that guiding
       20    principle is a part of every use of force decision by a
       21    Los Angeles Police Department officer?
11:41  22         A    Yes, it is.
11:41  23         Q    And in the training that you've received on
       24    interacting with persons armed with weapons other than
       25    firearms, is it your understanding that officers should
```

**Exhibit 17 - P. 219**

```
 1 record would anyone like to get their video orders in?
 2       MR. SAAED:  I would ask for an expedited
 3 transcript and video.
 4       MR. RAMIREZ:  We would like a copy of the
 5 transcript, please.
 6       MS. SMITH:  I do not need a copy of the video.
 7       (The reporter confirmed copy orders.)
 8       MS. SMITH:  Yes, I do.  Just electronic copy.
 9       THE VIDEOGRAPHER:  If nobody has anything, I
10 will go ahead and read us off the record.  This
11 concludes volume one of the deposition of Officer
12 Suarez-Alvarez in the matter of Mendoza, et al. versus
13 the City of Los Angeles, et al.  We are now off the
14 record.  The time is 11:45 a.m. Pacific Time.
15
16
17
18
19
20
21
22
23
24
25
```

11:44 (line 2)
11:44 (line 4)
11:44 (line 6)
11:44 (line 7)
11:44 (line 8)
11:45 (line 11)

Exhibit 17 - P. 220

1

2

3

4

5

6

7      I, OFFICER SUAREZ-ALVAREZ, do hereby declare under

8  the penalty of perjury that I have read the foregoing

9  transcript; that I have made any corrections as appear

10  noted, in ink, initialed by me, or attached hereto; that

11  my testimony is true and correct.

12      EXECUTED this _____ day of _____,

13  2022, at _____, _____.

14

15                         _____

16                         Officer Suarez-Alvarez

17

18

19

20

21

22

23

24

25

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, do hereby certify:

3   That the foregoing proceedings were taken before me at

4   the time and place herein set forth; that any witness in

5   the foregoing proceedings, prior to testifying were duly

6   sworn, that a verbatim record of the proceedings was

7   made by me using machine shorthand, which was thereafter

8   transcribed under my direction; that the foregoing

9   transcript is a true record of the testimony given.

10       Further, that if the foregoing pertains to the

11  original transcript of a deposition in a Federal Case

12  before completion of the proceedings, review of the

13  transcript was not requested.

14       I further certify I am neither financially

15  interested in the action nor a relative or employee of

16  any attorney or party to this action.

17       IN WITNESS WHEREOF, I have on this date

18  subscribed my name.

19  Date:

20  July 28, 2022

21

22  _____

                    Jasmine Richau
23                   CSR No. 14217

24

25

**Exhibit 17 - P. 222**