# Deposition Transcript

Case Number: 2:21-cv-04614-KS

Date: June 21, 2022

In the matter of:

# Mendoza, et al. v City of Los Angeles, et al.

## SERGEANT JASON HARDAKER

**CERTIFIED COPY**

**Reported by:**

Rebecca A. Graziano
CSR No. 14407



Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

Exhibit 14 - P. 96

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

1                    UNITED STATES DISTRICT COURT
                   CENTRAL DISTRICT OF CALIFORNIA
2
    YVONNE MENDOZA; RAYMUND MENDOZA;  )
3   and MARJORIE MARINO, as           )
    Administrators of the Estate of   )
4   ROMMEL MENDOZA,                    )
                                       )
5          Plaintiffs,                 )
                                       )
6   vs.                               )Case No.
                                      )2:21-cv-04614-KS
7   CITY OF LOS ANGELES, a public     )
    entity; OFFICER DANIEL HARTY;      )
8   SERGEANT J. HARDAKER; SERGEANT     )
    DAN WIDMAN; OFFICER SCOTT;         )
9   OFFICER JUAN GALVAN; OFFICER       )
    SIERRA; OFFICER KELLY; and DOES    )
10  1-30,                             )
                                       )
11         Defendants.                )

12                *******************************

13              REMOTE VIDEOTAPED DEPOSITION OF
                    SERGEANT JASON HARDAKER
14                       June 21, 2022
                  *******************************

15

16          SERGEANT JASON HARDAKER, produced as a

17     witness at the instance of the Plaintiffs, was

18     duly sworn and deposed in the above-styled and

19     numbered cause on June 21, 2022, from 12:06 p.m.

20     to 4:24 p.m. CST, stenographically reported,

21     pursuant to the Federal Rules of Civil Procedure

22     and the provisions stated on the record.

23
       Reported by:   Rebecca A. Graziano, CSR, RMR, CRR
24                     Texas CSR 9306
                       California CSR 14407
25                     Illinois CSR 084.004659

**Exhibit 14 - P. 97**

SERGEANT JASON HARDAKER                                                JOB NO. 274522
JUNE 21, 2022

```
 1              A P P E A R A N C E S

 2    (all attendees appearing via remote videoconference)

 3
      REPRESENTING THE PLAINTIFF:
 4
       Mr. Christopher J. Bou Saeed
 5     CBS LAW
       633 West 5th Street, 26th Floor
 6     Los Angeles, California  90071
       (213) 605-5838
 7     chris@thecbslaw.com

 8
      REPRESENTING THE DEFENDANT, CITY OF LOS ANGELES:
 9
       Ms. Colleen R. Smith
10     CITY ATTORNEY'S OFFICE
       200 North Main Street, Sixth Floor, City Hall East
11     Los Angeles, California  90012
       (213) 978-7027
12     colleen.smith@lacity.org

13
      REPRESENTING THE DEFENDANT, OFFICER DANIEL HARTY:
14
       Ms. Deann Rivard
15     MANNING & KASS, ELLROD, RAMIREZ, TRESTER, LLP
       801 South Figueroa Street, 15th Floor
16     Los Angeles, California  90017
       (213) 624-6900
17     dyr@manningllp.com

18
      REPRESENTING THE DEFENDANT, SERGEANT J. HARDAKER:
19
       Mr. Kevin E. Gilbert
20     ORBACH HUFF SUAREZ & HENDERSON, LLP
       6210 Stoneridge Mall Road, Suite 210
21     Pleasanton, California  94588
       (510) 999-7908
22     kgilbert@ohhlegal.com

23
      THE VIDEOGRAPHER/VIDEOCONFERENCE TECHNICIAN:
24
       Mr. Eli Wheeler
25
```

**Exhibit 14 - P. 98**

SERGEANT JASON HARDAKER                                          JOB NO. 274522
JUNE 21, 2022

```
 1                              INDEX
                                                    PAGE
 2

 3     EXAMINATION BY MR. BOU SAEED.....................   5

 4

 5

 6                            EXHIBITS

 7    NUMBER          DESCRIPTION                      PAGE

 8    Exhibit 1       Volume 1 policies................... 31

 9    Exhibit 2       Body-worn camera footage............ 116

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1              PROCEEDINGS
 2       (On the record at 12:06 p.m. CST)
 3            THE VIDEOGRAPHER:  Good morning.
 4    We are now on the record at 10:06 a.m.
12:06 5    Pacific time on June 21st, 2022, to begin
 6    the deposition of Sergeant J. Hardaker in
 7    the matter of Mendoza versus City of
 8    Los Angeles, et al.  This case is venued
 9    in the United States District Court,
12:06 10   Central District of California.  The case
 11   number is 2:21-cv-04614-KS.
 12            The deposition is taking place via
 13   the Steno Connect platform.  The legal
 14   videographer is Eli Wheeler here on behalf
12:06 15   of Steno, and the court reporter is Becky
 16   Graziano, also here on behalf of Steno.
 17            Would Counsel please identify
 18   yourselves and state whom you represent.
 19            MR. BOU SAEED:  Good morning.
12:06 20   Chris J. Bou Saeed for the plaintiffs.
 21            MR. GILBERT:  Good morning.  Kevin
 22   Gilbert for the deponent and defendant,
 23   Sergeant Hardaker.
 24            MS. SMITH:  Good morning.  Colleen
12:06 25   Smith for the defendant City of
```

STENO.COM
(310) 573-8380

Page 4
**Exhibit 14 - P. 100**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1        Los Angeles.
 2                MS. RIVARD:  Good morning.  Deann
 3        Rivard for defendant Daniel Harty.
 4                THE VIDEOGRAPHER:  Thank you,
12:07  5        Counsel.
 6                Would the reporter please swear in
 7        the witness.
 8                  (Witness duly sworn.)
 9                SERGEANT JASON HARDAKER,
12:07 10   being first duly sworn, testified as follows:
11                      EXAMINATION
12   BY MR. BOU SAEED:
13    Q     Good morning, Sergeant Hardaker.
14    A     Good morning, sir.
12:07 15    Q     Would you please state your name?
16    A     Sergeant Jason Hardaker.
17    Q     Sergeant Hardaker, have you ever had a
18   deposition taken of yourself before?
19    A     No.
12:07 20    Q     Have you ever testified in court before?
21    A     Yes.
22    Q     Approximately how many times have you
23   testified in court?
24    A     Greater than 20.
12:07 25    Q     Do you understand that you have a duty to
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
        1   Q      Sure.
        2          What kind of firearm were you armed
        3   with on May 27th, 2020?
        4   A      A Smith & Wesson M&P pistol.
12:16   5   Q      On May 27th, 2020, did you require any
        6   corrective vision apparatus, for example, glasses
        7   or contact lenses?
        8   A      No.
        9   Q      I want to go into your background and
12:17  10   training, Sergeant Hardaker.
       11          What year did you enter into the
       12   police academy?
       13   A      2005.
       14   Q      Approximately how old were you in 2005?
12:17  15   A      23.
       16   Q      Did you hold any other employment from the
       17   age of 18 to 23?
       18   A      Yes.
       19   Q      Could you please tell me what employment
12:17  20   you held when -- during the period of ages 18 to
       21   23?
       22   A      I was a computer technician, I was a
       23   tutor, and I was a parking enforcement officer.
       24   Q      How long were you a computer tech?
12:18  25   A      I was a computer tech for about five
```

**Exhibit 14 - P. 102**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
      1    Q       When did you graduate college?

      2    A       2004.

      3    Q       Where did you go to school?

      4    A       University --

12:19 5    Q       Let me be clear.

      6            Where did you go to school where you

      7    received a college degree?

      8    A       University of California at Irvine.

      9    Q       Fellow Anteater.  Nice to meet you.

12:19 10           What was your major?

     11    A       Criminology, law and society.

     12    Q       How long was the LAPD academy that you

     13    attended in 2005?

     14    A       When I attended, it was seven months.

12:20 15   Q       As part of your academy training, did you

     16    have to study California peace officer standards

     17    and training learning domain?

     18    A       Yes.

     19    Q       And the domains consisted of chapters on

12:20 20   different subjects; correct?

     21    A       I don't know if I'd categorize it as

     22    "chapters on different subjects."  We did learn

     23    various subjects.

     24    Q       And those subjects were related to law

12:20 25   enforcement responsibilities as a peace officer;
```

**Exhibit 14 - P. 103**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
        1   correct?
        2   A       Yes.
        3   Q       Did you also learn about law enforcement
        4   tactics while in the academy?
12:20   5   A       Yes.
        6   Q       Was the use of force one of those tactics?
        7   A       Yes.
        8   Q       Was the use of lethal force another
        9   tactic?
12:20  10   A       Yes.
       11   Q       And less-than-lethal force?
       12   A       Yes.
       13   Q       Did you learn about the concept of
       14   reasonable suspicion to detain a subject?
12:21  15   A       Yes.
       16   Q       And probable cause to arrest?
       17   A       Yes.
       18   Q       Did you learn about law enforcement
       19   interaction with persons with mental disabilities?
12:21  20   A       Yes.
       21   Q       And did you learn about law enforcement
       22   interaction with persons with edged weapons?
       23   A       Yes.
       24   Q       Upon graduation from the LAPD academy in
12:21  25   2005, what was your first assignment?
```

**Exhibit 14 - P. 104**

```
 1   please?
 2      Q      Was part of the subject matter that you
 3   received in your training for becoming a field
 4   supervisor the use of force?
 5      A      Yes.
 6      Q      And the reasonable use of force?
 7      A      Yes.
 8      Q      And the proportional use of force?
 9      A      We learned about what proportional use of
10   force was with regards to case law.
11      Q      And you also learned about officer safety?
12      A      Yes.
13      Q      And you received training as part of that
14   course that would help you reinforce department
15   rules and expectations to subordinate officers?
16      A      I don't recall if I received specific
17   training with regards to that exact subject that
18   you asked.
19      Q      Did you receive training regarding
20   proactive leadership?
21      A      I do not recall if they talked about
22   proactive leadership in field supervisor school.
23      Q      Are you -- have you ever been trained by
24   the LAPD on active leadership?
25      A      On proactive leadership?
```

Timestamps (left margin): 12:57 (line 5), 12:57 (line 10), 12:58 (line 15), 12:58 (line 20), 12:58 (line 25)

```
 1            appropriate and different situations where
 2            lethal force would be appropriate.
 3    BY MR. BOU SAEED:
 4      Q       In your training as a peace officer, after
01:01 5    the academy, did you also receive additional
 6    training regarding people with DS -- disabilities?
 7                 MS. SMITH:  I'm just going to
 8            object that that's vague.  Are you
 9            referring to physical disabilities?
01:01 10                MS. RIVARD:  Object -- joined.
11                 MR. BOU SAEED:  I'll rephrase.
12    BY MR. BOU SAEED:
13      Q       After your academy training as a LAPD
14    peace officer, did you receive additional training
01:01 15   regarding interactions with people with mental
16    disabilities?
17      A       Yes.
18      Q       Did you also receive additional training
19    regarding deescalation techniques?
01:01 20     A       Yes.
21      Q       And did you learn that the purpose of
22    deescalation techniques was to decrease the
23    intensity of a situation?
24      A       I think by stating that I learned it
01:02 25   would -- would infer that I had not known it
```

SERGEANT JASON HARDAKER                          JOB NO. 274522
JUNE 21, 2022

```
       1    A        Disengagement techniques was not a
       2   technique while I was an officer.
       3    Q        As a sergeant, have you received training
       4   regarding disengagement techniques?
01:03  5    A        Yes.
       6    Q        Had you received that training prior to
       7   May 27th, 2020?
       8    A        Yes.
       9    Q        You had mentioned that the LAPD has core
01:03 10   values; correct?
      11    A        Yes.
      12    Q        And the LAPD has a particular policy
      13   regarding the use of force that reflects those
      14   core values; correct?
01:04 15    A        Well, I hadn't mentioned that.  But, yes,
      16   I do believe that the LAPD's use of force policy
      17   is in line with the core values.
      18    Q        And that one of the guiding principles of
      19   the LAPD policy regarding use of force shall be
01:04 20   reverence for human life; correct?
      21    A        Yes.
      22    Q        And another guiding principle would be to
      23   attempt to control the incident, when feasible,
      24   using, for example, time?
01:04 25    A        I don't know if that's necessarily a
```

**Exhibit 14 - P. 107**

1    guiding principle of our use of force policy,

2    using time.

3       Q       Would you say it's part of the LAPD policy

4    regarding the use of force, as you understand it?

01:04   5               MR. GILBERT:  Vague.

6                       Go ahead.

7                       THE WITNESS:  Could you ask the

8          full question, please?

9    BY MR. BOU SAEED:

01:04  10      Q       Sure.

11              Is part of your understanding of the

12   LAPD policy regarding the use of force that an

13   officer should attempt to control an incident when

14   feasible using deescalation techniques?

01:05  15      A       That is one of the parts of the use of

16   force policy.

17      Q       And as part of that deescalation

18   technique, an officer should try to utilize time

19   to control a situation, if possible; correct?

01:05  20      A       When feasible, yes.

21      Q       And also when feasible, an officer should

22   attempt to utilize distance?

23      A       When feasible, yes.

24      Q       And when feasible, an officer should also

01:05  25   utilize communication?

**Exhibit 14 - P. 108**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
         1     A       Yes.

         2     Q       And incorporate efforts to deescalate or

         3    deintensify the situation; correct?

         4     A       When feasible.

01:05    5     Q       Is that a "yes"?

         6     A       Yes.

         7     Q       Any use of force by an LAPD officer must

         8    be objectively reasonable; correct?

         9     A       Yes.

01:06   10     Q       And the most important factor in

        11    determining reasonableness is whether a subject

        12    poses an immediate threat to the officer or to the

        13    public; correct?

        14     A       Could you ask that question again, please?

01:06   15     Q       Sure.

        16             The most important factor for a

        17    Los Angeles Police Department officer's

        18    objectively reasonable use of force is whether the

        19    subject poses an immediate threat to the officer

01:06   20    or to the public; correct?

        21     A       I don't know if that's categorized as the

        22    most important factor in use of force in general.

        23     Q       In -- in your determination of whether a

        24    use of force is reasonable, would whether an

01:07   25    individual poses an immediate threat to the
```

```
 1    officer or public be the most important factor?
 2                 MS. SMITH:  I'm just going to
 3           object that that's vague and overbroad as
 4           stated.  Are you referring to the use of
01:07  5     any force?
 6                 MS. RIVARD:  Joined.
 7                 MR. BOU SAEED:  Yes.
 8                 MR. GILBERT:  Sergeant, do you
 9           understand the question?
01:07 10                THE WITNESS:  I -- I don't
11           understand the question.
12    BY MR. BOU SAEED:
13     Q      Okay.  Your understanding -- I want to
14    just stick with your understanding.
01:08 15                Officers are allowed to use deadly
16    force; correct?
17     A        In certain circumstances, yes.
18     Q        And part of those circumstances are the
19    use of deadly force has to be reasonable; correct?
01:08 20     A        Yes.
21     Q        And the most important factor in
22    determining the reasonableness of a use of deadly
23    force is whether the subject poses an immediate
24    threat of death or great bodily injury to the
01:08 25    officer -- to an officer or a member of the
```

**Exhibit 14 - P. 110**

```
 1    public; correct?
 2                    MR. GILBERT:  Vague.  Are you
 3            asking his understanding of the policy or
 4            the law or something else?
01:08  5                MR. BOU SAEED:  His understanding
 6            of the law.
 7                    MR. GILBERT:  Go ahead, sir.
 8                    THE WITNESS:  If you're referring
 9            to lethal force --
01:08 10    BY MR. BOU SAEED:
11      Q      Yes, correct.
12      A      -- then, yes, a danger to others is a
13    factor.
14      Q      Would the immediate danger of death or
01:09 15    great bodily injury to others be the most
16    important factor to you in the use of lethal
17    force?
18                    MR. GILBERT:  Vague as to "most
19            important."
01:09 20                Go ahead.
21                    MS. RIVARD:  Objection; relevance.
22                    THE WITNESS:  Our policy words it
23            "eminent."  Eminent threat, not immediate.
24            And I would put "eminent [sic]."
25
```

**Exhibit 14 - P. 111**

SERGEANT JASON HARDAKER
JUNE 21, 2022                                                      JOB NO. 274522

```
        1              THE WITNESS:  I'm not sure how I'm
        2          supposed to know what another person's
        3          thinking, sir.
        4     BY MR. BOU SAEED:
01:41   5       Q    Let me be clear.  I'm not asking you
        6     whether Mr. Mendoza could comprehend the commands.
        7     I'm asking you, on that day, did any doubt arise
        8     in your mind that Mr. Mendoza was unable to
        9     comprehend the commands?
01:42  10       A    No.
       11       Q    As part of your official training with the
       12     Los Angeles Police Department, you've been trained
       13     regarding the recognition of behaviors associated
       14     with mental illness; correct?
01:42  15       A    Yes.
       16       Q    And that training doesn't allow you to
       17     diagnose mental illness; correct?
       18       A    Correct.
       19       Q    But the training does allow you to
01:43  20     recognize general indicators of mental illness;
       21     correct?
       22       A    Yes.
       23       Q    One of those general indicators that
       24     you've been trained on is fearfulness; correct?
01:43  25       A    I -- I don't recall if fearfulness is one
```

**Exhibit 14 - P. 112**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
      1              heard that was not part of LAPD training,
      2              was that somebody with a knife at 21 feet
      3              could be dangerous.
      4     BY MR. BOU SAEED:
02:03 5      Q       In your training that you've received by
      6     the LAPD regarding persons with weapons other than
      7     firearms, was an element that distance is not the
      8     only factor for determining the appropriate
      9     response?
02:03 10     A       I would say distance is one of several
      11    factors that an officer has to evaluate.
      12     Q       In that same training that you've received
      13    over the course of your career, was the word
      14    "threshold" ever used?
02:04 15     A       Not that --
      16                MR. GILBERT:  Go ahead.
      17                THE WITNESS:  Not that specific
      18         word, but many elements of that word are
      19         ingrained and integrated in many aspects
02:04 20         of LAPD training.
      21    BY MR. BOU SAEED:
      22     Q       Can you explain?
      23     A       For example, in building searches, the
      24    term "threshold" is actually used, and it's used
02:04 25    to delineate a zone inside and outside of a room
```

**Exhibit 14 - P. 113**

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

1    or a building.  So the word "threshold" is a

2    common word known to everybody, and it's an

3    effective way of communicating a zone, an area.

4       Q    And just so I'm clear, that word was never

02:05  5    used in the training that you've received from the

6    LAPD regarding persons with weapons other than

7    firearms?

8       A    I cannot recall that word officially being

9    in any printed pamphlet, but I cannot say if it

02:05 10    was or was not stated in any of the trainings I've

11    received in my 17 years with the Los Angeles

12    Police Department.

13       Q    In prior situations as a police officer,

14    have you ever used the word "threshold" to

02:05 15    communicate with other police officers regarding

16    how to respond to an incident?

17       A    I do not recall if I specifically used the

18    word "threshold," but the general idea of

19    "threshold" being a zone or an area where we have

02:06 20    to reassess has been used throughout my career.

21       Q    So just to be clear, you've never been

22    trained by the Los Angeles Police Department

23    regarding the utilization of a threshold?

24            MS. SMITH:  I'm just going to

02:06 25       object --

```
 1              MR. GILBERT:  Misstates testimony.
 2              MS. SMITH:  It's also vague.  Are
 3          you asking him about the use of the term
 4          generally, as in the definition in
02:06  5          Merriam-Webster's dictionary, or in a
 6          specialized manner?
 7  BY MR. BOU SAEED:
 8    Q      You may answer the question.
 9    A      I do not recall if the specific word was
02:07 10  ever used, but the general idea of "threshold" is
11  integrated in many aspects of training I received
12  with the Los Angeles Police Department.
13    Q      And in regards to the training that you've
14  received in responding to persons with edged
02:07 15  weapons, the word "threshold" has not been used;
16  correct?
17              MR. GILBERT:  Asked and answered.
18              Go ahead.
19              THE WITNESS:  Not that I recall.
02:07 20  BY MR. BOU SAEED:
21    Q      In training that you've received regarding
22  persons with edged weapons, has the concept of a
23  physical line ever been taught to you in regards
24  to responding or using force?
02:08 25              MR. GILBERT:  Vague.
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1              Go ahead.
 2              THE WITNESS:  I believe the word
 3         "physical line" has not been used.
 4         However, time plus distance -- distance in
02:08  5         itself -- I think that the word
 6         "threshold" is referring to distance and
 7         spatial relations, which is all in line
 8         with training I received with the
 9         Los Angeles Police Department and the
02:08 10         policies you're citing.
11   BY MR. BOU SAEED:
12    Q     Have you ever received training that when
13   a person armed with an edged weapon goes into a
14   particular zone, a use of force is then reasonable
02:09 15   solely because they've entered that zone?
16              MS. RIVARD:  Objection; vague as to
17         "zone."
18              MR. GILBERT:  Vague; incomplete
19         hypothetical.
02:09 20              Go ahead.
21              MS. SMITH:  Joined.
22              THE WITNESS:  We have received
23         training that if a sub- -- suspect is
24         exhibiting particular behaviors, such as
02:09 25         being violent and having a weapon, and
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
         1          they're closing the distance, that there's
         2          a certain point where action needs to be
         3          taken.
         4    BY MR. BOU SAEED:
02:09    5     Q      And regarding that action that needs to be
         6    taken, did your training ever specify what action
         7    needs to be taken?
         8     A      It depends on the behavior of the suspect
         9    at the time.
02:10   10     Q      So your training was -- let me -- let me
        11    rephrase again.
        12               On May 27th, 2020, you heard Officer
        13    Scott say the word "threshold;" correct?
        14     A      Yes.
02:10   15     Q      And what did that word mean to you on
        16    May 27th, 2020?
        17     A      To me, that delineated an area where we
        18    were no longer going to allow him to freely act as
        19    he was acting --
02:11   20               THE WITNESS:  I have something
        21          going on on the screen right there.
        22               MR. GILBERT:  All right.  Hold on.
        23          Go ahead.  Keep answering.
        24               THE WITNESS:  Okay.
02:11   25               That that was an area where we were
```

SERGEANT JASON HARDAKER
JUNE 21, 2022

JOB NO. 274522

```
 1              going to have to reassess, and -- because
 2              before we were letting the subject walk
 3              around in circles and act erratic in an
 4              area that was safe for us.  But at the
02:11  5        point where the threshold was called, that
 6              would be the point that less-lethal would
 7              need to be used if the subject was
 8              continuing to act like he was acting.
 9              Because past the point of the threshold,
02:11 10        there were many points where he could have
11              concealed himself and produced a weapon or
12              caused a danger to officers.
13                      MR. GILBERT:  Counsel, we need
14              about 30 seconds.  My plugs have an issue,
02:11 15        so just pause on your next question real
16              quick.
17                      MR. BOU SAEED:  Yes.
18                 (Discussion off the record.)
19                      MR. GILBERT:  All right.  Sorry.
02:13 20        Technical issues.  We're good now.
21         BY MR. BOU SAEED:
22          Q      Sergeant Hardaker, during that delay, I
23         saw you looking off to the side.  Were you reading
24         something?
02:13 25          A      No.  I was watching them retrieve the
```

**Exhibit 14 - P. 118**

```
   1    power adapter for this laptop.
   2      Q      When Officer Scott used the word
   3    "threshold," you had a full understanding of what
   4    it meant; correct?
02:13  5               MR. GILBERT:  Vague; speculation.
   6               Go ahead.
   7               MS. SMITH:  Joined.
   8               THE WITNESS:  Yes.
   9    BY MR. BOU SAEED:
02:14 10      Q      Officer Scott never used the word
  11    "less-lethal" in relation to the threshold;
  12    correct?
  13      A      No, he did not use that specific word that
  14    I heard.
02:14 15      Q      And you did not communicate that the
  16    threshold meant the utilization of less-lethal
  17    force; correct?
  18      A      I did not verbally communicate that;
  19    however, it's in line with our department policy
02:14 20    that that threshold be used for less-lethal.  And
  21    all the officers on the line had received similar
  22    training to myself, because they are part of the
  23    Los Angeles Police Department.
  24      Q      Therefore, you did not think it was
02:14 25    necessary to explicitly specify it meant
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
    1    Q        Prior to May 27th, 2020, had you ever used
    2    the word "threshold" to designate a zone in
    3    responding to a suspect armed with a firearm -- or
    4    I'm sorry -- with a weapon not a firearm?
02:22 5    A        I don't recall.
    6    Q        Prior to May 27th, 2020, had you ever
    7    heard another police officer use the term
    8    "threshold" at a scene involving a person armed
    9    with a weapon other than a firearm?
02:23 10   A        I don't recall.
    11   Q        I want to take you to May 27th, 2020,
    12   Sergeant Hardaker.
    13            You were at the police station when
    14   you received the call for help; correct?
02:24 15   A        I personally did not receive the call for
    16   help, but I heard the help call on the radio when
    17   I was at the police station.
    18   Q        And when you overheard that radio call,
    19   you were unaware of the reason why the officers
02:25 20   were on the scene; correct?
    21   A        Correct.
    22   Q        And you immediately departed to the scene
    23   from the station; correct?
    24   A        Correct.
02:25 25   Q        And you were monitoring radio
```

**Exhibit 14 - P. 120**

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
        1   training, it did refer to distances and areas.
        2    Q      Is there anything that would refresh your
        3   recollection as to whether the training used those
        4   types of words?
04:00   5                MR. GILBERT:  Speculation.
        6                Go ahead.
        7                THE WITNESS:  I would have to go
        8           over 17 years of both written and verbal
        9           training to tell you if those specific
04:00  10           words were used.
       11   BY MR. BOU SAEED:
       12    Q      When you say "written training," what do
       13   you mean?
       14    A      Training can be given orally by somebody
04:01  15   else, a supervisor or peer.  It can be given
       16   formally through a classroom.  There can be an
       17   online video.  There can be training directives
       18   printed out.  Training can come in a myriad of
       19   different ways, and it does with LAPD.
04:01  20    Q      And -- and some of that, like you
       21   mentioned, is in writing?
       22    A      Yes.
       23    Q      And do you get to keep those writings, or
       24   you turn them back in after the end of the
04:01  25   training?
```

**Exhibit 14 - P. 121**

1    word "zone" as a synonym for -- for area and

2    distance and didn't necessarily indicate that

3    there's different zones designated for specific

4    things.

04:03  5    Q     So how does -- in your training, how would

6    area and distance relate to the use of a use of

7    force?

8    A     Could you be more specific?

9    Q     No.

04:03 10          How does area and distance relate to

11   the training you've received regarding the use of

12   force?

13          MR. GILBERT:  Overbroad; vague;

14      compound.

04:03 15          Go ahead.

16          MS. RIVARD:  Joined.

17          THE WITNESS:  I think you'd have to

18      be more specific, because that's --

19      there's too many variables with that

04:04 20      question, sir.

21   BY MR. BOU SAEED:

22   Q     Have you been trained that a particular

23   use of force option should only be utilized when a

24   suspect is in a particular area?

04:04 25   A     I think it would depend on the use of

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1   force option you're referring to, sir.

 2              MR. BOU SAEED:  Court Reporter,

 3         could you read back to me the question I

 4         just asked?

04:05  5        (Record read as requested.)

 6   BY MR. BOU SAEED:

 7    Q      So, Sergeant Hardaker, I'm trying to

 8   understand your training in regards to use of

 9   force options.

04:05 10              How are you taught to use a

11   40-millimeter less-lethal launcher in relation to

12   a suspect armed with a weapon other than a

13   firearm?

14              MR. GILBERT:  Vague.

04:05 15              Go ahead.

16              THE WITNESS:  It really depends on

17         the situation, sir.  For instance, we're

18         not supposed to utilize a 40-millimeter on

19         somebody armed with something other than a

04:05 20         firearm if they're standing on a balcony

21         because they might fall off the building.

22              Is that what you're referring to,

23         sir?

24   BY MR. BOU SAEED:

04:05 25    Q      Sure.
```

**Exhibit 14 - P. 123**

SERGEANT JASON HARDAKER                                JOB NO. 274522
JUNE 21, 2022

```
 1            "edged weapon," whether it's a sword or a
 2            pocket knife, and the circumstances
 3            leading up to it.
 4                  Go ahead, sir.
04:07  5            MS. RIVARD:  Joined.
 6                  THE WITNESS:  It all depends on
 7            what the suspect -- the suspect's actions
 8            and all of the other circumstances present
 9            at the time.
04:07 10  BY MR. BOU SAEED:
11   Q       When you walked over to the east side of
12   that police car and said, "We'll keep the white
13   SUV as a threshold," did any officer ask you what
14   you meant?
04:07 15   A       No.
16   Q       So every officer indicated that they
17   understood what you were saying?
18                 MR. GILBERT:  Vague as to
19            "indicated."
04:07 20                 Go ahead.
21                 MS. SMITH:  Joined.
22                 THE WITNESS:  The word "threshold"
23            is just a word that I used to convey a
24            general concept that is known with other
04:07 25            LAPD officers that have received the same
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
 1          training and ongoing training as me.
 2    BY MR. BOU SAEED:
 3     Q      And what did that concept mean?
 4     A      It meant that while we were going to let
04:08  5    the suspect walk around where he was at up the
 6    street, if he got to the point where that white
 7    SUV was, we were going to have to utilize
 8    less-lethal in an attempt to deescalate the
 9    situation if the subject was continuing to act
04:08 10    like he -- he was at the present time.
11     Q      And so that, you're saying, is not
12    something you were ever trained on?
13                MR. GILBERT:  Misstates testimony.
14                Go ahead.
04:08 15                THE WITNESS:  I never said that.
16    BY MR. BOU SAEED:
17     Q      So you had received training on the
18    concept of a threshold and the use of less-lethal
19    force?
04:08 20                MR. GILBERT:  Misstates testimony.
21                MS. SMITH:  Joined.
22                MR. GILBERT:  Go ahead.
23                THE WITNESS:  I have --
24                MS. RIVARD:  Joined.
04:08 25                THE WITNESS:  I have received
```

**Exhibit 14 - P. 125**

SERGEANT JASON HARDAKER                           JOB NO. 274522
JUNE 21, 2022

```
 1            trained on less-lethal force.  I've
 2            received training on the effective ranges
 3            of less-lethal force.  And -- is that what
 4            you're asking?
04:09  5  BY MR. BOU SAEED:
 6     Q      Yes.  Why did you believe it was clear
 7  that it meant less-lethal force and not lethal
 8  force?
 9     A      Because lethal force can only be used by
04:09 10  each individual officer based on the circumstances
11  they know at the time and cannot be directed to
12  use lethal force.
13     Q      Did it make sense to you that that concept
14  of a threshold, as you used it, would also be a
04:09 15  point in which an officer would use lethal force?
16     A      I was --
17            MS. SMITH:  I'll object as vague.
18            MR. GILBERT:  Go ahead.
19            THE WITNESS:  I was not using that
04:09 20        term in that context, and the context was
21        how the suspect was acting at the time
22        that I -- that I talked about the SUV.
23  BY MR. BOU SAEED:
24     Q      So it would not have made sense to you if
04:09 25  lethal force was then used based on what you said
```

SERGEANT JASON HARDAKER                                    JOB NO. 274522
JUNE 21, 2022

```
         1   don't know how that's written in policy exactly.
         2    Q     Is that something that you ever thought
         3   about didn't make sense?
         4    A     I can't say that I spent any time thinking
04:12    5   about that exact question, sir.
         6    Q     At the time on May 27th, 2020, when you
         7   conveyed -- or I'm sorry.
         8                At the time on May 27th, 2020, when
         9   you said "okay" to the white SUV being the
04:13   10   threshold, you believed it unambiguously meant
        11   less-lethal force; correct?
        12    A     Yes.
        13    Q     Now do you still feel like it would mean
        14   unambiguously less-lethal force?
04:14   15                MR. GILBERT:  Vague.
        16                Go ahead.
        17                THE WITNESS:  Yes.
        18   BY MR. BOU SAEED:
        19    Q     So it is your understanding that every
04:14   20   officer understood you to mean less-lethal force
        21   in relation to the threshold?
        22                MS. RIVARD:  Objection; calls for
        23       speculation.
        24                MR. GILBERT:  Speculation;
04:14   25       foundation; incomplete question.
```

**Exhibit 14 - P. 127**

```
        1                  Go ahead.
        2                  MS. SMITH:  Joined.
        3                  THE WITNESS:  What was the
        4           question?
04:14   5    BY MR. BOU SAEED:
        6     Q      Today, sitting here, you believe that the
        7    issuance of a threshold that did not specify
        8    less-lethal is unambiguous?
        9                  MR. GILBERT:  Vague.
04:14  10                  MS. RIVARD:  Joined.
       11                  THE WITNESS:  Yes, because someone
       12           cannot be directed to utilize lethal
       13           force.  It has to be that officer's
       14           individual decision based on the totality
04:15  15           of circumstances.
       16    BY MR. BOU SAEED:
       17     Q      And you thought the white SUV, at that
       18    distance, would be an appropriate distance for the
       19    40-millimeter less-lethal launcher?
04:15  20                  MR. GILBERT:  Asked and answered
       21           several times.
       22                  Go ahead.
       23                  THE WITNESS:  Yes.
       24                  MR. BOU SAEED:  One moment, please.
       25
```

1          This concludes the deposition of

2     Sergeant J. Hardaker in the matter of

3     Mendoza versus City of Los Angeles, et al.

4     We are now off the record.  The time is

04:24  5     2:24 p.m. Pacific time.

6          (Off the record at 4:24 p.m. CST)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Exhibit 14 - P. 129**

```
 1          I, SERGEANT JASON HARDAKER, have read the

 2    foregoing deposition and hereby affix my signature

 3    that same is true and correct, except as noted

 4    above.

 5                            _____

 6                            SERGEANT JASON HARDAKER

 7    THE STATE OF _____ )

 8    COUNTY OF _____ )

 9          BEFORE ME, _____, on

10    this day personally appeared SERGEANT JASON

11    HARDAKER, known to me (or proved to me under oath

12    of _____ or through

13    _____) (description of

14    identity card or other document) to be the person

15    whose name is subscribed to the foregoing

16    instrument and acknowledged to me that they

17    executed the same for the purposes and

18    consideration therein expressed.

19          Given under my hand and seal of office this

20    ___ day of _____, 2022.

21

22

23                            _____

24                            NOTARY PUBLIC IN AND FOR
                              THE STATE OF _____

25                            MY COMMISSION EXPIRES:
                              _____
```

```
 1                  UNITED STATES DISTRICT COURT
 2                  CENTRAL DISTRICT OF CALIFORNIA

 3    YVONNE MENDOZA; RAYMUND MENDOZA; )
      and MARJORIE MARINO, as          )
 4    Administrators of the Estate of  )
      ROMMEL MENDOZA,                   )
 5                                       )
              Plaintiffs,                )
 6                                       )
      vs.                               )Case No.
 7                                       )2:21-cv-04614-KS
      CITY OF LOS ANGELES, a public     )
 8    entity; OFFICER DANIEL HARTY;      )
      SERGEANT J. HARDAKER; SERGEANT     )
 9    DAN WIDMAN; OFFICER SCOTT;         )
      OFFICER JUAN GALVAN; OFFICER       )
10    SIERRA; OFFICER KELLY; and DOES    )
      1-30,                              )
11                                       )
              Defendants.                )
12

13                  REPORTER'S CERTIFICATION
            REMOTE VIDEOTAPED DEPOSITION OF
14                 SERGEANT JASON HARDAKER
                       June 21, 2022
15

16          I, Rebecca A. Graziano, Certified Shorthand

17     Reporter in and for the States of Texas,

18     California, and Illinois, hereby certify to the

19     following:

20          That the witness, SERGEANT JASON HARDAKER,

21     was duly sworn and that the transcript of the oral

22     deposition is a true record of the testimony given

23     by the witness;

24          I further certify that pursuant to FRCP Rule

25     30(f)(1) that the signature of the deponent:
```

**Exhibit 14 - P. 131**

1        _____ was requested by the deponent or a

2   party before the completion of the deposition and

3   returned within 30 days from date of receipt of

4   the transcript.  If returned, the attached Changes

5   and Signature Page contains any changes and the

6   reasons therefor.

7        _____ was not requested by the deponent or a

8   party before the completion of the deposition.

9        I further certify that I am neither attorney

10  nor counsel for, related to, nor employed by any

11  of the parties to the action in which this

12  testimony was taken.

13        Further, I am not a relative or employee of

14  any attorney of record in this cause, nor do I

15  have a financial interest in the action.

16

17                  Certified on July 6, 2022

18

19

20        _____
            Rebecca A. Graziano, CSR, RMR, CRR
21          Texas CSR 9306
            Expiration:  07/31/22
22          California CSR 14407
            Expiration:  09/30/22
23          Illinois CSR 084.004659
            Expiration:  05/31/23
24

25

**Exhibit 14 - P. 132**