# Deposition Transcript

Case Number: 2:21-cv-04614-KS
Date: July 20, 2022

In the matter of:

# MENDOZA, et al. v CITY OF LOS ANGELES, et al.

## Officer Paul Scott

**CERTIFIED COPY**

**Reported by:**
Monica Vogelbacher
CSR No. 6404



**Steno**
**Official Reporters**

**315 W 9th St.**
**Suite 807**
**Los Angeles, CA 90015**
concierge@steno.com
**(310) 573-8380**
**NV: FIRM #108F**

**Exhibit 15 - P. 133**

1              UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4  YVONNE MENDOZA, RAYMUND        )  No. 2:21-cv-04614-KS
   MENDOZA, and MARJORIE MARINO, as )
5  Administrators of the Estate of )
   Rommel Mendoza,                )
6                                  )
              Plaintiffs,          )
7                                  )
              vs.                  )
8                                  )
   CITY OF LOS ANGELES, public     )
9  entity, OFFICER DANIEL HARTY,   )
   SERGEANT J. HARDACKER, SERGEANT )
10 DAN WIDMAN, OFFICER SCOTT, OFFICER)
   JUAN GALVAN, OFFICER SIERRA,    )
11 OFFICER KELLY, and DOES 1-30,   )
                                   )
12             Defendants.         )
   _____)

13

14    CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER AND BOUND

15          SEPARATELY:  PAGES 32, 47, 49, 55, 57

16

17         REMOTE AND VIDEOTAPED DEPOSITION OF

18                 OFFICER PAUL SCOTT

19              Wednesday, July 20, 2022

20

21

22

23  Reported by:

24  MONICA T. VOGELBACHER, CSR No. 6406

25  Job No.:  280085

**Exhibit 15 - P. 134**

```
 1              UNITED STATES DISTRICT COURT

 2            CENTRAL DISTRICT OF CALIFORNIA

 3

 4   YVONNE MENDOZA, RAYMUND          )  No. 2:21-cv-04614-KS
     MENDOZA, and MARJORIE MARINO, as )
 5   Administrators of the Estate of  )
     Rommel Mendoza,                  )
 6                                    )
               Plaintiffs,            )
 7                                    )
          vs.                         )
 8                                    )
     CITY OF LOS ANGELES, public      )
 9   entity, OFFICER DANIEL HARTY,    )
     SERGEANT J. HARDACKER, SERGEANT  )
10   DAN WIDMAN, OFFICER SCOTT, OFFICER)
     JUAN GALVAN, OFFICER SIERRA,     )
11   OFFICER KELLY, and DOES 1-30,    )
                                      )
12             Defendants.            )
     _____)
13

14

15

16

17          Deposition of OFFICER PAUL SCOTT, taken

18   remotely, beginning at 1:05 p.m. and ending at 2:33 p.m.,

19   on Wednesday, July 20, 2022, before MONICA T.

20   VOGELBACHER, Certified Shorthand Reporter No. 6406.

21

22

23

24

25
```

```
 1   APPEARANCES:

 2

 3   For Plaintiffs:

 4           CBS LAW
             BY:  CHRISTOPHER J. BOU SAEED
 5           Attorney at Law
             633 West 5th Street, 26th Floor
 6           Los Angeles, California  90071
             (213) 605-5838
 7           chris@thecbslaw.com

 8   For City of Los Angeles:

 9           CITY ATTORNEY'S OFFICE
             BY:  COLLEEN R. SMITH
10           Attorney at Law
             200 North Main Street, Sixth Floor
11           City Hall East
             Los Angeles, California  90012
12           (213) 978-7027
             colleen.smith@lacity.org
13
     For Defendant Officer Daniel Harty:
14
             MANNING & KASS
15           ELLROD, RAMIREZ, TRESTER LLP
             BY:  CRAIG SMITH
16           Attorney at Law
             801 South Figueroa Street, 15th Floor
17           Los Angeles, California  90017
             (213) 553-2405
18           gcs@manningllp.com

19
     Also Present:
20
             RENEE MAYFIELD, video operator
21
             AUSTIN LIETZ, tech
22

23

24

25
```

```
 1                    Wednesday, July 20, 2022

 2                      1:05 p.m. - 2:33 p.m.

 3

 4          THE VIDEO RECORDER:  We are on record.

 5          My name is Renee Mayfield.  I'm a notary public

 6   contracted by Steno.  I am not financially interested in

 7   this action nor am I a relative or employee of any of the

 8   attorneys or any of the parties.

 9          Today is July 20th, 2022.  The time is 1:05 p.m.

10   Pacific.  This video deposition is taken remotely via

11   Steno Connect.

12          The name of the case is Yvonne Mendoza, et al.,

13   versus City of Los Angeles, filed in the United States

14   District Court, Central District of California, number

15   2:21-cv-04614-KS.

16          This is Volume 1 in the video recorded

17   deposition of Officer Paul Scott.  The attorney taking

18   this deposition is Christopher Saeed.

19          Would the attorneys introduce themselves and

20   state who you represent.

21          MR. SAEED:  Good afternoon, Officer Scott and

22   everyone.  Christopher Bou Saeed for the plaintiffs.

23          MS. SMITH:  Good afternoon.  Colleen Smith for

24   the City of Los Angeles.  And I'm also representing the

25   deponent for purposes of this deposition.  That would be
```

Time stamps in left margin:
01:05  5
01:05  10
01:05  15
01:06  20
01:06  25

```
  1   Officer Paul Scott.

  2          MR. SMITH:  And good afternoon.  Craig Smith on

  3   behalf of Officer Daniel Harty.

  4          THE VIDEO RECORDER:  Would the court reporter

  5   please swear in the witness.

  6          (Witness sworn.)

  7          THE WITNESS:  I do.

  8

  9                   OFFICER PAUL SCOTT,

 10   having been first duly sworn, was examined and testified

 11   as follows:

 12

 13                   EXAMINATION

 14   BY MR. SAEED:

 15       Q   Good afternoon, Officer Scott.

 16       A   Good afternoon.

 17       Q   Have you ever had your deposition taken before?

 18       A   Yes.

 19       Q   Have you ever testified in court before?

 20       A   Yes.

 21       Q   Okay.  Do you understand that a deposition,

 22   though it's in this informal setting, has the same force

 23   and effect as testimony given in court?

 24       A   Yes.

 25       Q   And do you understand that you've taken an oath
```

01:06  5
01:06  15
01:06  20
01:07  25

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

| | | |
|---|---|---|
| 1 | understand, please just let me know you don't understand | |
| 2 | the question, and I'll rephrase. | |
| 3 | A   I will. | |
| 4 | Q   Okay. | |
| 01:08  5 | When were you first hired by the Los Angeles | |
| 6 | Police Department? | |
| 7 | A   January of 1995. | |
| 8 | Q   And you are no longer employed with the Los | |
| 9 | Angeles Police Department? | |
| 01:08 10 | A   I'm not. | |
| 11 | Q   When did you leave employment with the Los | |
| 12 | Angeles Police Department? | |
| 13 | A   August 1st of last year. | |
| 14 | Q   That's of 2021? | |
| 01:08 15 | A   Yes. | |
| 16 | Q   And are you currently employed as a law | |
| 17 | enforcement officer? | |
| 18 | A   I'm a reserve with the Los Angeles Police | |
| 19 | Department. | |
| 01:08 20 | Q   Do you have any other employment currently? | |
| 21 | A   Yes. | |
| 22 | Q   What are you employed as? | |
| 23 | MS. SMITH:  Sorry, can you repeat that question. | |
| 24 | I didn't quite catch all of it. | |
| 01:09 25 | MR. SAEED:  Sure. | |

```
     1  BY MR. SAEED:

     2       Q   I asked what are you employed as, Officer Scott?

     3       A   Private security.

     4       Q   What's the name of the private security company?

01:09 5           MS. SMITH:  I'm just going to object to that

     6  that invades his rights to privacy, and it's not relevant

     7  for purposes of this case, this deposition.  So I would

     8  instruct him not answer as to the name of the company

     9  that he works for.

01:09 10  BY MR. SAEED:

    11       Q   When you retired from the Los Angeles Police

    12  Department, what was your title at the time?

    13       A   I was a -- what's considered a police officer 3,

    14  a field training officer.

01:10 15      Q   How long were you a police officer 3 for with

    16  the LAPD?

    17       A   Approximately six years.

    18       Q   And you mentioned you were also a field training

    19  officer?

01:10 20      A   Correct.

    21       Q   What were your responsibilities as a field

    22  training officer?

    23       A   My responsibilities were, once we get a -- what

    24  we call probationer sent to the division, I was assigned

01:10 25  with the probationer, and my role was to guide them,
```

**Exhibit 15 - P. 140**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

1   the best candidate at the time.

2   BY MR. SAEED:

3        Q    And at some point during your career with the

4   Los Angeles Police Department, did you become qualified

01:12   5   to carry a rifle?

6        A    Yes.

7        Q    When did you become qualified to carry a rifle?

8        A    I would, without my record in front of me,

9   estimate it was approximately 10 to 12 years ago.

01:12   10        Q    So around 2010?

11        A    Roughly.

12        Q    How did you achieve qualifications and carry a

13   rifle with the Los Angeles Police Department?

14        A    We attend a 40-hour class sponsored and taught

01:12   15   by the Los Angeles Police Department.

16        Q    Beyond the 40-hour class, were there any

17   recertification requirements to maintain your status as a

18   rifle qualified officer?

19        A    Yes.

01:12   20        Q    What were those -- I'm sorry, what were those

21   training requirements?

22        A    Well, they've changed over the years, and

23   obviously COVID played a part in that as well.  But they

24   would be anywhere from quarterly to annually, anywhere

01:13   25   from four-year blocks of -- I'm sorry, four-hour blocks

1    of instruction to six- and eight-hour blocks of

2    instruction.

3          Q    And you mentioned COVID interfered with that?

4          A    Yes.  When we had the outbreak, they limited the

01:13  5    amount of people, and some of the classes even got

6    cancelled.

7          Q    And before you retired, had they resumed those

8    classes, as far as you are aware?

9          A    Yes.

01:13 10          Q    Do you know when?

11          A    I do not.

12          Q    On May 27th, 2020, were the rifle qualification

13    classes on hiatus due to the pandemic?

14          MS. SMITH:  Calls for speculation.

01:14 15          You can answer if you know.

16          THE WITNESS:  I don't know.

17    BY MR. SAEED:

18          Q    On May 27, 2020, you deployed your rifle at the

19    incident at 6400 Elmer Avenue, correct?

01:14 20          A    Yes.

21          Q    Was this your first time ever deploying the

22    rifle at an incident?

23          A    No.

24          Q    Approximately how many times prior to May 27,

01:14 25    2020 did you deploy your rifle as a Los Angeles Police

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
|       | 1  | Q   Why not?                                                         |
|       | 2  | A   Well, it's a personal preference.  Many officers                |
|       | 3  | do, some don't.  My personal preference is that I'm more            |
|       | 4  | comfortable with a -- with open sights or those iron                |
| 01:16 | 5  | sights or a red dot.                                                 |
|       | 6  | Q   Did your rifle come with a red dot that was                     |
|       | 7  | deployed on May 27, 2020?                                           |
|       | 8  | A   Yes.                                                            |
|       | 9  | Q   What's the distinction between a red dot and a                 |
| 01:16 | 10 | scope?                                                              |
|       | 11 | A   A scope is a magnification of what it's looking               |
|       | 12 | at, and that can vary anywhere from two times                       |
|       | 13 | magnification to nine times magnification, whereas a red            |
|       | 14 | dot is just a mirror, and it acts -- in the absence of              |
| 01:17 | 15 | iron sights, it acts as the sight, so there's no                    |
|       | 16 | magnification.                                                      |
|       | 17 | Q   And the red dot represents where the presumed                 |
|       | 18 | target is or where the bullet would reach the target?              |
|       | 19 | A   Correct.                                                        |
| 01:17 | 20 | Q   Give me one moment, please.  I dropped                         |
|       | 21 | something.                                                          |
|       | 22 | A   Uh-huh.                                                         |
|       | 23 | Q   Thanks.                                                         |
|       | 24 | So on May 27, 2020, you responded to a help call                    |
| 01:17 | 25 | at 6400 Elmer Avenue?                                               |

1        A    Yes.

2        Q    And that was in your capacity as a P3 field

3    training officer?

4        A    Yes.

01:17    5        Q    And you had a probationer with you?

6        A    Yes.

7        Q    And you arrived on scene.

8             Did you see the suspect when you immediately

9    arrived on scene?

01:18   10        A    No.

11        Q    What did you do when you arrived on scene?

12             MS. SMITH:  I'm just going to object that that's

13    vague.

14             But if you understand, you can answer his

01:18   15    question.

16    BY MR. SAEED:

17        Q    How about I'll re-ask.

18             What did you initially do when you arrived on

19    scene?

01:18   20        A    Are you -- so that I answer correctly, or at

21    least to the best that I can, are you asking from the

22    time I parked my vehicle, and that's going to be several

23    blocks away, or are you asking from the time I actually

24    got to where the incident was?

01:18   25        Q    I'll retract the question and just ask you more

**Exhibit 15 - P. 144**

1    did you see -- did you initially see Mr. Mendoza exit his

2    residence?

3         A    Immediately upon setting up?

4         Q    Yes.

01:23 5   A    No.  No.

6         Q    How did you know where Mr. Mendoza was

7    immediately upon setting up?

8         A    Through the communication from the airship, from

9    the helicopter.

01:23 10       Q    So through radio dispatch?

11        A    Yes.

12        Q    At some point thereafter, did you see

13   Mr. Mendoza exit the street, exit onto the street?

14        A    Yes.

01:23 15       Q    And you were under the impression, at that

16   moment, that he may have been armed with a rifle.

17        A    Correct.

18        Q    And did you then see that he was not armed with

19   a rifle?

01:24 20       A    Yes.

21        Q    And did you see, instead, he was armed with an

22   edged weapon?

23        A    Yes.

24        Q    When you first saw Mr. Mendoza, you had not

01:24 25  heard any orders from supervisory officers, correct?

```
 1    regarding the suspect's actions, correct?
 2        A    Correct.
 3        Q    And you formulated a plan at that time with
 4    Officer Galvan, correct?
 5        A    Correct.
 6        Q    And you had asked Officer Galvan to ask a
 7    supervisor, How far are we going to let Mr. Mendoza go,
 8    correct?
 9        A    Yes.
10        Q    And you received no response from Mr. Galvan,
11    correct?
12        A    Correct.
13        Q    And that was after you heard Officer Galvan yell
14    out, Hey, Sarge, how far are we going to let this guy go?
15        A    Yes.
16        Q    So it was at that moment in time you decided to
17    fill -- I'm sorry.
18            It was at that moment in time -- I'll retract
19    that.
20            It was at that moment in time that you then set
21    the white SUV on the east side of Elmer Street as the,
22    quote, threshold, correct?
23        A    Correct.
24        Q    Had you ever, in a prior incident, set a
25    threshold before?
```

01:27 (line 5)
01:27 (line 10)
01:27 (line 15)
01:28 (line 20)
01:28 (line 25)

**Exhibit 15 - P. 146**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
 1          A    What type of incident?

 2          Q    An incident involving a suspect with an edged

 3     weapon.

 4          A    Not to my recollection.

01:28  5    Q    In any other type of incident with a suspect

 6     armed with a weapon, had you ever set a threshold before?

 7               MS. SMITH:  I'm just going to object that that

 8     that's -- it's vague as worded.

 9               You can answer.

01:28 10         THE WITNESS:  Mentally, as an officer, you

11     always have in your mind what the danger zone is going to

12     be depending on the threat.  You're constantly assessing

13     and reassessing what that threat is.  So that means that

14     your threshold will change and develop.  It's very fluid.

01:29 15   BY MR. SAEED:

16          Q    So prior to May 27, 2020, you had never verbally

17     set a threshold to other officers before, correct?

18          A    Using that specific terminology or just in

19     general?

01:29 20         Q    Using that specific terminology.

21          A    No.

22          Q    Had anyone, in your experience on scene of an

23     incident, ever used that terminology before, a threshold?

24          A    One more time.  I'm sorry, repeat it.

01:29 25         Q    Have you in your experience as a Los Angeles
```

**Exhibit 15 - P. 147**

1    Police Department officer ever heard another officer on

2    scene use the word "threshold" before?

3         A    Yes.

4         Q    Approximately how many times?

01:29  5    A    I couldn't say.  I don't know.

6         Q    Over a hundred times?

7         A    No.

8         Q    Over five times?

9         A    Yes.

01:29  10   Q    Over 20 times?

11        A    Somewhere between 20 and five I think is fair.

12        Q    And those times you had heard the word

13   "threshold" used, it meant to you how far a suspect can

14   come before a use of force is utilized?

01:30  15   A    No.

16        Q    What did it mean?

17        A    It's just a point of reference.

18        Q    In regards to what?

19        A    Anywhere from where a suspect could be hiding,

01:30  20   we're clearing a building, like a door threshold, or that

21   danger zone, that cushion, if you will, between whatever

22   we're dealing with and ourselves.

23        Q    And when you say a danger zone between whatever

24   we're dealing with and ourselves, what do you mean

01:30  25   "danger zone"?

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

1      A   Well, for instance, if you are serving a search

2   warrant and you're making entry into a building, there's

3   going to be a threshold at a door, and from that point in

4   is going to be your danger zone.  So crossing that

01:31   5   threshold would represent a danger zone.

6      Q   In May 27, 2020, when you set the white SUV as a

7   threshold, in your mind, that was the marker of the

8   danger zone, correct?

9      A   No, that was a marker as far as the situation is

01:31   10   concerned and how we're going to relate it to

11   less-lethal.

12      Q   So, in other words, when the suspect reached

13   that threshold, that's when you thought less-lethal was

14   appropriate?

01:31   15      A   That's when we needed to start considering using

16   less-lethal.

17      Q   Not lethal force?

18      A   Not lethal force.

19      Q   What factors did you use in setting the

01:32   20   threshold as the white SUV?

21      A   The distance, the type of weapon that the

22   suspect had, the distance between the suspect, at that

23   point, and officers.  And there's various factors when

24   that window from transitioning to -- from less-lethal to

01:32   25   lethal force is needed.

**Exhibit 15 - P. 149**

OFFICER PAUL SCOTT                    Confidential                  JOB NO. 280085
JULY 20, 2022

1    appropriate threshold?

2          A    No.

3          Q    When receiving training as a rifle operator, did

4    you ever receive training on how to set a threshold for a

01:34  5    use of force?

6          A    No.

7          Q    During your training as a rifle operator, did

8    you ever train with officers armed with 40-millimeter

9    less-lethal launchers?

01:34 10          A    One more time.

11          Q    During your training as a rifle operator with

12    the Los Angeles Police Department, did you ever conduct

13    training exercises with officers armed with 40-millimeter

14    less-lethal launchers?

01:34 15          A    No.

16          Q    You mentioned that when you set the threshold,

17    you understood it to mean a threshold for the use of

18    less-lethal force, correct?

19          A    Correct.

01:35 20          MS. SMITH:   Objection, misstates his testimony.

21    BY MR. SAEED:

22          Q    In your head, did you believe that the other

23    officers also understood it to mean less-lethal force?

24          A    Yes.

01:35 25          Q    Why did you believe that?

**Exhibit 15 - P. 150**

1       A   Based on the conversation that I had with

2   Officer Galvan, who was over my right shoulder, and the

3   conversations that I heard behind me in regards to the

4   40-millimeter.

01:36   5       Q   You were aware that there was officers on scene

6   with a 40-millimeter less-lethal launcher, correct?

7       A   Yes.

8       Q   Did you have a threshold or distance in mind

9   where the use of lethal force would be necessary based on

01:36  10   Mr. Mendoza's actions?

11      A   No.

12      Q   Was it your intent that should Mr. Mendoza reach

13  that white SUV, that less-lethal force would be used?

14      A   I'm sorry, one more time.

01:37  15      Q   Was it your intent that when Mr. Mendoza reached

16  that white SUV, that less-lethal force would be used?

17      A   My intent was that once Mr. Mendoza reached the

18  white SUV, that that was the time when we needed to start

19  considering using less-lethal.

01:37  20      Q   And was your idea that if less-lethal was used,

21  then officers would have sufficient time and space to

22  determine whether another use of force was necessary?

23      A   Correct.

24      Q   Even a higher level of force, like lethal force.

01:37  25      A   Well, you're constantly reassessing the use of

OFFICER PAUL SCOTT                 Confidential                 JOB NO. 280085
JULY 20, 2022

          1          You can answer based on your understanding.

          2          THE WITNESS:  Officer Galvan had the advantage

          3     of seeing a situation around me where -- and things that

          4     I could not, such as officers to my right, to my left,

01:41    5     conversations going on behind me.  And in that capacity,

          6     he could act as a spotter.

          7     BY MR. SAEED:

          8          Q    What is a spotter?

          9          A    Well, it depends on what the role is and what

01:41   10     the definition, because different departments and

         11     different agencies use them differently.

         12          Q    What is the role of a spotter in the Los Angeles

         13     Police Department while you were an officer there?

         14          A    We don't train with spotters per se.  We don't

01:42   15     have that.  Each operator is their own set of eyes when

         16     it comes to lethal force.

         17          Q    In your rifle training with the Los Angeles

         18     Police Department, were you trained to utilize an officer

         19     as a comm- -- another officer as a communication tool?

01:42   20          A    I'm sorry, one more time?

         21          Q    Sure.  Give me one moment.

         22          In your training as a rifle operator with the

         23     Los Angeles Police Department, were you ever trained to

         24     utilize another officer, like you had utilized Officer

01:42   25     Galvan on May 27, 2020?

**Exhibit 15 - P. 152**

OFFICER PAUL SCOTT        Confidential        JOB NO. 280085
JULY 20, 2022

1      A    During the entire incident?

2      Q    Correct.

3      A    I don't recall.

4      Q    In your interview with the force investigation

01:54   5   division, you told them that you had maintained your

6   finger on the side of the receiver, correct?

7      A    Correct.

8      Q    And you did not tell them that you had placed

9   your finger on the trigger, correct?

01:54   10      A    Correct.

11      Q    One moment, please.

12      A    Uh-huh.

13      Q    On May 27, 2020, when you set the threshold as

14   the white SUV for less-lethal force, did you have in your

01:56   15   mind any threshold for lethal force?

16      A    No.

17      Q    After Mr. Mendoza was shot, you led the team to

18   place him under arrest, correct?

19      A    Correct.

01:57   20      Q    And while you were walking up to Mr. Mendoza as

21   part of the arrest team, you did not know, at that moment

22   in time, that he had been shot with lethal force,

23   correct?

24      A    Correct.

01:57   25      Q    And you did not learn he was shot with lethal

OFFICER PAUL SCOTT                      Confidential                      JOB NO. 280085
JULY 20, 2022

```
 1              THE WITNESS:  Imminent threat is based on the

 2    officer that engages the suspect, what their

 3    interpretation is, not my interpretation.  So -- go

 4    ahead.

02:04  5  BY MR. SAEED:

 6        Q   No, please go ahead, finish.

 7        A   No, I'm finished.

 8        Q   So based on your interpretation of what

 9    constituted an imminent threat of death or great bodily

02:04 10  injury, you did not believe that the white SUV reached

11    that threshold, correct?

12        A   The only reason why the white SUV came into play

13    is because our tactical plan called for less-lethal, and

14    less-lethal was the option at that -- at the white SUV.

02:04 15  It's the only reason why it was in play.  Not as a

16    threshold for imminent threat or, you know, that

17    somebody's going to die or get killed, it's based on our

18    less-lethal option.

19        Q   As a police officer, can you think of any

02:05 20  benefit from an officer firing lethal force at the same

21    time another officer fires less-lethal force?

22              MS. SMITH:  I'm just going to object that that's

23    vague, it's overbroad, it's argumentative, it's an

24    incomplete hypothetical.

02:05 25              I'm also going to object that that's calling for
```

**Exhibit 15 - P. 154**

OFFICER PAUL SCOTT         Confidential         JOB NO. 280085
JULY 20, 2022

```
      1    BY MR. SAEED:

      2        Q   You received training from the Los Angeles

      3    Police Department in addition to just the rifle operator

      4    training, correct?

02:11 5            MS. SMITH:  I'm going to object as vague and

      6    overbroad.  Are you talking about any and all training,

      7    Counsel?

      8            MR. SAEED:  Yes.

      9            MS. SMITH:  You can answer the question.

02:11 10           THE WITNESS:  Yes.

      11   BY MR. SAEED:

      12       Q   In any of those trainings, did you ever perform

      13   a training exercise where various officers utilized

      14   various different kinds of weapon systems?

02:12 15       A   Yes.

      16       Q   In those trainings that you said yes to, was

      17   there ever a situation where the suspect was armed with a

      18   edged weapon?

      19       A   Yes.

02:12 20       Q   And did those trainings involve utilizing

      21   less-lethal force before the utilization of lethal force?

      22       A   When you're able to.

      23       Q   Is that a "yes"?

      24       A   Yes, when you're able to.

02:12 25       Q   One moment, please.
```

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
 1          A    I don't recall if it came from the helicopter or
 2     it came from the patrol car.
 3          Q    Could you hear what any officer was saying,
 4     besides Officer Galvan, during your time before
02:25  5     Mr. Mendoza was shot?
 6          A    Yes.
 7          Q    Before Mr. Mendoza was shot, as you were at the
 8     parked car on the west side of Elmer Street, could you
 9     hear Sergeant Hardacker speaking?
02:26 10          MS. SMITH:  I'm just going to object that that
 11     assumes facts and lacks foundation.
 12          But you can answer.
 13          THE WITNESS:  I hear someone identified as a
 14     sergeant.  I can't -- at that time, I couldn't tell you
02:26 15     exactly who it was.
 16     BY MR. SAEED:
 17          Q    Are you familiar with the Los Angeles Police
 18     Department's policy on the use of force issued on
 19     February 4th, 2020?
02:27 20          A    Use of deadly force or force in general?
 21          Q    Use of deadly force in particular.
 22          A    Yes.
 23          Q    And in that policy, does it state that in
 24     determining whether deadly force is necessary, officers
02:27 25     shall evaluate each situation in light of the particular
```

**Exhibit 15 - P. 156**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

1   circumstances of each case and shall use other available

2   resources and techniques if reasonably safe and feasible?

3        A    Yes.

4        Q    And it is partially based on your understanding

02:28  5   of the Los Angeles Police Department's policy on the use

6   of deadly force that you set the less-lethal threshold as

7   the white SUV?

8        A    Yes.

9        Q    In those times that you had mentioned you had

02:30  10  heard other officers utilize the term "threshold" as you

11  used it on May 27, 2020, did those officers specify that

12  it meant for less-lethal force?

13            MS. SMITH:  Well, I'm just going to object that

14  that assumes facts, it lacks foundation, and it calls for

02:30  15  speculation as to when or why the word "threshold" was

16  ever used.

17            You can answer if you understand the question.

18            THE WITNESS:  Can you repeat the question one

19  more time.

02:30  20            MR. SAEED:  Madame Reporter, can you repeat

21  that.

22            (The record was read as follows:

23            "Question:  In those times that you

24            had mentioned you had heard other

02:30  25            officers utilize the term 'threshold'

**Exhibit 15 - P. 157**

1                    as you used it on May 27, 2020, did

2                    those officers specify that it meant

3                    for less-lethal force?")

4                    THE WITNESS:  No.

02:31  5    BY MR. SAEED:

6          Q    But you understood those references to

7    "threshold" during those incidents as meaning less-lethal

8    force?

9                    MS. SMITH:  I object that that's overbroad, it

02:31 10    lacks foundation, it calls for speculation.

11                    You can answer.

12                    THE WITNESS:  I think it would have to be on a

13    case-by-case basis as to what the meaning was.

14    BY MR. SAEED:

02:32 15          Q    Based on the circumstances as present on scene?

16          A    The day of?

17          Q    Those prior instances --

18          A    Oh.

19          Q    -- when you heard the term "threshold" being

02:32 20    used, that's what I'm asking about.

21          A    Again, it's a generic term.  It can be applied

22    multiple ways.  So it would have to be on a case-by-case,

23    you know, in reference to it being used in the past.

24          Q    When you say "generic term," you mean that the

02:32 25    word can be understood in various different ways.

**Exhibit 15 - P. 158**

OFFICER PAUL SCOTT                    Confidential                    JOB NO. 280085
JULY 20, 2022

```
        1       A    Correct.

        2       Q    And you've never received training regarding how

        3   to use that term in different ways, correct?

        4           MS. SMITH:  Are you asking training from the

02:32   5   LAPD or training in his life?

        6           MR. SAEED:  Training from the LAPD.

        7           MS. SMITH:  Okay.

        8           THE WITNESS:  No.

        9   BY MR. SAEED:

02:32  10       Q    Thank you, Officer Scott.  I appreciate it.

       11           MR. SAEED:  I have no further questions,

       12   Counsel.

       13           THE WITNESS:  Thank you.

       14           MR. SMITH:  I don't have any questions.

02:33  15           MS. SMITH:  No questions.

       16           MR. SAEED:  I think, then, we could go off

       17   record.

       18           MS. SMITH:  Okay.

       19           THE VIDEO RECORDER:  We are off the record.  The

02:33  20   time is 2:33 p.m.

       21           (The deposition was concluded at 2:33 p.m.)

       22   //

       23   //

       24

       25
```

1

2

3

4

5

6

7       I, OFFICER PAUL SCOTT, do hereby declare under

8  penalty of perjury, under the laws of the United States,

9  that I have read the foregoing transcript; that I have

10 made such corrections as noted herein, in ink, initialed

11 by me, or attached hereto; that my testimony as contained

12 herein, as corrected, is true and correct.

13       EXECUTED this _____ day of _____,

14 20_____, at _____, _____.
                    (City)                    (State)

15

16

17       _____
                    OFFICER PAUL SCOTT

18

19

20

21

22

23

24

25

```
 1    STATE OF CALIFORNIA        )
                                 : ss
 2    COUNTY OF LOS ANGELES      )

 3

 4           I, the undersigned, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify:

 6           That the foregoing proceedings were taken before

 7    me at the time and place herein set forth; that any

 8    witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is a true record

13    of the testimony given.

14           Before completion of the deposition, review of

15    the transcript [X] was [ ] was not requested.  If

16    requested, any changes made by the deponent (and provided

17    to the reporter) during the period allowed are appended

18    hereto.

19           I further certify that I am not interested in

20    the outcome of the action.

21           WITNESS my hand this date

22    July 22nd, 2022.

23

24           Monica T. Vogelbacher

25           MONICA T. VOGELBACHER, CSR No. 6406
```